# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DWAYNE GRANT, Individually and as
Next Friend for D.G., D.G., D.G., and
D.G.;
ANTHONY MOORER SR., Individually
and as Next Friend for A.M., A.M., and
A.M.;
LANETTE WILLIAMS., Individually and as
Next Friend for S.W., and J.W.;
TIA SHAW., Individually and as Next Friend
for B.S.;
SHANIA MARTIN, Individually and as
Next Friend for K.H., D.H., D.H., and
D.H.;
MARLENE SNEAD, Individually and
as Next Friend for J.C., D.F., J.C.,
and B.B.;
DONEALA HINES; Individually and as
Next Friend for T.W.;
YONINIHA PARKER, Individually and as
Next Friend for W.P., M.P., and L.P.;
JAMALL D. MCELRATH, Individually and
as Next Friend for J.M., J.M., and C.M.;
SANDRA WALKER, Individually and as
Next Friend for Z.A. and S.W.;
CARLESHA WILLIAMS, Individually and
as Next Friend for D.W. and J.S.;
Individually: CHERITA BYNUM
Individually: TINA HUGHES
Individually: SANDRA ANDERSON
Individually: DIANE COLE
Individually: JASARIA CHATWOOD

Case No.:

Honorable Judge Robert J. Jonker

Individually: DYONDREA GRANT
Individually: DONNESHA HARRELL
Individually: BETTY J. WILLIAMS
Individually: GLORIA OSBY
Individually: DIANE WILLIAMS
Individually: ISIS SANDERS
Individually: SYLVIA S. TIBBS
Individually: ANNIECE WASHINGTON
Individually: MARY HOWARD
Individually: MELVIN HOWARD
Individually: DENNIS GUIDRY
Individually: MICHAEL GUIDRY
Individually: BRENDA K. MOORE
Individually: DENISE HOPKINS
Individually: JOHN MCCOY
Individually: BRIAN MCGHEE
Individually and on behalf of themselves and
all other similarly situated Plaintiffs of
the Benton Harbor Lead Water Crisis

         Plaintiffs,

               v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
and its Administrators MICHAEL S. REAGAN
and DEBRA SHORE, Individually and in their
official capacities;
GOVERNOR GRETCHEN WHITMER,
Individually and in her official capacities;
STATE OF MICHIGAN-ENVIRONMENTAL,
GREAT LAKES, & ENERGY; and its Director
LIESL CLARK, Individually and in her official
capacities; DRINKING WATER UNIT
DIRECTOR ERIC OSWALD, Individually
and in his official capacities; MICHIGAN
DEPARTMENT OF HEALTH & HUMAN
SERVICES; and its DIRECTORS ROBERT
GORDON and ELIZABETH HERTEL,
Individually and in their official capacities;

THE CITY OF BENTON HARBOR, a
municipal corporation and its subsidiary
BENTON HARBOR WATER DEPARTMENT;
MAYOR MARCUS MUHAMMAD,
Individually and in his official capacities;
WATER PLANT OPERATOR MICHAEL
O'MALLEY, Individually and in his
official capacities; CITY OF BENTON
HARBOR CITY MANAGERS DARWIN
WATSON & ELLIS MITCHELL, Individually
and in their official capacities; ELHORN
ENGINEERING COMPANY; F&V
RESOURCE MANAGEMENT INC.; and
any unknown, yet to be discovered liable
persons or entities.

        Defendants.

_____ /

    Attorney John R. Beason III
    (D.C. Bar No.1721583)
    **The J.R. Beason Firm PLLC.**
    Attorney for the Plaintiffs
    853 McAlister St.
    Benton Harbor, MI 49022
    JRBeason3@TheJRBeasonFirm.com

## PLAINTIFFS' CLASS ACTION COMPLAINT, REQUEST FOR EQUITABLE RELIEF, AND DAMAGES

    There is another action which arises out of the same
transaction and occurrence as stated herein, which was
previously filed and presently pending assignment
to a Judge in this court.

(1)

The proposed Plaintiff Class, (Plaintiff Class), Residents of Benton Harbor, MI, through counsel, comes and brings this class-action suit for tort based constitutional violations against the Defendants, namely: violations of the equal protection and due process clauses, substantiating: willful neglect of duty, gross negligence, failure to warn, battery, assault, trespass to property, public and private nuisance, unjust enrichment, and wrongful death. This class action complaint is brought on behalf of approximately ten thousand Michigan citizens (The Class), residents of the City of Benton Harbor, whom from at least 2018 to the present, have experienced and will continue to experience human rights violations, irreparable bodily injury,  deteriorative property damage, consistent assaults, mental anguish, and emotional distress due to the presence and ingestion of toxic lead contaminants in their tap water.  The Class asserts that these violations of their unalienable human and constitutional rights were caused by the Defendants' unconstitutional, deliberate misconduct and nonfeasance.

(2)

## INTRODUCTION

This is a Civil Action asserting claims under federal and state law alleging violations of equal protection, due process, disparate treatment, willful neglect of duty, gross negligence, assault, battery, unjust enrichment, and intentional infliction of emotional distress. in violation of the U.S. Const. amend. XIV, U.S. Const. amend. V, 42 U.S.C.A. § 300g-6, MI Const. Art 1 §17, M.C.L.A. § 325.1019, M.C.L.A. § 600.2959, M.C.L.A. § 750.81,

M.C.L.A § 600.2948, and M.C.L.A. § 600.2922, M.C.L.A. § 750.478.  The Class Plaintiffs requests a jury trial and seeks declaratory, injunctive relief, and equitable relief, as well an award of compensatory, hedonic, and punitive damages, as well as reasonable attorney fees, and cost pursuant to M.C.L.A.  § 325.1022, M.C.L.A. § 600.6305 , and 42 U.S.C.A. § 1983.

(3)

## JURISDICTION & VENUE

This court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C § 139, as all plaintiffs and the majority of the Defendants reside in the Western District of Michigan, as well the occurrence of the significant and relevant incidents giving rise to suit taking place in Benton Harbor, MI; within the jurisdiction of this Court.

(4)

## THE PARTIES

(5)

## THE PLAINTIFF CLASS

Plaintiff Class are citizens of the State of Michigan and residents in the City of Benton Harbor, within the County of Berrien.

(6)

Plaintiffs Melvin and Mary Howard, of Benton Harbor, MI, County of Berrien, unknowingly consumed toxic water for three years due to the actions of the Defendants. The Great-Grandparents both suffer from chronic headaches and hypertension.  In addition to their ailments, they are gravely concerned for their Great-Grandsons, all of whom have been diagnosed with learning disabilities.

(7)

Cherita Bynum, of Benton Harbor, MI, County of Berrien, did not relate her symptoms to lead (Pb) exposure until October of 2021.  In 2019, Ms. Bynum became ill with MSRA, a severe infection, in her foot.  She traveled and labored to see several medical professionals, none of which could explain the cause of her random illness.  Since the toxic lead-water exposure in Benton Harbor, MI has been revealed, Ms. Bynum now believes that her high blood pressure, chronic headaches, and mysterious MSRA battle are all caused by toxic levels of lead (Pb) in the public water system.  Ms. Bynum stated in her letter to counsel, "*I really hope, Mr. Beason, that you can help the people of this community... my stomach turned behind these nasty pipes that have never been changed; rust, germs, bacteria; we wonder why we are sick?...We are tired of all this secretive, underhanded, hiding from the public. It's not fair! A secret, somebody has to answer for it!*"

(8)

Plaintiff Betty J. Williams, resident of Benton Harbor, MI, County of Berrien, is an Eighty-Eight year old home owner and victim.  Mrs. Williams has suffered from heightened hypertension, fatigue, and has been diagnosed with kidney cancer since she began digesting lead-water at least between 2018 and 2021.  Mrs. Williams, at Eighty Eight years old, finds procuring, storing, and opening bottled water containers painful and exhausting.  The thought of surviving two years depending on bottled waters to cook and drink is dreadful and an extreme, inhumane condition.  Mrs. Williams also fears that her home's pipes have been destroyed as a result of the City's lead water crisis.  Mrs. Williams is also a pet owner whose dog has ingested toxic lead water for at least three consecutive years.  While all dogs shed,  Mrs. Williams' dog "Piper", is essentially going bald, destroying vacuums and creating another nuisance for her in the home.  Mrs. Williams' dog quickly loss her hearing and mobility, often getting stuck in the home and requiring Mrs. Williams to seek assistance on her behalf.  Mrs. Williams feels that she and her fellow residents need to be compensated for the stress, pain, and suffering they have endured as a result of the actions and inactions of the Defendants.

(9)

Plaintiff Shania Martin is a Forty year old native and resident of Benton Harbor, MI in the County of Berrien.  Ms. Martin suffers from hypertension, chronic headaches, joint pains, and fatigue.  A mother of four, Ms. Martin's daughters suffer from similar symptoms at

very young ages.  Ms. Martin's sons suffer from attention deficit disorder and hyperactivity (ADHD), both known developmental disabilities associated with lead (Pb) exposure.  Mrs. Martin fears for her infant child who was born into the ongoing Benton Harbor water crisis.

(10)

Plaintiffs Dwayne and Deondrea Grant, husband and wife, and their four children, are residents of Benton Harbor, MI, County of Berrien.  Two of the four Grant children suffer from hearing impairments, with one child's hearing slowly worsening over time.

(11)

Mrs. Gloria Osby, a life-long resident of Benton Harbor, MI, County of Berrien, ingested statutorily illegal neurotoxic lead-water for approximately three years or longer.  She now suffers from memory loss, headaches, fatigue, and hypertension.  Mrs. Osby's fatigue affects all areas of her life, essentially making it tiring to live.

(12)

Plaintiffs, Residents of Benton Harbor, MI, County of Berrien, Anthony Moorer Sr., his wife Jasaria Chatwood, and their children, as a family, suffer from symptoms of toxic lead-exposure.  Anthony Moorer Sr, suffers from rashes, joint pains, memory loss, chronic headaches, and insomnia since moving back home to Benton Harbor, MI from Grand

Rapids, MI in 2017.  Mr. Moorer's children were born with digestive issues and now endure slow growth, hyperactivity, irritability, and learning disabilities.

(13)

Plaintiffs, Brothers Dennis and Michael Guidry, both residents in Benton Harbor, MI, County of Berrien, suffer from similar health issues; hypertension and chronic headaches. The elder brother, Dennis Guidry, over the last decade, has resided in both Flint, MI and Benton Harbor, MI.  Mr. Guidry feels that he has unknowingly received a double dose of toxic lead-water exposure solely because of his consistent presence in two Michigan cities known for their robust African-American communities.

(14)

Plaintiff Damond Gilbert, resident in Benton Harbor, MI, County of Berrien, is disheartened and appalled by the loss of clean drinking water in the Benton Harbor Public Water System.  In his letter to counsel he states: "Something needs to be done about these pipes. I mean, we have been here all of our lives, drinking this water for years and never have the pipes been changed. Not to mention, I have grandbabies who are born into this world drinking this water also!"   Mr. Gilbert, a proud grandfather, suffers from hypertension and chronic headaches.

(15)

Plaintiff Doneala Hines is a lifetime resident and mother in Benton Harbor, MI.  Since ingesting toxic levels of lead for the past three years, she, like many others, now suffers from chronic migraines and her child is suffering from learning disorders, slow growth, and developmental delays.

(16)

Plaintiff Sandra Anderson, of Benton Harbor, MI, County of Berrien, has been ingesting Benton Harbor water all of her life as well.  Lead levels in her home were extremely high at 8ppb, egregiously beyond legal limits. She also suffers from hypertension, chronic headaches, fatigue, and joint and muscle pains.

(17)

Benton Harbor native, Plaintiff Desiree Lewis, is a mother of three children; she lives and works in the City of Benton Harbor, MI, County of Berrien.  Ms. Lewis reports that all three of her children have behavior problems and suffer through slow growth and hyperactivity.  Ms. Lewis reports enduring constant hospital visits in relation to her own high blood pressure and chronic headaches. In addition to the mental and physical health issues of herself and her children, Ms. Lewis is also angry and distraught at the thought of the public tap water being secretly toxic for years.

(18)

Plaintiff Mr. John McCoy, of Benton Harbor, MI, County of Berrien, was the victim of a violent crime in 2014.  Mr. McCoy was stabbed seven times by four young Benton Harbor men, in a case of mistaken identity.  After three years of toxic lead water exposure, Mr. McCoy suffers from hypertension, fatigue, and headaches.  Mr. McCoy believes his imprisoned assailants were exposed to low levels of lead throughout their lives because the City's lead service lines have never been changed, and that the neurotoxic side-effects may have contributed to the culminating of his stabbing in 2014.  Mr. McCoy believes the City and State have been covering up lead in the water for longer than three years; applying the common American cultural phrase, "once a liar, always a liar", both forward into the future, and retroactively into the past.

(19)

Tia Shaw and her son are both suffering from lead exposure complications.  Mrs. Shaw's son has been diagnosed with lead poisoning and learning disorders while she herself is suffering from chronic memory loss after unknowingly drinking toxic contaminated water in Benton Harbor, MI.

(20)

Diane Cole is also a lifetime resident of Benton Harbor, MI, County of Berrien.  Ms. Cole expressed how she struggles to get heavy packages of water, (dropped off at her door as part of the State of Michigan's response to the lead-water crisis), from her doorstep and

into her home.  Mrs. Cole suffers from hypertension and kidney cancer, having one of her kidneys removed already, she fears that slow, low level exposure to lead has caused her intense health complications.

(21)

Carlesha Williams is a current and lifetime resident of Benton Harbor, MI, County of Berrien.  Mrs. Williams, her husband, and sons have been ingesting lead (Pb) contaminated water for three consecutive years. The children, like many children in Benton Harbor, are now suffering from developmental delays and learning disorders.

(22)

## THE DEFENDANTS

Defendants U.S. Environmental Protection Agency, Administrator Michael S. Reagan, Region 5 Administrator Debra Shore, Gov. Gretchen Whitmer, State of Michigan Environment, Great Lakes, & Energy, EGLE Director Liesl Clark, Drinking Water Unit Director Eric Oswald, Michigan Department of Health and Human Services and Directors Robert Gordon and Elizabeth Hertel, the City of Benton Harbor as a municipal corporation, Benton Harbor Water Department, City of Benton Harbor Mayor Marcus Muhammad, Benton Harbor Water Plant and Chief Operator Michael O'Mally, Elhorn Engineering Company, and  F&V Operations and Resource Management Inc., are all West Michigan

residents and or corporate entities with active residences or primary places of business within the jurisdiction of this Court.

(23)

## FACTS GIVING RISE TO COMPLAINT

In 1998 Benton Harbor, MI city officials applied for grants, loans, and or other state and federal support to address deterioration in the city's water system.  Over the past several decades, despite being eligible for such support, Benton Harbor residents were denied the needed upgrades.   Between 1998 and 2011, Benton Harbor's hundred year old water system received no repairs before the State of Michigan began appointing "Emergency Managers" to restructure "economically distressed" cities within the State.  Despite several cities and school districts qualifying as "economically distressed", the State's "Public Act 4 of 2011" and "Public Act 436 of 2012" were applied almost exclusively to minority communities and school districts; namely the communities and districts of Benton Harbor, Detroit Public Schools, Ecourse, Pontiac, Flint, Highland Park Schools, and Muskegon Heights Schools, with Allen Park and Hamtramck Michigan being the sole two cities without majority or large African American populations, albeit both are present within the greater metro-Detroit area.  For roughly five years, Benton Harbor, MI had its city works and water plant staff shaved to a perceived bare operating minimum.  The Class asserts that the former city workers complained about the need for repairs and eradication of lead

service lines up until they were laid off by the State appointed Emergency City Manager, who despite depleting the city's public works staff, made no arrangements for further maintenance or compliance of the city's water system with federal regulations.

(24)

Understaffed and poorly funded, from 2015 to 2018, The Benton Harbor City Water Plant operator Michael O'Malley and his staff engaged in a habitual practice of misconduct and safe drinking water regulation violations, failing to maintain records, pass inspections, and or comply with state and federal laws.  During the same time period, elected State representatives, appointed environmental department directors, local county and city officials were, or should have been aware of the lack of funding, mismanagement, and failures of compliance, but did not act to aid the residents of Benton Harbor, MI in any way.  Unable to meet water plant compliance standards without proper funding and support, the City of Benton Harbor Defendants sought several extensions and exemptions from State of Michigan regulators, all of which were granted without being coupled with adequate funding or guidance support, directly creating the current lead-water crisis giving rise to this suit.  The State of Michigan EGLE granted the City of Benton Harbor at least five extensions to comply with a March 2019 administrative order handed down due to pre-lead exceedance compliance failures.  Prior to, during, and after the State's emergency financial management of the City of Benton Harbor, water quality violations remained

common and the State failed to cite and or support Benton Harbor Residents in attaining

suitable, safe drinking water.  Issues with Benton Harbor's water compliance should have

been known to the State and its EGLE and Health & Human Services Departments, and

their appointed directors, as a priority human rights issue at least since the times of the

city's unilaterally assigned "Emergency Financial Manager", whose sole purpose, as

promoted, was to restructure and prioritize the city's functions.  In its customs and policies

of excusing the Benton Harbor City Defendants' consistent compliance violations, the

State of Michigan created and participated in a pattern of habitual nonfeasance.  Despite

several violations of SDWA 40 CFR  §141, the State of Michigan Defendants failed to cite

and or resolve the City Defendants violations, nor did the State take any actions within

their broad enforcement powers to protect the Plaintiff Class.  Adding to the confusion, the

United States Environmental Protection Agency failed to issue revisions to the Consumer

Confidence Report Regulations by October 23rd, 2020, a nondiscretionary duty pursuant to

42 U.S.C. $ 3009-3(c)(4).

(25)

Under the Safe Water Drinking Act, community water systems must regularly issue

right-to-know reports to the more than 300 million public drinking water consumers across

the country.  These reports, termed under the statute as "consumer confidence reports",

must give consumers important information about the safety of their drinking water,

including (among other things) the presence of certain contaminants in their tap water and any violations of national primary drinking water regulations. 42 U.S-C. $ 300g-3(c)(4). The United States Environmental Protection Agency was required by law to make these reports more understandable and useful, and to increase reporting frequency for many consumers.  After the now infamous Flint lead-water crisis, similar incidents occured in East Chicago, Indiana and Newark, New Jersey.  In 2020, two years after Class Plaintiffs in this complaint began ingesting toxic lead-water, the EPA had not published or even proposed any new rules to ensure the public's awareness or protection as mandated by federal statute.

(26)

In October of 2018, City of Benton Harbor sample water test revealed extremely high lead levels, beyond three times the acceptable limit under the Safe Water Drinking Act (SDWA 40 CFR  §141.  This lead level exceedance triggered a series of statutorily mandatory actions that were not taken by the Defendants, including the duty to send out adequate public notice within three days to any and all persons who use City water and could possibly be affected by the toxic contaminants.

(27)

From at least October of 2018 to October of 2021, Plaintiff Class members unknowingly paid for and ingested extremely high levels of toxic lead contaminants, unfit for the

intended uses of cooking food, bathing, and oral hygiene.  Like all people, Class members need and use fresh water for innumerable parts of their lives.  Most cases of lead poisoning are due to chronic low-dose exposure. Since symptoms of slow lead poisoning are mainly emotional and mental in nature, lead poisoning may be the last thing people suspect. Children are at the greatest risk. Lead can delay physical and mental development in babies and young children. In adults, slow accumulation of lead can result in kidney and nervous system damage, anemia, stroke or cancer." (Pedersen & @LiveScience, *Facts About Lead | Live Science* 2021).

> "It is widely recognized that Pb (lead) exposure exerts toxic effects in every organ system, especially the central nervous system (CNS). Brain damage induced by Pb may result in a variety of neurological disorders, including mental retardation (Sanders et al., 2009) Alzheimer's disease, Parkinson's disease (Monnet-Tschudi et al., 2006) and schizophrenia (Opler et al., 2008). In addition, the neurotoxic effects of lead exposure may cause behavioral problems such as attention deficit hyperactivity disorder, juvenile delinquency, and criminality (Pihl and Ervin, 1990; Wright et al., 2008). In addition, lead can adversely affect general intellectual functioning (Sanders et al., 2009), visuospatial function (Weisskopf et al., 2007), and verbal learning and memory (Bleecker et al., 2005). Furthermore, recent studies have demonstrated that executive function may be at risk in Pb-induced neurotoxicity (Trope et al., 2001; Canfield et al., 2004). Most works on executive dysfunction focus on children and only a few aim to analyze adult workers exposed to Pb (Trope et al., 2001; Canfield et al., 2004; Sanders et al., 2009). Since adult occupational exposure and childhood developmental exposure to Pb cause cognitive and behavioral alterations (Sanders et al., 2009; National Toxicology Program, 2012), studies on workers exposed to the pollutant are needed to clarify Pb neurotoxicity related to executive functions. (Martínez-Lazcano et al., A Hypothesis of the Interaction of the Nitrergic and Serotonergic Systems in Aggressive Behavior Induced by Exposure to Lead 2021).

(28)

In the three years of known toxic lead exposure, Benton Harbor residents, especially its adolescents, suffered and endured crime rates five and six times the national average.  The Governor's Office, Federal Bureau of Investigation, Michigan State Police, Berrien County Sheriff's Department, and Benton Harbor City officials colluded to recklessly import excessive, external law enforcement officers into the city and upon city residents while being fully aware that the Plaintiff Class was suffering from toxic lead exposure and were in need of fresh drinking water.  During the same time period, Governor Whitmer's office and treasury department attempted to close Benton Harbor High School, citing low performance and "economic distress". At no time while importing law enforcement officers into the city or pursuing school closures did the Defendants, the Governor of the State Michigan, the Mayor of the City of Benton Harbor, nor any of their Defendant colleagues inform the Class of the neurotoxic lead-water they were consuming.

(29)

Between 2018 and 2021, Defendants Michael O'Malley and State of Michigan EGLE specialist debated and argued back and forth about the City's inability to fund compliance with state and federal regulations and the best method to resolve the lead problem, all while The Class Plaintiffs ingested contaminated water, endured the consequences, and continued to suffer from the unconstitutional nonfeasance of the Defendants' failure to warn the public.  City Defendants wanted to pursue lead service line replacement, while State

Defendants (EGLE), chose to demand corrosive control measures as the most adequate response to water plant compliance issues and the lead exceedance.

(30)

In 2018, the City Defendants contracted Defendants Elhorn Engineering and F&V Resource Management Inc. to assist in the maintenance and management of the water plant, as well as consulting and guidance directed towards achieving compliance with state and federal water regulations; namely, a mandatory follow-up study to be conducted and concluded in response to the 2018 lead exceedance.  The City Defendants and the contracted Defendants of Elhorn Engineering Co. and F&V Resource Management Inc. failed to meet the study deadline, as well as to attain an effective corrosive control admixture within a reasonable time.  In response, and consistent with their pattern of nonfeasance, the State Defendants failed to cite the City for compliance failures or fund the City towards regulation compliance in any significant way.

(31)

In May 2020, the Defendants, The City and the State of Michigan, applied for a nearly $15 million grant from the U.S. Environmental Protection Agency to help replace lead pipes and conduct a required corrosion control study for a city of ten thousand residents that couldn't afford such measures on its own.  Eventually City Defendants received notice later that year that they would receive grant funding, but far less than they sought in their

application: a mere $5.6 million, far less than what is needed to restore the human right of safe drinking water to the Plaintiffs.  The funds reached the Defendants in June of 2021. Simultaneously, City of Benton Harbor Defendants were unable to receive State grants allegedly because of covid-19 related administrative decisions to reduce spending.

(32)

On September 9th, 2021, the Benton Harbor Community Water Council (BHCWC) filed an emergency petition with the United States Environmental Protection Agency with the caption reading:    "*Petition for Emergency Action under the Safe Drinking Water Act, 42 U.S.C. §300i and 42 U.S.C. §300j-l(b), to Abate the Imminent and  Substantial Endangerment to Benton Harbor, Michigan Residents  from Lead Contamination in Drinking Water*" According to the BHCWC Petition, the lead levels in Benton Harbor, MI rose consistently between 2018 and 2021, from 0-60 to 0-889 while remaining at least eight to twelve "sites" above the actionable contaminant level.  (*Ibid.*, Petition for Emergency Action Under the Safe Drinking Water Act, 42 U.S.C. §300i and 42 U.S.C. § 300j-l(b) to Abate the Imminent and Substantial  Endangerment to Benton Harbor, Michigan Residents from Lead Contaminated  Drinking Water.)

(33)

In a hearing with state elected officials on October, 21st of 2021, Defendant EGLE Director admitted that corrosive control measures "take a long time...it takes a while" to

configure an appropriate chemical mix to effectively coat toxic lead service lines. Clearly stating his understanding that he and his agency willfully exposed the Plaintiff class to contaminated tap water for substantial periods of time.  As to date, the City Defendant's Corrosive Control study has yet to be completed.  An initial five year plan, after three years of secrecy was rebuffed by the EPA and a new plan to have suitable water restored by 2023 has been touted by the Defendants.

(34)

During this entire process, for at least three years, the Class went unwarned of the imminent and present danger within and around them at all times.  The Class consistently paid some of the highest water bills in the county of Berrien and Southwest Michigan, only to receive what equates to be poison corroding their home's pipes, possessing no functional use or value.  The Class' Plaintiffs report enduring skin irritation, hives, flaking, peeling skin, and other ailments from bathing in the water currently running into their homes and schools.  Since the imminent threat of lead water has been properly announced to the public, and the community has removed itself from the City's tap water, the Plaintiffs report a drastic and noticeable drop in violent crimes.

(35)

**THE PLAINTIFF CLASS' ALLEGATIONS**

(36)

The Class realleges paragraphs 1-36

The Plaintiffs of Benton Harbor, MI bring this case as a proposed class action under
Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

(37)

This action is brought by the named Plaintiffs on behalf of all Benton Harbor
residents whom from at least September 2018 to present, were exposed to
neurotoxic contaminated water, which contained high levels of lead (Pb), and have
experienced various derivative injuries,  both physical and or emotionally, to their
person, property, and dignity as human beings. Continuing harms such as daily
nuisances and assaults are ongoing because the toxic lead-water contamination has
not been abated.

(38)

Benton Harbor, MI is a minority community in Southwest Michigan composed of
eighty-five percent African-Americans and five percent Mexican Americans, making
the community's population of approximately 10,000 citizens a protected class under
federal equal protection laws.  The number of Benton Harbor residents affected by
the misconduct and willful neglect of duty of the Defendants is in the thousands. In a
short time, hundreds of residents have already registered with the J.R. Beason Firm
PLLC. to be added as Class Plaintiffs in this complaint, and any other claims arising

22

out of the facts giving rise to the City of Benton Harbor lead-water crisis.

(39)

The named Plaintiffs and the Benton Harbor Plaintiff Class are so numerous so as to make adjudication of individual claims impractical and expose plaintiffs to inconsistent remedies.  There are common questions of law and fact as to the entire class of Benton Harbor residents, any employees working within the city, and their employers operating within city limits and these common questions of facts and law that cover all Benton Residents and persons regularly present in the city using tap water that are most practically and efficiently adjudicated together as a class.

(40)

The named representatives of the Plaintiff Class assert unequivocally that their primary concern is justice and seeking adequate remedies for the harms suffered by all Benton Harbor residents.  The named class is varied and covers a focused cross-section of the community; children and elderly residents, home owners and persons employed within the city.  These named Plaintiffs, and thousands of other unnamed plaintiffs, suffer from hearing impairments, memory loss, fatigue, behavioral disorders, developmental disabilities, hypertension, kidney cancer, anxiety, emotional distress, and the general burden and nuisance of surviving without an adequate public water system.

(41)

The claims and defenses of any interested and concerned plaintiffs or defendants not named would be best served by this Plaintiff Class of Benton Harbor and their selected counsel.  The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members, including but not limited to assault, battery, and public nuisance causing both non-economic injury and economic injury.

(42)

The Plaintiffs Class's representative, Attorney John R. Beason III, will exhaust all legal remedies and claims on behalf of the resident-victims of Benton Harbor, MI; and fight vigorously to adequately and fairly protect the interest of all concerned persons.  Plaintiffs' counsel is aware of a conflict of interest between the class representatives in this complaint and the proposed class members represented in a previously filed and pending class action arising out of these same facts.  The absent class members represented in this complaint, and those registered with the J.R. Beason Firm PLLC., approximately four hundred residents to date, seek to hold Defendants liable for "willful neglect of duty", "Public Nuisance", "Wrongful Death", and "Negligent Failure to Warn under Products Liability".  These community members believe this complaint and representation can fully articulate and appreciate the unique gravity, depth, and breadth of the wrongs previously committed against the Plaintiff Class of Benton Harbor, MI, the harms they are continuing to suffer on a day to day basis, as well as the harms they will endure in

the future.  With  respect to all pertinent matters and claims at issue in this litigation; the class representatives swear to strenuously litigate this suit and any unknown claims on behalf of the Class against any and all applicable defendants, known or yet to be revealed.  The Class Representatives are represented by counsel of their choice, A Benton Harbor, MI native and resident. Attorney Beason III is a former school BHAS district alumni and substitute teacher with an extensive, acute, and intimate understanding of the Plaintiff Class as well as the distinct issues facing the Southwestern Michigan community.  Between 2011 and 2014, Mr. Beason worked with Benton Harbor  K-12 youths daily, often in special needs classrooms, seeing and learning first hand the effects of low-level lead poisoning.  Now a federal practitioner, Attorney Beason is licensed to practice law in the federal districts of the District of Columbia, the Eastern and Western Districts of the State of Michigan, and the Eastern District of the State of Wisconsin.  Attorney John R. Beason III is competent in constitutional and human rights jurisprudence, and is an active member of the International Bar Association.  The J.R. Beason Firm PLLC. and Attorney John R. Beason III have worked closely with the Plaintiff Class members, speaking directly to hundreds of citizens to carefully understand the community's story, concerns, needs, and demands for justice.

(43)

This proposed Plaintiff Class' counsel has vetted, investigated, and expended considerable time and resources pursuing all claims and competently representing

the Class of Benton Harbor, MI Plaintiffs.  Furthermore, the Class members listed in this complaint have expressed that they believe the community will be best served and represented by legal counsel present within the jurisdiction of the Court and the City of Benton Harbor, MI

(44)

The Plaintiff Class' allegations against the Defendants for unconstitutional willful neglect of duty, gross negligence, and other violations of law are typically applicable to all existing Plaintiffs, necessitating a remedy which is sufficient in its scope for declaratory, equitable and injunctive relief for the entire Class of potential plaintiffs.

(45)

## COUNT I.

## VIOLATION OF M.C.L.A.  § 750.478: WILLFUL NEGLECT OF DUTY BY PUBLIC OFFICER OR EMPLOYEE OR PERSON HOLDING PUBLIC TRUST

(46)

The Class reallege paragraphs 1-46.

(47)

The Defendants committed willful neglect of duty when they acted with deliberate forbearance to intentionally and knowingly, purposely misbehave and engage in wrongful conduct when they willfully and consciously withheld information about the presence of neurotoxic lead contaminants in Benton Harbor City tap water.

"When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00." Mich. Comp. Laws Ann. § 750.478 (West). For purposes of the statute setting forth the offense of willful neglect of duty by a public officer, willful neglect of a duty required by law to be performed by an officer, i.e., deliberate forbearance, necessarily entails the intent to intentionally, knowingly, and purposely misbehave and engage in wrongful conduct. People v. Waterstone (2012) 818 N.W.2d 432, 296 Mich.App. 121.

(48)

This "Statute setting forth the offense of willful neglect of duty by a public officer, which punishes the willful neglect of duty, necessarily encompasses the element of corrupt behavior, and corrupt behavior is also an element of misconduct in office committed through nonfeasance." People v. Waterstone (2012) 818 N.W.2d 432, 296 Mich.App. 121.  The corrupt behavior alleged by the Plaintiffs of the Defendants is their possession of pertinent information about the presence of egregiously excessive levels of lead contaminants in Benton Harbor City tap water and their continuous failure to warn residents and present persons of the imminent and dangerous threat around them.  As public officers, employees, or persons holding a public trust, as well as Public Water suppliers, the Defendants possessed statutory duty to warn the

public pursuant to M.C.L.A. 325.1019 which reads: "If water delivered by or the operation of a public water supply is found not to be in compliance with the state drinking water standards, the department shall require the supplier of water to notify its users of the extent and nature of the noncompliance. Notification of users must be in a form and manner prescribed or otherwise approved by the department. Mich. Comp. Laws Ann. § 325.1019 (West).

(49)

The Defendants committed egregious and outrageous willful neglect of duty, shocking the consciousness of a reasonable person when, for three consecutive years, they acted with deliberate forbearance to intentionally and knowingly, willfully and consciously withhold information and fail to warn the Plaintiff Class about the presence and their ingestion of neurotoxic lead contaminants in Benton Harbor City tap water from at least 2018 to the present.

(50)

## COUNT II.

## VIOLATION OF DUE PROCESS PURSUANT TO  U.S.C.A. CONST. AMEND. XIV, § 1-PRIVILEGES/DUE PROC--ALL DEFENDANTS

(51)

The Class realleges paragraphs 1-51.

(52)

The Defendants violated the Class Plaintiff's right to due process under the U.S. Constitution's 14th Amendment when they exposed the Class to toxic contaminated lead water, failed to warn them, and caused them to suffer various ailments, property damage, mental and physical illnesses, and emotional distress associated with toxic lead-water exposure and ingestion.

(53)

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1-Privileges. "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1-Due Proc.

(54)

"The Fourteenth Amendment's Due Process Clause significantly restricts government action; its core is preventing the government from abusing its power, or employing it as an instrument of oppression." Guertin v. State, 912 F.3d 907 (6th Cir. 2019), cert. denied sub nom. City of Flint, Michigan v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and cert. denied sub nom. Busch v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020).  "The substantive due process aspect of the Fourteenth Amendment protects against conscience-shocking deprivations of liberty." In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).

(55)

In exposing the Plaintiff Class to lead-water with extremely high rates of toxicity, allowing them to ingest and bathe in the poisonous contaminants for three years without forewarning or access to safe drinking water, the Defendants acted, in their positions as public officers, employees, and persons holding a public trust i.e., operation of the Public Water System, to oppress the Plaintiff Class,  abuse their power, and shock the conscience of an informed reasonable person when they deprived the Plaintiffs of fundamental, universally recognized liberties such as bodily integrity and access to safe drinking water.   By purposely withholding information from the public that they were statutorily mandated to disclose, the Defendants have caused the Plaintiff Class to suffer innumerable harms, suppressing their quality of life for the foreseeable future; lead contamination in Benton Harbor tap water continues and projects to take at least two years to resolve.

(56)

## COUNT III.

## VIOLATIONS OF 42 U.S.C.A. § 1983 EQUAL PROTECTION AND 40 C.F.R. § 141.31, 141.35 REPORTING FOR UNREGULATED CONTAMINANT MONITORING RESULTS --STATE CREATED DANGER -- ALL DEFENDANTS

(57)

The Class reallege paragraphs 1-57.

(58)

30

The Defendants violated the Plaintiff Class' constitutional rights to equal protection under the law, procedural, and substantive due process when they failed to comply with water system reporting requirements, enforce relevant regulations, and or provide needed guidance and support under their statutory, common law, and equitable duties of care to the Plaintiff Class.

(59)

Under § 1983, an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute. 42 U.S.C.A. § 1983.

(60)

"The supplier of water must report to the State within 48 hours the failure to comply with any national primary drinking water regulation (including failure to comply with monitoring requirements) set forth in this part." 40 C.F.R. § 141.31.

(61)

Any owner or operator of a public water system subject to the provisions of this part shall retain on its premises or at a convenient location near its premises the following records: (b) Records of action taken by the system to correct violations of primary drinking water regulations shall be kept for a period not less than 3 years after the last action taken with respect to the particular violation involved. (c) Copies of any written reports, summaries or communications relating to sanitary surveys of the system conducted by the system itself,

by a private consultant, or by any local, State or Federal agency, shall be kept for a period

not less than 10 years after completion of the sanitary survey involved. (d) Records

concerning a variance or exemption granted to the system shall be kept for a period ending

not less than 5 years following the expiration of such variance or exemption. (e) Copies of

public notices issued pursuant to subpart Q of this part and certifications made to the

primacy agency pursuant to § 141.31 must be kept for three years after issuance. (f) Copies

of monitoring plans developed pursuant to this part shall be kept for the same period of

time as the records of analyses taken under the plan are required to be kept under paragraph

(a) of this section, except as specified elsewhere in this part." 40 C.F.R. § 141.33.

(62)

 "If your PWS cannot sample according to your assigned sampling schedule (e.g., because

of budget constraints, or if a sampling location will be closed during the scheduled month

of monitoring), you must mail or email a letter to EPA, as specified in paragraph (b)(1) of

this section, prior to the scheduled sampling date. You must include an explanation of why

the samples cannot be taken according to the assigned schedule, and you must provide the

alternative schedule you are requesting. *You must not reschedule monitoring specifically to

avoid sample collection during a suspected vulnerable period.*" 40 C.F.R. § 141.35.

(63)

"Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff

must show how the government's discretionary conduct that deprived that interest was

constitutionally repugnant, in order to establish substantive due process violation." <u>Guertin</u> <u>v. State</u>, 912 F.3d 907 (6th Cir. 2019), <u>cert. denied sub nom.</u> <u>City of Flint, Michigan v.</u> <u>Guertin</u>, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and <u>cert. denied sub nom.</u> <u>Busch v.</u> <u>Guertin</u>, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020).

(64)

The Defendant's discretionary misconduct in failing avert the Benton Harbor water crisis, mismanaging a public trust via there pattern of statutory compliance failures,  and displaying an apathetic, indifferent response to imminent danger of the public by consciously refusing to warn the Plaintiff Class of threat of poisonous lead-water, equates to a State created danger and constitutionally repugnant disparate treatment against the Plaintiff Class.

(65)

**COUNT IV.**

**VIOLATIONS OF 42 U.S.C. §1983 EQUAL PROTECTION, SUBSTANTIVE, &**

**PROCEDURAL DUE PROCESS AND 42 U.S.C.A. § 300g-6 -- FAILURE TO WARN**

**& BODILY INTEGRITY -- ALL DEFENDANTS**

(66)

The Class reallege paragraphs 1-66.

(67)

33

The Defendants violated the Plaintiff Class' constitutional rights to equal protection under the law, substantive, and procedural due process when they caused the Plaintiff Class to be exposed to and digest poisonous lead water in their persons without their consent, nor complying with federal duties to warn, causing substantial irreparable harms, economic, and non-economic damages.

(68)

"Each owner or operator of a public water system shall identify and provide notice to persons that may be affected by lead contamination of their drinking water where such contamination results from either or both of the following: (i) The lead content in the construction materials of the public water distribution system. (ii) Corrosivity of the water supply sufficient to cause leaching of lead. The notice shall be provided in such manner and form as may be reasonably required by the Administrator. Notice under this paragraph shall be provided notwithstanding the absence of a violation of any national drinking water standard." 42 U.S.C.A. § 300g-6 (West).

(69)

"Under § 1983, an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." 42 U.S.C.A. § 1983.  "Violating a person's bodily integrity is a grave deprivation of their liberty, against which deprivation substantive due process provides protection." In re Flint Water Cases, 960 F.3d 303 (6th

Cir. 2020).  "A government actor violates individuals' right to bodily integrity under Fourteenth Amendment's Due Process Clause by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit. Guertin v. State, 912 F.3d 907 (6th Cir. 2019), cert. denied sub nom. City of Flint, Michigan v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and cert. denied sub nom. Busch v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020).  "By its own terminology, § 1983 grants a cause of action to the party injured and, accordingly, a § 1983 action for deprivation of civil rights is an action personal to the injured party." 42 U.S.C.A. § 1983. Blair v. Harris, 993 F. Supp. 2d 721 (E.D. Mich. 2014).

(70)

"City residents plausibly alleged, as required to state a claim, that supervisor for city's water treatment plant laboratory was deliberately indifferent to their substantive due process right to bodily integrity, in § 1983 actions arising from lead contamination and legionella contamination in city's water supply, by alleging that supervisor covered up extent of lead contamination, and distorted water quality tests to downplay the extent of lead contamination." U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6). In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).  The Class Plaintiffs petitioning for relief in this complaint are analogous to city residents in the In re Flint Water Cases, in that these Class Plaintiffs allege willful neglect of duty and deliberate indifference to their constitutional and federal due process rights to bodily integrity and equal protection under

the law, pursuant to U.S. Const. Amend. 14; 42 U.S.C.A. § 1983 and  42 U.S.C.A. § 300g-6.

(71)

The standard for government officials' deliberate indifference to an individual's substantive due process rights is subjective recklessness, and the plaintiff must show that the government officials knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights. In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).  The Plaintiff Class asserts that all the Defendants, named and unnamed, knew of facts from which they could infer a substantial risk of serious harm to the Plaintiff Class when they became aware of extremely high, excessive levels of lead contamination present in Benton Harbor tap water in 2018, did infer the substantial harm when they discussed solutions to resolve the issue for two years, but refused to inform the Plaintiff Class of the crisis of imminent danger until late 2021.

(72)

The misconduct of the plaintiffs in negligently exposing the Plaintiff Class to neurotoxic lead water and failing to warn them pursuant to their constitutional rights and continuously allowing them to suffer mental, emotional, physical, property damage for three consecutive years "shocks the conscience, infringes upon the decencies of civilized conduct, is so brutal

and so offensive to human dignity, and interferes with rights implicit in the concept of ordered liberty." U.S. Const. Amend. 14. <u>Guertin v. State</u>, 912 F.3d 907 (6th Cir. 2019).

(73)

## COUNT V.

## GROSS NEGLIGENCE: VIOLATIONS OF THE FEDERAL & STATE "SAFE WATER DRINKING ACTS", "AMERICA'S WATER INFRASTRUCTURE ACT OF 2018" (AIWA) AND THE FEDERAL CODES OF REGULATIONS: 42 U.S.C.A. § 300g-6, M.C.L.A. § 325.1019, & 40 C.F.R. § 141.31, 141.33, 141.35, 141.74, 141.85, 141.86

(74)

The Class reallege paragraphs 1-74.

(75)

The Defendants acted with gross negligence when they established and sustained a pattern of consistently and flagrantly violating a multitude of safe drinking water statutes and failing to correct, remedy, or cure said multitude of statutory violations for several years.

(76)

""Gross negligence" is conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." <u>McLain v. Lansing Fire Dep't</u>, 309 Mich. App. 335, 869 N.W.2d 645 (2015). "Under Michigan law, "gross negligence" is an almost willful

disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." Mich. Comp. Laws Ann. § 691.1407. 194 F.Supp.3d 658.

(77)

"Each owner or operator of a public water system shall identify and provide notice to persons that may be affected by lead contamination of their drinking water where such contamination results from either or both of the following: (i) The lead content in the construction materials of the public water distribution system. (ii) Corrosivity of the water supply sufficient to cause leaching of lead. The notice shall be provided in such manner and form as may be reasonably required by the Administrator. Notice under this paragraph shall be provided notwithstanding the absence of a violation of any national drinking water standard." 42 U.S.C.A. § 300g-6 (West).  "The sampling sites selected for a community water system's sampling pool ("tier 1 sampling sites") shall consist of single family structures that: (i) Contain copper pipes with lead solder installed after 1982 or contain lead pipes; and/or (ii) Are served by a lead service line. When multiple-family residences comprise at least 20 percent of the structures served by a water system, the system may include these types of structures in its sampling pool." 40 C.F.R. § 141.86.

(78)

"When considered necessary for protection of the public health, the department shall notify a supplier of water of the need to make changes in operations, to provide treatment, to make structural changes in existing systems, or to add additional capacity as necessary to

produce and distribute an adequate quantity of water meeting the state drinking water standards." Mich. Comp. Laws Ann. § 325.1015 (West).  "In addition to other relief granted under this section, the court may impose a civil penalty of not more than $5,000.00 for each day of violation." Mich. Comp. Laws Ann. § 325.1022 (West).  A suit can be filed "against any person (including (A) the United States, and (B) any other governmental instrumentality or agency." 42 U.S.C.A. § 300j-8 (West).

(79)

"If regulated contaminants are detected in a public water supply, and certain subpopulations are particularly vulnerable to the adverse effects because of age, gender, pregnancy, or preexisting medical conditions, the consumer confidence report or other reports and notices, or both, shall contain information related to all of the following: (a) The contaminant that was detected. (b) The level of the contaminant that was detected. (c) The vulnerable population that may be susceptible to the level of contaminant detected. (d) The potential adverse health effects associated with exposure of the vulnerable population to the level of contaminant detected in the water supply."  Mich. Comp. Laws Ann. § 325.1014 (West).

(80)

"If water delivered by or the operation of a public water supply is found not to be in compliance with the state drinking water standards, the department shall require the supplier of water to notify its users of the extent and nature of the noncompliance.

Notification of users must be in a form and manner prescribed or otherwise approved by the department. (2) In addition to the notification under subsection (1), if public education regarding lead is required under R 325.10410 of the Michigan Administrative Code, a supplier of water shall issue a public advisory within 3 business days after the department notifies the supplier of water that an exceedance of the lead action level occurred. Additional public education tasks must be conducted as required under R 325.10410 of the Michigan Administrative Code. A supplier of water shall provide the public advisory under this subsection in a form and manner designed to fit the specific situation and the public advisory must be reasonably calculated to reach all persons served by the public water supply. To reach all persons served by the public water supply, a supplier of water shall use, at a minimum, 1 or more of the following forms of communicating the public advisory: (a) Appropriate broadcast media, such as radio and television. (b) Posting of the public advisory in conspicuous locations throughout the area served by the public water supply. (c) Hand delivering the public advisory to persons served by the public water supply. (d) A communication method other than one listed in subdivisions (a) to (c) as approved, in writing, by the department. (3) A notification or public advisory received pursuant to this section or information obtained from the notification or public advisory shall not be used against a person in a litigation, except a prosecution for perjury or for giving a false statement. Mich. Comp. Laws Ann. § 325.1019 (West).

(81)

Any owner or operator of a public water system subject to the provisions of this part shall retain on its premises or at a convenient location near its premises the following records: (a) Records of microbiological analyses and turbidity analyses made pursuant to this part shall be kept for not less than 5 years. Records of chemical analyses made pursuant to this part shall be kept for not less than 10 years. Actual laboratory reports may be kept, or data may be transferred to tabular summaries, provided that the following information is included: (1) The date, place, and time of sampling, and the name of the person who collected the sample; (2) Identification of the sample as to whether it was a routine distribution system sample, check sample, raw or process water sample or other special purpose sample; (3) Date of analysis; (4) Laboratory and person responsible for performing analysis; (5) The analytical technique/method used; and (6) The results of the analysis. (b) Records of action taken by the system to correct violations of primary drinking water regulations shall be kept for a period not less than 3 years after the last action taken with respect to the particular violation involved. (c) Copies of any written reports, summaries or communications relating to sanitary surveys of the system conducted by the system itself, by a private consultant, or by any local, State or Federal agency, shall be kept for a period not less than 10 years after completion of the sanitary survey involved. (d) Records concerning a variance or exemption granted to the system shall be kept for a period ending not less than 5 years following the expiration of such variance or exemption. (e) Copies of public notices issued pursuant to subpart Q of this part and certifications made to the

primacy agency pursuant to § 141.31 must be kept for three years after issuance. (f) Copies of monitoring plans developed pursuant to this part shall be kept for the same period of time as the records of analyses taken under the plan are required to be kept under paragraph (a) of this section, except as specified elsewhere in this part. 40 C.F.R. § 141.33.

(82)

"(a) Except where a shorter period is specified in this part, the supplier of water shall report to the State the results of any test measurement or analysis required by this part within (1) The first ten days following the month in which the result is received, or (2) the first ten days following the end of the required monitoring period as stipulated by the State, whichever of these is shortest. (b) Except where a different reporting period is specified in this part, the supplier of water must report to the State within 48 hours the failure to comply with any national primary drinking water regulation (including failure to comply with monitoring requirements) set forth in this part. (c) The supplier of water is not required to report analytical results to the State in cases where a State laboratory performs the analysis and reports the results to the State office which would normally receive such notification from the supplier." 40 C.F.R. § 141.31.

(83)

"Systems shall complete the applicable source water monitoring and treatment requirements (described in the referenced portions of paragraph (b) of this section, and in §§ 141.86, and 141.88) by the following deadlines. (a) Deadlines for completing source

water treatment steps— (1) Step 1: A system exceeding the lead or copper action level shall complete lead and copper source water monitoring (§ 141.88(b)) and make a treatment recommendation to the State (§ 141.83(b)(1)) no later than 180 days after the end of the monitoring period during which the lead or copper action level was exceeded. (2) Step 2: The State shall make a determination regarding source water treatment (§ 141.83(b)(2)) within 6 months after submission of monitoring results under step 1. (3) Step 3: If the State requires installation of source water treatment, the system shall install the treatment (§ 141.83(b)(3)) within 24 months after completion of step 2. (4) Step 4: The system shall complete follow-up tap water monitoring (§ 141.86(d)(2) and source water monitoring (§ 141.88(c)) within 36 months after completion of step 2. (5) Step 5: The State shall review the system's installation and operation of source water treatment and specify maximum permissible source water levels (§ 141.83(b)(4)) within 6 months after completion of step 4. (6) Step 6: The system shall operate in compliance with the State-specified maximum permissible lead and copper source water levels (§ 141.83(b)(4)) and continue source water monitoring (§ 141.88(d)).” 40 C.F.R. § 141.83.

(84)

“A water system that fails to meet the lead or copper action level on the basis of tap samples collected in accordance with § 141.86 shall collect lead and copper source water samples in accordance with the following requirements regarding sample location, number of samples, and collection methods: (i) Groundwater systems shall take a minimum of one

sample at every entry point to the distribution system which is representative of each well after treatment (hereafter called a sampling point). The system shall take one sample at the same sampling point unless conditions make another sampling point more representative of each source or treatment plant. (ii) Surface water systems shall take a minimum of one sample at every entry point to the distribution system after any application of treatment or in the distribution system at a point which is representative of each source after treatment (hereafter called a sampling point). The system shall take each sample at the same sampling point unless conditions make another sampling point more representative of each source or treatment plant." 40 C.F.R. § 141.88.

(85)

"Systems that fail to meet the lead action level in tap samples taken pursuant to § 141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of this section. If a system is in violation of § 141.81 or § 141.83 for failure to install source water or corrosion control treatment, the State may require the system to commence lead service line replacement under this section after the date by which the system was required to conduct monitoring under § 141.86(d)(2) has passed. (b)(1) A water system shall replace annually at least 7 percent of the initial number of lead service lines in its distribution system." 40 C.F.R. § 141.84.

(86)

The Defendants habitually violated each safe water drinking statute mentioned above and failed to comply with several uncited laws on a consistent basis.  For several years, the Defendants acted so reckless, indifferent, and outrageous in their compliance to safe drinking water statutes, that their habitual statutory violations demonstrate a substantial and dangerous lack of concern for whether injuries resulted to the Plaintiff Class. The following violations were cited by the EPA Unilateral Order, City of Benton Harbor Nov. 11th, 2021:

1. Between January 2016 and December 2018, the 90th percentile of the samples collected during this period was 22 ppb, which is a lead action level exceedance ("ALE") pursuant to the LCR at 40 C.F.R. § 141.80(c).

2. Between January 2019 and June 2019, the 90th percentile of the samples collected during this sampling period was 27 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

3. Between July 2019 and December 2019, the 90th percentile of the samples collected during this sampling period was 32 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

4. Between January 2020 and June 2020, the 90th percentile of the samples collected during this sampling period was 23 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

5. Between July 2020 and December 2020, the 90th percentile of the samples collected during this sampling period was 24 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

6. Between January 2021 and June 2021, the 90th percentile of the samples collected during this sampling period was 24 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

   ○ A PWS that exceeds the lead action level based on tap water samples collected in accordance with 40 C.F.R. § 141.86 must comply with certain public education requirements at 40 C.F.R. § 141.85.

   ○ 40 C.F.R. § 141.85(a) regulates the content of written public education materials (e.g., brochures and pamphlets), while 40 C.F.R. § 141.85(b) regulates the delivery of such public education materials.

   ○ Pursuant to 40 C.F.R. § 141.85(b)(2)(ii)(A), a CWS that exceeds the lead action level must contact the local health department and deliver education materials that meet the content requirements of 40 C.F.R. § 141.85(a) to local public health agencies even if they are not located within the water system's service area, along with an informational notice that encourages distribution to all the organization's potentially affected customers or CWS's users.

○ 40 C.F.R. § 141.85(b)(3) requires contact with the local health department at least every twelve (12) months as long as the CWS exceeds the lead action level.

○ According to the System's February 2021 and August 2021 public education certifications, the System did not contact the local health department in the 12-month period between August 2020 and August 2021.

○ Respondent's failure to contact the local health department in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(ii)(A) and 141.85(b)(3). Unilateral Order, City of Benton Harbor Nov. 11th, 2021.

(87)

The Defendants' habitual failures to comply with federal and state safe drinking water regulations continued through September 2021 and the Plaintiff class is unaware of any new compliance.  The EPA cited the following in November of 2021: "During and after the September 2021 Inspection, the System did not produce analysis records for disinfectant byproducts ("DBP"), Total Organic Carbon precursor, turbidity, or residual chlorine that the inspectors asked Respondent to produce during and after the September 2021 Inspection."

1. Respondent's failure to retain records of microbiological, turbidity, and chemical analyses made pursuant to the NPDWRs is a violation of 40 C.F.R. § 141.33(a).

2. During the September 2021 Inspection, the inspectors requested the Total Organic Carbon precursor monitoring and DBP distribution system sampling. The System provided an incomplete set of records and did not provide the data from February 2018 to October 2020, and January and February 2021.

3. Respondent's failure to retain complete records of Total Organic Carbon precursor monitoring and DBP distribution system sampling made pursuant to the NPDWRs is a violation of 40 C.F.R. § 141.33(a).

4. Pursuant to 40 C.F.R. § 141.91, any system subject to the requirements of Subpart I (40 C.F.R. §§ 141.80 through 141.93) shall retain on its premises original records of all sampling data and analyses, reports, surveys, letters, evaluations, schedules, State determinations, and any other information required by 40 C.F.R. §§ 141.81 through 141.88. Each water system shall retain the records required by this section for no fewer than twelve (12) years. Unilateral Order, City of Benton Harbor Nov. 11th, 2021.

(88)

The Defendants showed gross negligence when they habitually failed to comply with statutes controlling the regulation of safe drinking water, thereby displaying willful disregard of precautions or measures that attend to the safety of the public, and in doing so, the Defendants showed a shocking disregard for the substantial risks of harm and injuries caused to the Class Plaintiffs by compliance failures.

(89)

## COUNT VI.

## ASSAULT-- ALL DEFENDANTS

(90)

The Class reallege paragraphs 1-90.

(91)

By intentionally and purposefully maintaining a habitual practice of violating safe drinking water regulations and failing to warn the Plaintiff Class of clear and  present danger of neurotoxic lead in their tap water, the Defendants, for at least three years, have and continue to assault the plaintiffs by causing them to ingest and be confronted with poisonous, offensive running water everyday and continuously for years.

(92)

"Absent lawful authority, invasion of one's body is an indignity, an assault, and a trespass prohibited at common law." Guertin v. State, 912 F.3d 907 (6th Cir. 2019), cert. denied sub nom. City of Flint, Michigan v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and cert. denied sub nom. Busch v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020).  "Under Michigan law, an "assault" is defined as an attempt to commit a battery or an unlawful act which places another person in reasonable apprehension of receiving an immediate battery." Moher v. United States, 875 F. Supp. 2d 739 (W.D. Mich. 2012).  To recover civil damages for assault under Michigan law, a plaintiff must show an intentional unlawful

offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact. Moher v. United States, 875 F. Supp. 2d 739 (W.D. Mich. 2012).

(93)

From 2018 to 2021, the Plaintiffs Class were forced to unknowingly digest and bathe in neurotoxic led water because the Defendants knowingly and forcibly sent contaminated water into their homes.   Since late October 2021 when they are warned and up until the toxic water contamination in Benton Harbor, MI the Plaintiffs will be confronted with offers of offensive, corporal injury, unlawfully directed at them via the poison running out of all faucets in the city.

(94)

Under Michigan law, an "assault" is defined as an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery. Binay v. Bettendorf, 601 F.3d 640 (6th Cir. 2010).   Under Michigan law, a "battery" is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person; it is not necessary that the touching cause an injury. Lakin v. Rund, 318 Mich. App. 127, 896 N.W.2d 76 (2016). Finally being warned of the extremely high toxicity of their tap water, each and every time the Plaintiffs are confronted with the neurotoxic material coming from their faucets, they

suffer an assault through the offensive nature of the toxic lead-water and the imminent and present danger it poses to their health, the health of their loved ones, and their properties such as homes, pets, and plants.

(95)

## COUNT VII.

## BATTERY- ALL DEFENDANTS

(96)

The Class reallege paragraphs 1-96.

(97)

For approximately one thousand and eighty consecutive days, the Plaintiffs Class unknowingly digested, bathed in, and otherwise came in harmful, unwanted contact with neurotoxic lead contaminants because of the Defendant's intentional actions of willfully and knowingly selling toxic water.  There is currently a two-year abatement plan to resolve the Benton Harbor, MI Lead-Water Crisis, causing the Plaintiffs to endure continued unwanted harmful contact for the foreseeable future.

(98)

"A "battery" is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person; it is not necessary that the touching cause an injury. Lakin v. Rund, 318 Mich. App. 127, 896 N.W.2d 76 (2016).

"Common-law battery does not require force capable of causing physical pain or injury."
Stokeling v. United States, 139 S. Ct. 544, 202 L. Ed. 2d 512 (2019).

(99)

Each and every time the Plaintiffs have come in contact with contaminated tap water, they
have suffered an intentional, unconsented, offensive, and harmful touching of their person
because the Defendants knowingly caused them to be presented with water unfit for human
consumption or use and toxic in nature.

(100)

**COUNT VIII.**

**MENTAL ANGUISH & INTENTIONAL INFLICTION OF EMOTIONAL**

**DISTRESS --ALL DEFENDANTS**

(101)

The Class reallege paragraphs 1-101.

(102)

The Defendant's intentional, bad-faith breach of their public duties coupled with their
outrageous conduct of knowingly, secretly, and deliberately selling toxic lead-water for
three years was reckless; damaging the neurosystems of Plaintiff Class Members and
causing them to suffer heightened levels of anxiety, depression, aggressiveness, mild
schizophrenia, irrational stress, and other mental and emotional symptoms of continuous
lead (Pb) ingestion.

(103)

Now that the Plaintiffs Class Members are aware of the Defendants unconstitutional actions, habitual statute violations, and willful neglect of their public duties, yet still without safe drinking water flowing in their city, the Plaintiff Class is currently suffering severe emotional distress and mental anguish as a result of realizing the causation, and or contribution neurotoxic lead-water made to their past, current, and future sufferings. These Plaintiffs are currently, and will continuously suffer severe mental distress through the ongoing infringement on their human dignity caused by the Defendants appalling actions of secretly selling poison to the community.

(104)

The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. Doe v. Roman Cath. Archbishop of Archdiocese of Detroit, 264 Mich. App. 632, 692 N.W.2d 398 (2004).  The test for whether conduct is sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!". Swain v. Morse, 332 Mich. App. 510, 957 N.W.2d 396 (2020), appeal denied, 957 N.W.2d 338 (Mich. 2021).  Under Michigan law, "hedonic damages" refers to damages for the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment, and inconvenience affecting an

individual's normal pursuits and pleasures of life. M.C.L.A. § 600.2922(6). Blair v. Harris, 993 F. Supp. 2d 721 (E.D. Mich. 2014).  It is for the trial court to initially determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery in a suit alleging intentional infliction of emotional distress. Swain v. Morse, 332 Mich. App. 510, 957 N.W.2d 396 (2020), appeal denied, 957 N.W.2d 338 (Mich. 2021).

(105)

A 2017 study into the effects of lead (Pb) ingestion in children revealed: "With increasing Pb levels, children exhibit higher levels of hostile distrust and oppositional defiant behaviors, were more dissatisfied and uncertain about their emotions, and had difficulties with communication. These significant associations were found within a range of blood Pb levels from 0.19 to 3.25 μg/dL, well below the "reference value" for children of >5 μg/dL."

(Gump & Dykas, *High Normal Lead and Mercury Exposures: Psychological and Behavioral Problems in Children* 2021). According to this research study, lead levels well below the federal regulation limits can harmfully affect the mental states of children.  A research study focusing on the effects of low-level lead exposure in adults revealed: "In these young adults with low levels of lead exposure, higher blood lead levels were associated with increased odds of major depression and panic disorders. Exposure to lead at levels generally considered safe could result in adverse mental health outcomes." (Bouchard et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults | Adolescent Medicine | JAMA Psychiatry | JAMA Network* 2021). If it is known that even

low-level lead-water ingestion can cause major depression and panic disorders in adults, a reasonably informed person would be shocked and outraged at the Defendants knowingly and purposely providing illegal toxic lead-water (Pb) to the Plaintiff Class.

(106)

In 2018, when Class Plaintiffs were unknowingly consuming neurotoxic lead water, the violent crime rate in the City was six times the national average.   In 2019, when the Defendants presumably took some insufficient counter-measures to combat the lead-water crisis, the City's violent crime rate dropped to five times the national average. (*Crime in Benton Harbor, Michigan (MI): murders, rapes, robberies, assaults, burglaries, thefts, auto thefts, arson, law enforcement employees, police officers, crime map* 2021).    By 2021, after three years of purposely causing the Plaintiff Class to suffer ingestion of neurotoxic water and its known side effects, the Defendants imported a surge of police officers to address the residents' need for freshwater.   A local South West Michigan news agency reported in May of 2021 that "Michigan State Police have bolstered their presence in Benton Harbor with the addition of the new Fifth District Crime Prevention Squad. Lieutenant DeWayne Robinson tells WSJM News the squad *is in addition* to the MSP Secure Cities Partnership in the city, and increases the number of troopers in town. *"Our goal is just to make the streets safer, to combat violent crime where it's present, and to prevent it just by our presence as well,"* Robinson said. The article concludes with: "MSP have had an extra presence in Benton Harbor since 2015 when the Secure Cities

Partnership was formed." (*State Police Add More Troopers To Benton Harbor | News/Talk/Sports 94.9 WSJM* 2021).    When the Defendants were habitually violating safe drinking regulations and denying the Plaintiff Class their constitutional rights to equal protection under the law, the Defendants chose to import external law enforcement officers into the community, unreasonably endangering the Plaintiff Class Members and unwitting public servants.

(107)

Simultaneously as the unknown lead consumption went on, according to the Detroit Free Press "Just 3% of Benton Harbor's third-graders — four of the 127 students tested — read at grade level on the 2018 state evaluation test.  The state rate was 44% proficient.  Zero of the district's 11th-graders were deemed college ready, according to tests in the last five years.   The article details how the urban school district of The Plaintiffs Class, "1,800 students are 92 percent black and 81 percent economically disadvantaged, has staggeringly low academic achievement and has been ravaged by years of declining enrollment". While the Governor and her appointees were aware or should have been aware of lead water consumption in Benton Harbor the article further states that   "despite the efforts of a turnaround specialist who was ready to move ahead with educational and financial reforms for the next three years under state watch, Gov. Gretchen Whitmer has told the community the only course of action left is to close Benton Harbor High School and a smaller alternative high school. Whitmer wants to send the students to primarily white, rural and more affluent districts to address the district's $18.3 million debt." (Chambers, *Benton Harbor school crisis*

*has racial overtones* 2021).  Benton Harbor area students have suffered from and displayed the known

mental anguish of human beings exposed to lead exposure and have been treated

inhumanely as a consequence of the actions and inactions of the Defendants.  The Plaintiff

Class seeks punitive, compensatory, hedonic, and equitable damages for the foul and

abhorrent harms they have and continue to suffer.

(108)

The Defendants acted outrageous and reckless when they intentionally caused and allowed

neurotoxic, lead contaminated tap water to be sold and or presented to unaware persons in

the City of Benton Harbor for three consecutive years without warning, a fact that would

arouse and shock the consciousness of any member of a civilized society, causing them to

exclaim, "Outrageous!"   The Plaintiff Class seeks punitive, compensatory, hedonic, and

equitable damages for the foul and abhorrent harms they have and continue to suffer.

(109)

## COUNT IX.

## PUBLIC & PRIVATE NUISANCE: TRESPASS TO REAL PROPERTY

(110)

The Class reallege paragraphs 1-110.

(111)

The Defendants caused a public and private nuisance when they allowed their nonfeasance

and unconstitutional misconduct to create a lead-water crisis rendering the public water

system of Benton Harbor, MI statutorily insufficient and unusable to provide safe drinking water for the previous three years and the foreseeable future.

(112)

"Nuisance" is an interference with the plaintiff's use and enjoyment of his land. Morse v. Colitti, 317 Mich. App. 526, 896 N.W.2d 15 (2016).   Under Michigan law, a private nuisance is an unreasonable interference with the use or enjoyment of property that results in significant harm. Davis v. Echo Valley Condo. Ass'n, 945 F.3d 483 (6th Cir. 2019), cert. denied, 141 S. Ct. 162, 207 L. Ed. 2d 1099 (2020).   A "public nuisance" involves the unreasonable interference with a right common to all members of the general public. Sholberg v. Truman, 496 Mich. 1, 852 N.W.2d 89 (2014).  No better definition of a "public nuisance" has been suggested than that of an act or omission which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects. Sholberg v. Truman, 496 Mich. 1, 852 N.W.2d 89 (2014).  A defendant held liable for a public nuisance must have possession or control of the land. Sholberg v. Truman, 496 Mich. 1, 852 N.W.2d 89 (2014).

(113)

"Trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it."  Terlecki v. Stewart, 278 Mich. App. 644, 754 N.W.2d 899 (2008).  Claims of trespass and nuisance include overlapping concepts and are difficult to distinguish. Terlecki v. Stewart, 278 Mich. App.

644, 754 N.W.2d 899 (2008).  Recovery for trespass to land is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession. Terlecki v. Stewart, 278 Mich. App. 644, 754 N.W.2d 899 (2008).

(114)

The Defendants created and caused public and private nuisance when their failures to uphold their statutory duties and standards of care, culminating in the toxic contamination and uselessness of the public water system, causing the Plaintiff Class to be incapable of enjoying fresh water in their homes and or public places.  The Defendants' actions have led to the community being forced to resort to bottled water for cooking, drinking, and oral hygiene. The process of procuring, storing, using, and disposing of plastic water bottles for all of the communities fresh water needs, and the constant anxiety such a task breeds, is a general burden laid across each and every person in Benton Harbor, MI.  The Defendants have caused the Plaintiff Class to publicly endure the loss of reputation and loathsome status of being a resident of a repugnant community and State that not only failed to provide its peoples with adequate public drinking water, but knowingly and nefariously sold and provided neurotoxic water for years.

(115)

The Defendants, through their intentional actions of selling and transporting unauthorized, neurotoxic contaminated tap-water into the homes of the Plaintiff Class, thereby harming

their pipes, fixtures, and or otherwise diminishing the value of the properties in violation of the Plaintiff's exclusive property rights.

(116)

**COUNT X.**

**UNJUST ENRICHMENT --ALL DEFENDANTS**

(117)

The Class reallege paragraphs 1-117.

(118)

The Defendants, as licenced, bonafide sellers in regulated commerce, have been unjustly enriched by receiving payments from the Plaintiff's Class, made in good faith, and delivering contaminated toxic water in bad faith by knowing at the time of sale, at least since 2018, that the water provided by the Benton Harbor Public Water System was and remains statutorily insufficient for human consumption.  The Defendants are still issuing and accepting payment for statutorily inadequate water.

(119)

For any state that recognizes the cause of action, the typical elements of a state-law claim for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted the benefit; and (3) injustice would occur if the defendant did not pay the plaintiff for the value of the benefit. Chapman v. Gen. Motors LLC, No. 219CV12333TGBDRG, 2021 WL 1286612 (E.D. Mich. Mar. 31, 2021). Even though no

60

contract may exist between two parties, under the equitable doctrine of unjust enrichment, a person who has been unjustly enriched at the expense of another is required to make restitution to the other. <u>Morris Pumps v. Centerline Piping, Inc.</u>, 273 Mich. App. 187, 729 N.W.2d 898 (2006).  The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. <u>Morris Pumps v. Centerline Piping, Inc.</u>, 273 Mich. App. 187, 729 N.W.2d 898 (2006).

(120)

Plaintiff Class Members have reported paying some of the highest public water bill rates in greater Southwest Michigan, only to be provided with harmful toxic water, unfit for human digestion or general use.  The Defendants have been enriched via a disgusting trade that would shock the conscience of any reasonable, well-informed individual.  The Plaintiff conferred the Defendant the benefit of money, the Defendant accepted the benefit, and knowingly exchanged harmful neurotoxic lead-water and would thereby be enriched unless all funds accepted under false pretenses are returned with interest.

(121)

## COUNT XI.

## NEGLIGENT FAILURE TO WARN (PRODUCTS LIABILITY) --ALL DEFENDANTS

(122)

Plaintiffs reallege paragraphs 1-122.

(123)

To the extent that there is any non-offensive, commercial value to neurotoxic led contaminated water, the Defendants destroyed it by failing to warn and allowing customers and residents to ingest and consume their tap-water in a manner and usage in which it was harmful to use.

(124)

"In order to state negligent failure-to-warn claim in products liability case under Michigan law, plaintiff must prove that product was rendered defective by manufacturer's failure to warn about dangers regarding product's intended uses, as well as foreseeable misuses." Hill v. Bayer Corp., 485 F. Supp. 3d 843 (E.D. Mich. 2020), reconsideration denied, No. 19-CV-12198, 2020 WL 5903892 (E.D. Mich. Oct. 5, 2020).  "In order to state negligent failure-to-warn claim in products liability case under Michigan law, plaintiff must prove that product was rendered defective by manufacturer's failure to warn about dangers regarding product's intended uses, as well as foreseeable misuses." Mich. Comp. Laws Ann. § 600.2948(3). Hill v. Bayer Corp., 485 F. Supp. 3d 843 (E.D. Mich. 2020), reconsideration denied, No. 19-CV-12198, 2020 WL 5903892 (E.D. Mich. Oct. 5, 2020).

(125)

The Defendants' actions of failing to warn of the harms of their commercial product nor providing adequate instructions for its safe use for three consecutive years, rendered the

water sold and provided to the Plaintiffs Class dangerous for the intended uses under which it was sold.

(126)

## COUNT XII.

## WRONGFUL DEATH --ALL DEFENDANTS

(127)

The Class reallege paragraphs 1-127.

(128)

The Defendants, for the previous three years, have contributed and or directly caused deaths of would be Plaintiff Class members by wantonly and willfully causing neurotoxic contaminated lead-water to be ingested by the deceased persons and embryos.

(129)

"Whenever the death of a person, injuries resulting in death, or death as described in section 2922a1 shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation that would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured or death as described in section 2922a, and although the death was caused under circumstances that constitute a felony." Mich. Comp. Laws Ann. § 600.2922 (West).  "A person who commits a wrongful or negligent act

against a pregnant individual is liable for damages if the act results in a miscarriage or stillbirth by that individual, or physical injury to or the death of the embryo or fetus." Mich. Comp. Laws Ann. § 600.2922a (West).  "Nature and purpose of wrongful-death action does not change because it is the death of an embryo or fetus giving rise to the wrongful-death action." Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015).

(130)

"Obvious purpose of the wrongful-death statute is to provide an action for wrongful death whenever, if death had not ensued, there would have been an action for damages." Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015). "Wrongful-death action brought on behalf of the deceased is the same legal action—with all of its statutory and common-law limitations—that the deceased could have brought if the injuries the deceased sustained because of the wrongful act, neglect, or fault of another had not caused death."  Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015).  Three requirements for a wrongful-death action are (1) a death; (2) that the death be caused by wrongful act, neglect, or fault of another; and (3) that the wrongful act, neglect, or fault of another be such that, if death had not ensued, a cause of action could have been filed against the responsible party and damages recovered from them.  Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015).  Every action under this section shall be brought by, and in the name of, the

personal representative of the estate of the deceased. Within 30 days after the commencement of an action, the personal representative shall serve a copy of the complaint and notice as prescribed in subsection (4) upon the person or persons who may be entitled to damages under subsection (3) in the manner and method provided in the rules applicable to probate court proceedings. Mich. Comp. Laws Ann. § 600.2922 (West).

(131)

Through their willful neglect of duty and violations of their public trusts in participating in a habitual pattern of failing to comply with statutory regulations, concealing the presence of harmful neurotoxic contaminants for three consecutive years, and purposefully causing the Plaintiff Class to digest destructive lead-water, they wrongfully caused and or contributed to the deaths of hundreds of would be class Plaintiffs.  The Plaintiffs Class, through counsel, endeavors to exhaust all expendable resources and efforts to find and notify the proper estate representatives of deceased Class Plaintiffs.

(132)

**COUNT XIII.**

**FAILURE TO ISSUE REVISIONS TO CONSUMER CONFIDENCE REPORTS: IN VIOLATION OF THE SAFE WATER DRINKING ACT  42 U.S.C § 300g-3(c)(4)(F)(i), M.C.L.A. § 750.478.**

(133)

The United States Environmental Protection Agency violated 42 U.S.C § 300g-3(c)(4)(F)(i) when they failed to issue revisions to consumer confidence reports

within the time frame prescribed by legislators and that failure has contributed to the on-going lead water crisis in Benton Harbor, MI.

(134)

"Not later than 24 months after October 23, 2018, the Administrator, in consultation with the parties identified in subparagraph (A), shall issue revisions to the regulations issued under subparagraph (A)—**(I)**to increase—**(aa)**the readability, clarity, and understandability of the information presented in consumer confidence reports; and **(bb)** the accuracy of information presented, and risk communication, in consumer confidence reports." 42 U.S.C § 300g-3(c)(4)(F)(i) (West).

(135)

Under the Safe Water Drinking Act, community water systems must regularly issue right-to-know reports to the more than 300 million public drinking water consumers across the country.  These reports, termed under the statute as "consumer confidence reports", must give consumers important information about the safety of their drinking water, including (among other things) the presence of certain contaminants in their tap water and any violations of national primary drinking water regulations. 42 U.S-C. $ 300g-3(c)(4). EPA was required by law to issue revised rules by October 23,2020, to make these reports more understandable and useful, and to increase reporting frequency for many consumers. After the Flint lead-water crisis, similar incidents occured in East Chicago, Indiana and Newark, New Jersey.  In 2020, two years after Class Plaintiffs began ingesting toxic

lead-water, the EPA had not published or proposed new rules to ensure the public's awareness and protection as mandated by federal statute.

(136)

Access to water and sanitation are recognized by the United Nations as human rights, reflecting the fundamental nature of these basic necessities in every person's life.  The lack of access to safe water for digestion and hygiene has a devastating effect on the physical health, mental health, dignity and prosperity of billions of people, and plays a direct, significant role in the realization of other human rights. *International Convention on the Elimination of All Forms of Racial Discrimination art.5(e)(iv)(v), 6, 7, Dec.21, 1965, Ratified October 8, 1994* (OHCHR | International Convention on the Elimination of All Forms of Racial Discrimination 2021).

(137)

Under constitutional and international law, citizens and residents are rights-holders and States like the United States of America and its departments, are duty-bearers of providing water and sanitation services equally to the general public.  Duty-bearers must guarantee the rights to water and sanitation equally and without discrimination.  Water is the essence of life.  Safe drinking water is universally recognized by civilized peoples as indispensable to sustain life, health, and is fundamental to the dignity of all. U.S. Const. art. VI, cl. 2.

(138)

At the exact time when this Plaintiff Class needed the EPA's compliance the most, the federal department failed to issue revised regulations by October 23rd, 2020 as mandated. 42 U.S.C § 300g-3(c)(4)(F)(i).   The Plaintiff Class of Benton Harbor Michigan was not warned of the precise issues and dangers sought to be addressed by the act, nor were they warned or protected in any way, for three consecutive years, from the imminent and grave threat to their health and bodily integrity; an egregious danger that was clear and obvious to all Defendants.

(139)

Had the EPA complied with its statutory duty, the Plaintiff Class of Benton Harbor, MI would have been notified with timely, understandable, pertinent information warning them that their water was and continues to be neurotoxic before they were actually made aware in late 2021.   The EPA's failure to comply with its statutory duty under 42 U.S.C § 300g-3(c)(4)(F)(i) by October 23rd, 2020 thereby harmed the Plaintiff Class of Benton Harbor, MI and the greater nation, when it left the people of America without proper consumer confidence reports which contributed to the harm suffered by toxic lead-water exposure victims in Benton Harbor, MI from at least 2018 to the present.   The harms suffered by the citizens of Benton Harbor, MI amount to violations of International Covenants.


**POLICY: STATE HUMAN RIGHTS OBLIGATIONS AND INTERNATIONAL LAW COMPLIANCE**

(140)

Human Rights are inalienable; they cannot be given nor taken away by a State government, rather it be regional or federal in nature.  The Constitution of the United States of America grants to all persons within its jurisdiction the undeniable right to universally agreed upon human rights standards within the borders of the United States of America and its territories.  The States avoidance and evading the correction of wrongs and compensating for the harms of nonfeasance in governance, is failed governance and violation of international human rights treaties, i.e., the "Supreme Law of the Land".  U.S. Const. art. VI, cl. 2.  Federal District Courts bear the burden of holding the State accountable, legally liable, and bringing the State, as a Defendant, back into the realm of constitutional and human rights compliance whenever it acts out.

(141)

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.   "Federal courts exercising the power given to them by Congress have vastly altered and reshaped state institutions to conform them to the mandates of the Constitution and to remedy past constitutional wrongs" (Wolcher, *Sovereign Immunity and the Supremacy Clause: Damages against States in Their Own Courts for Constitutional Violations* 2021). In accordance with the

supremacy clause from which the congress and all courts draw their jurisdiction, any ratified treaty is to be on par, equal to, considered and deliberated in the background of any domestic legal issues placed before the court which may implicate obligations covered under ratified multilateral-treaties.

(142)

"In compliance with the fundamental obligations laid down in article 2 of this Convention, States Parties undertake to prohibit and to eliminate racial discrimination in all its forms and to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin, to equality before the law, notably in the enjoyment of the following rights: (e) Economic, social and cultural rights, in particular: (iv) The right to public health, medical care, social security and social services; (v) The right to education and training; (vi) The right to equal participation in cultural activities; (f) The right of access to any place or service intended for use by the general public, such as transport hotels, restaurants, cafes, theatres and parks.  Article 6: States Parties shall assure to everyone within their jurisdiction effective protection and remedies, through the competent national tribunals and other State institutions, against any acts of racial discrimination which violate his human rights and fundamental freedoms contrary to this Convention, as well as the right to seek from such tribunals just and adequate reparation or satisfaction for any damage suffered as a result of such discrimination.  Article 7: State Parties undertake to adopt immediate and effective measures, particularly in the fields of teaching, education, culture and

information, with a view to combating prejudices which lead to racial discrimination and to promoting understanding, tolerance and friendship among nations and racial or ethnical groups, as well as to propagating the purposes and principles of the Charter of the United Nations, the Universal Declaration of Human Rights, the United Nations Declaration on the Elimination of All Forms of Racial Discrimination, and this Convention." *International Convention on the Elimination of All Forms of Racial Discrimination art.5(e)(iv)(v), 6, 7, Dec.21, 1965, Ratified October 8, 1994 (OHCHR | International Convention on the Elimination of All Forms of Racial Discrimination 2021).*

(143)

"In the present Convention, genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent births within the group; Article III The following acts shall be punishable: (e) Complicity in genocide. Article IV: Persons committing genocide or any of the other acts enumerated in article III shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals. Article V The Contracting Parties undertake to enact, in accordance with their respective Constitutions, the necessary legislation to give effect to the provisions of the present Convention, and, in particular, to provide effective penalties for persons guilty of genocide or any of the other acts enumerated in article III. Article VIII: Any Contracting

Party may call upon the competent organs of the United Nations to take such action under the Charter of the United Nations as they consider appropriate for the prevention and suppression of acts of genocide or any of the other acts enumerated in article III. *Convention on the Prevention and Punishment of the Crime of Genocide, Art.2(b)(c)(d), Art.3(e), Art.4, Art.5, Art.8, Dec.9, 1948, Ratified November 5, 1988,* (Nations, United Nations Office on Genocide Prevention and the Responsibility to Protect 2021).

(144)

Benton Harbor, MI, the only distinctly African American community in Southwest Michigan, through failed governance evidenced by decades of mismanagement, failure to comply with domestic regulations, and State complicity on all levels of government, is now the only community in Southwest Michigan without adequate, safe public water. The rights of "access to any place or service intended for use by the general public" as well as the right to "public health, medical care, social security and social services" have been denied in whole to Plaintiff Class members. The sole difference between the Benton Harbor community saddled with contaminated neurotoxic lead-water, and the surrounding communities who have been afforded State support in safe drinking water regulations and compliance, is the color of the pigmentation in the skins of the fellow Michangers and their ethnic and cultural histories in relation to the State.

(145)

In Southwest Michigan, those people with running water are descendants of European immigrants, while those peoples without public water are descendants of indigenous

natives of African descent and or colonial-era captives of war.  Due to the States history of oppressing the human rights of indigenous natives of "African Nativity" and the African Descendants of captives of colonial-era wars, The Plaintiff Class fearfully presumes that the State's nonfeasance, willful neglect of duty, and violation of public trust is rooted in universally prohibited race discrimination, pursuant to the ratified International Covenant Against All Forms of Racial Discrimination.  Dating back to the "Naturalization Act' of 1870", "African Americans" have suffered unilateral state controlled identity changes and state sponsored discrimination, habitually excused by later State officials as the archaic ignorance of past generations, Black Americans continue to suffer unconstitutional racial discrimination in all facets of American life.  Hanrick v. Patrick, 119 U.S. 156, 166, 7 S. Ct. 147, 152, 30 L. Ed. 396 (1886).

(146)

The Plaintiff Class asserts that this lead (Pb) based pestilence and calamity was brought on by complicit State nonfeasance in enforcing its own laws, coupled with the State's unconstitutional failure to "adopt immediate and effective measures, particularly in the fields of teaching, education, culture and information, with a view to combating prejudices which lead to racial discrimination." *International Convention on the Elimination of All Forms of Racial Discrimination art.7.*  Now that a protected class under constitutional law has been denied a right accessed and provided to all in the general public, the District Courts must "assure to everyone within their jurisdiction effective protection and

remedies... against any acts of racial discrimination which violate his human rights and fundamental freedoms contrary to this Convention, as well as the right to seek from such tribunals just and adequate reparation or satisfaction for any damage suffered as a result of such discrimination."  The Plaintiff Class asserts that the District Court of the Western District of Michigan, Southern Division, is one said "tribunal" under relevant treaty law, pursuant to the Constitution's Supremacy Clause.

(147)

By purposefully causing neurotoxic lead water to be ingested by residents and failing to warn them for several years, the Defendants acted intentionally and indifferently to cause serious bodily or mental harm to Plaintiff Class members, and a reasonable, well informed person would conclude these acts were intended to create conditions of life calculated to bring about the Plaintiff Class's physical destruction and or intended to prevent births within the group.  The State, i.e. the Federal Government, U.S. EPA, and all other empowered government entities have been complicit in allowing Plaintiff Class residents to ingest neurotoxic water.  The Federal regulations intended to protect the population from lead contamination call for emergency action at levels two times as high as scholarly research shows detrimentally affects the human body.  The Safe Water Drinking regulations of the United States Government, in their construction, application, or both, is insufficient and failed to sustain constitutional human rights and dignity of the Plaintiff Class.  The Plaintiff Class pleads with and warns the Court as an official organ of

Government, that the State is either indiscriminately providing neurotoxic, contaminated water through lead services lines across the country, or it has discriminated against the Plaintiff Class of Benton Harbor, MI, the only community in Southwest Michigan where freshwater is not in the public system.  If lead water drinking water is common across the nation, irrespective of race or other protected characteristics, then the government has failed.  If lead-water is not indiscriminately prominent across the nation, and has only become a threat to human life in minority cities like Flint, MI, East Chicago, IL, Benton Harbor, MI, and Newark, NJ, then the State has acted or stayed complicit in genocidal conditions inflicted upon the Plaintiff Class and other similarly situated minority Americans.

(148)

Pursuant to the Supremacy Clause of the United States Constitution, the Plaintiffs mercifully request the District Court of the Western District of Michigan, Southern Division, to adequately and properly require equitable relief and reparations suitable to bring the State in line with its international treaty obligations and universally recognized standards of decency.

## PLAINTIFF CLASS' REQUEST FOR REMEDIES & RELIEF

(149)

Mercifully, in the pursuit of Justice, the Plaintiff Class members of the

community of Benton Harbor, MI  request the following relief from the Court:

1.   An Order certifying this case as a class action;

2.   An Order certifying these Plaintiffs and counsel as Representatives of the Class Action and any potential plaintiffs arising out of the common facts and allegations in this complaint.

3.   An Order declaring the conduct of Defendants unconstitutional.

4.   An Order of equitable relief to remediate the harm for:

    a.   Unjust Enrichment: Equitable Estoppel Injunction prohibiting the Defendants from charging Benton Harbor Residents for water in exceedance of contamination regulations and awarding refunds of all sales of contaminated waters.

    b.   Damage to property: repairs and compensation of property damage;

    c.   Lead Service Line Abatement: immediate removal of all lead service lines in the City of Benton Harbor and the installation of adequate replacements;

    d.   Adequate Water Supplies: Daily delivery to each home of an adequate freshwater supply until new service lines are replaced and water suitable for human consumption is restored;

    e.   Health Care: establishment of a medical monitoring facility and community investigation processes designed to discover and treat

the effects of lead exposure in Plaintiff Class Members and the
Benton Harbor Community.

f.  Regulation Compliance: appointing and funding a qualified
specialist to administer, hire, and train the water operations staff
to sustain operations at a quality level sufficient to uphold the
constitutional and human rights of the Plaintiffs Class and the
Benton Harbor, MI community.

g.  Education & Training: A state of the art educational facility
containing but not limited to:

   i.  Construction & woodworks apprenticeship training and
adequate resources for certifications, job placements, and
or business establishment

   ii.  Public works management training and adequate resources
for various department certifications, job placements, and
or business establishment

   iii.  Plumbing certification training and adequate resources for
various department certifications, job placements, and or
business establishment

   iv.  Agricultural education, training, and adequate resources
for certifications, job placements, and or business
establishment.

     v.    Renewable Energy and Electrical Engineering education, training, and adequate resources for certifications, job placements, and or business establishment.

     vi.    Water & Waste Management training and adequate resources for certifications, job placements, and or business establishment.

     vii.    Technology training in coding, cryptocurrencies, and other emerging fields, with adequate resources for certifications, job placements, and or business establishment

   h.  Adequate funding for historical, public, and resident-owned building upgrades to alleviate property damage.

   i.  Any other equitable remedies the Court may find reasonable and applicable in its wisdom and expertise.

5. An Order awarding punitive and hedonic damages;

6. An Order awarding incidental damages;

7. An Order awarding compensatory, economic, and non-economic damages;

8. An Order awarding actual and reasonable attorney fees and litigation expenses;

9. An Order for all such other relief as the court deems equitable and reasonable.

Respectfully submitted,

**THE J.R. BEASON FIRM PLLC.**
By: \S\ John R. Beason III, Esq.
Attorney for the Plaintiffs
Attorney John R. Beason III
D.C. Bar No. 1721583
IBA No.: 1522438
JRBeason3@TheJRBeasonFirm.com
(269) 213-1426
www.JRBeasonLaw.com

March, 2nd, 2022.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GRANT, et al.,

                                 Case No.:

        Plaintiffs,                Hon. Robert J. Jonker

v.

WHITMER et al.,

        Defendants.

_____/

Attorney John R. Beason III
(D.C. Bar No.1721583)
**The J.R. Beason Firm PLLC.**
Attorney for the Plaintiffs
853 McAlister St.
Benton Harbor, MI 49022
JRBeason3@TheJRBeasonFirm.com

_____/

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury as to all issues triable as a matter of right.

                        Respectfully submitted,

                        **THE J.R. BEASON FIRM PLLC.**

                        \S\ John R. Beason III, Esq._____
                          John R. Beason III,
                          Attorney for the Plaintiffs
                          D.C. Bar No.: 1721583
                          IBA Bar No.: 1522438
                          853 McAlister St.
                          Benton Harbor, MI 49022
                          JRBeason3@TheJRBeasonFirm.com

March 2nd, 2022.