UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DWAYNE GRANT, individually and as
Next Friend for D.G, et al.,

      Plaintiffs,

v.                                                                                    Hon. Hala Y. Jarbou
                                                                                      Hon. Phillip J. Green

U.S. ENVIRONMENTAL PROTECTION                    Case No. 1:22-cv-0186
AGENCY, et al.,

      Defendants.
_____/

## <u>REPORT</u> <u>AND</u> <u>RECOMMENDATION</u>

      Plaintiffs, Benton Harbor residents, seek redress for harm allegedly resulting

from lead contaminants in their tap water.[1]  They have raised thirteen claims and

have named no less than twenty defendants, including federal, state, and local

agencies and officials, as well as several private companies.  (Amended Complaint,

ECF No. 75).  The complaint also includes a gratuitous seven-page "policy" statement

about human rights (*id.* at PageID.510-17), which is, itself, facially insufficient to

state a claim.

_____

[1] This is one of three related cases pending in this Court.  The other two are *Braziel v. Whitmer*, Case No. 1:21-cv-960, and *Mitchell v. Benton Harbor*, Case No. 1:22-cv-475.  The instant case and the *Braziel* case are putative class actions, while *Mitchell* is not.  The Court ordered the parties in the instant case and in *Braziel* to file motions simultaneously in each case.  (*Grant*, Case No. 1:22-cv-186, ECF No. 59; *Braziel*, Case No. 1:21-cv-960, ECF No. 130).  Unless otherwise noted, citations in this Report and Recommendation are from *Grant*, Case No. 1:22-cv-186.

The claims largely consist of an incoherent jumble of accusations and conclusory assertions regarding purported violations of constitutional rights and statutory obligations.  By all appearances, Plaintiffs expended little effort to provide "a short and plain statement of the claim[s] showing that [Plaintiffs are] entitled to relief."  FED. R. CIV. P. 8(a)(2).  Nevertheless, the undersigned has made every reasonable effort to construe the claims "so as to do justice."  FED. R. CIV. P. 8(e).

The defendants can be divided into five categories:  (1) the United States and the U.S. Environmental Protection Agency (EPA) ("Federal Defendants"), (2) EPA Administrators Michael Reagan and Debra Shore in their individual capacities,[2] (3) State of Michigan agencies and officials ("State Defendants"), (4) Benton Harbor and its officials ("City Defendants"), and (5) several private engineering firms ("Private Contractors").  The State Defendants include Governor Gretchen Whitmer; the Michigan Department of Environment, Great Lakes, and Energy (EGLE), its Director Liesl Clark, and EGLE's Drinking Water and Environmental Health Division Director Eric Oswald; the Michigan Department of Health and Human Services (MDHHS) and its directors Robert Gordon and Elizabeth Hertel.[3]  The City Defendants include the City of Benton Harbor, the Benton Harbor Water

---

[2] The United States of America has been substituted for EPA Administrators Reagan and Shore in their official capacities.  (*See* Order, ECF No. 116).  Accordingly, the only remaining claims against EPA Administrators Reagan and Shore are in their individual capacities.  They have separate representation regarding the individual capacity claims, and have separately filed a motion to dismiss those claims.  (ECF No. 91).

[3] The state officials are all being sued in both their official and individual capacities.

Department, Benton Harbor Mayor Marcus Muhammad, Water Plant Manager Michael O'Malley, City Manager Ellis Mitchell, and former City Manager Darwin Watson. The Private Contractor defendants include Elhorn Engineering Company ("Elhorn"); F&V Operations and Resource Management, Inc. ("F&V"); and Abonmarche Consultants, Inc. ("Abonmarche"). The undersigned shall refer to the defendants by their respective category unless otherwise noted.

### Introduction: This is not Flint

Plaintiffs have made a concerted effort to equate the instant case to the "infamous government-created environmental disaster commonly known as the Flint Water Crisis." *Guertin v. State of Michigan*, 912 F.3d 907, 915 (6th Cir. 2019). That crisis resulted from an ill-advised decision to switch the City of Flint's water supply from the Detroit Water and Sewerage Department (DWSD), which drew water from Lake Huron, to an outdated water treatment plant that drew water from the Flint River. The water in the Flint River was nineteen times more corrosive than that in Lake Huron. The deciding officials compounded this problem by using a water treatment plant they knew was ill-equipped to handle the contaminants, and without adding chemicals to treat the water's known corrosivity.

"The harmful effects were as swift as they were severe." *Id.* at 915. These effects included hair loss, skin rashes, a spike in deaths from Legionnaires' disease, and reports of dangerously high blood-lead levels in Flint children. These same officials twice turned down opportunities to reconnect to the DWSD after learning of the extent of the harm being visited on the consumers of the Flint water system.

3

A review of the allegations in the pending complaint in this case paints a very different picture from that described of the Flint water crisis.  There is no allegation that anyone in Benton Harbor did anything to change the water source or the way water was being processed.  Rather, the Benton Harbor water system was old and needed repairs and upgrades.  The amended complaint describes unsuccessful efforts Benton Harbor city officials made to obtain funding the improve the city's water system. It also describes staffing reductions at the water plant that further impeded any efforts to improve the system.  Complaints about needed repairs went unanswered.

In October 2018, tests revealed that the city's water supply contained lead levels that exceeded the acceptable limit.  Plaintiffs contend that city officials failed to take appropriate action, to provide adequate public notice, and to candidly advise the public concerning the issue.

No one should minimize the problems Plaintiffs face, given the elevated lead levels in their drinking water from 2018 to 2021.  This is a very serious matter with very serious potential consequences.  And the undersigned assumes nothing about who may be at fault, or who should have done what, when.  Plaintiffs may ultimately be successful in their efforts to hold officials accountable under statutory or state common law.  But this Court must assess Plaintiffs' due process claims under the purposely high "shocks-the-conscience" standard.  In *Guertin*, the Sixth Circuit found that the alleged misconduct of *some* of the Flint officials was so egregious that the constitutional claims could go forward.  This is not Flint.

4

## Background of This Case

The following is taken from relevant statutory and regulatory authority, as well as exhibits submitted by the State Defendants in support of their factual challenge to the Court's subject matter jurisdiction and in support of their motion to dismiss for failure to state a claim. Plaintiffs have not objected to these exhibits. The undersigned has endeavored to limit this discussion to that which appears to be undisputed.

The Safe Drinking Water Act (SDWA) confers upon the Administrator of the EPA the authority to regulate "public water systems," including setting standards regarding harmful water contaminants. *See* 42 U.S.C. §§ 300f, 300g-1(b). The Act allows the EPA to confer upon the states the primary enforcement responsibility for these systems, including the authority to set standards that are at least as stringent as the national standards set by the EPA. *See* 42 U.S.C. § 300g-2(a)(1); 40 C.F.R. § 142.10(a). The State of Michigan has assumed this responsibility through EGLE. *See* MICH. COMP. L. 325.1003. EGLE implements Michigan's Lead and Copper Rule, which includes several provisions more stringent than the federal rule. *See* MICH. ADMIN. CODE R. 325.10604f.

Under the Lead and Copper Rule, a water supplier is required to test water samples periodically, and to take corrective action "if the ninetieth percentile lead level is more than 0.015 milligrams per liter (mg/l) in tap water samples collected

during a monitoring period." MICH. ADMIN. CODE R. 325.10604f(1)(c).[4]  This is commonly known as the lead "action level."  Exceeding the lead action level is not a violation of the SDWA, nor does it necessarily constitute a public health emergency, but it requires the water supplier to take certain corrective actions, including notification, education, and remediation.  *See id.* at 325.10604(f)(1).  Among the remedial measures required are corrosion-control treatment and, if that is not effective, replacement of lead service lines.  *See id.* at 325.10604f(1)(d), (1)(f).  The notification requirement includes notice of the lead monitoring results.  *See id.* at 325.10604f(1)(g).  The educational requirements are spelled out in detail.  *See id.* at 325.10410(2)(a)(i)-(vi).

Pursuant to the requirements of the Lead and Copper Rule, Benton Harbor had been testing its water supply for elevated lead every three years.  (Benton Harbor Drinking Water Advisory, ECF No. 96-7, PageID.805).  Elevated lead levels were first detected in eight of the thirty water samples taken in the summer of 2018, with the ninetieth percentile of samples testing at 22 parts per billion.  (*Id.*).  Benton Harbor's water system operator notified EGLE of the action level exceedance on October 10, 2018.  (*See* B. Onan Decl. at ¶ 5, ECF No. 96-3, PageID.771).  There had been no change in the city's water source (Lake Michigan) or its water treatment that would

---

[4] The parties have used the equivalent standard of fifteen parts per billion.  The Court will hereafter do the same.

account for the action level exceedance.  (*See id.*).[5]

On October 18, 2018, EGLE hosted a meeting with staff from MDHHS and the Berrien County Health Department to discuss how to educate the public on the lead exceedance and to introduce the county health department to EGLE staff with expertise in testing for lead in school drinking water.  (*Id.*).  On October 22, 2018, EGLE formally notified Benton Harbor of the lead action exceedance, and it ordered the city to issue a public advisory notice and to send educational materials to the water system customers.  (Department of Environmental Quality Letter to Darwin Watson, Oct. 22, 2018, ECF No. 96-13).

Benton Harbor issued the notice on October 24, 2018, advising customers that the 90th percentile of water samples contained 22 ppb of lead, and noting that "[e]levated levels of lead in the drinking water can cause health concerns."  (*See* Drinking Water Advisory, ECF No. 96-7, PageID.805).  This advisory provided advice on how to reduce the risk of lead exposure by running water for three to five minutes before drinking, and using bottled water for baby formula.  (*Id.*).  The advisory also provided websites for obtaining additional information regarding lead in drinking water and a city hotline for questions about "water testing, health concerns, or getting [a] child's blood lead level tested."  (*Id.*).  City officials held a press conference, which

---

[5] Several city water systems similar to Benton Harbor's have not experienced a lead action level exceedance even though they have lead components, use Lake Michigan as a water source, and use treatment protocols that do not include a corrosion control additive.  These include St. Joseph, Muskegon, and Holland.  (B. Onan Decl. at ¶ 6, ECF No. 96-3, PageID.771).

resulted in a newspaper article reporting on the lead level exceedance.  (*See Too much lead in Benton Harbor Water*, THE HERALD-PALLADIUM, Oct. 24, 2018, updated Oct.29, 2021, ECF No. 96-14).  The city partnered with local health departments to provide lead education to at-risk consumers, and it distributed notices through schools (*See* Summary of Public Education Requirements, ECF No. 96-17).

On November 30, 2018, additional educational materials were mailed to Benton Harbor water customers alerting them to "IMPORTANT INFORMATION ABOUT LEAD IN YOUR DRINKING WATER."  (ECF No. 96-15).  This four-page document addressed the health effects of lead and steps customers could take to reduce their exposure to lead.  (*Id.* at PageID.907-09).  Among the suggestions for reducing one's exposure to lead was running water to flush out the lead-containing water from the service lines, purchasing bottled water, and using a water filter approved to reduce lead.  (*Id.* at PageID.908-09).  At least some water tests performed indicated a significant drop in lead levels in the drinking water following the water flushing procedure.  (*See* EGLE Drinking Water Laboratory Report, ECF No. 96-16).

As a result of the lead action level exceedance, Benton Harbor was required to submit, within six months after the end of the monitoring period in which the exceedance occurred, a recommendation to EGLE regarding the "optimal corrosion control treatment."  *See* MICH. ADMIN. CODE R. 325.10604f(2)(e)(i).  The monitoring period in which the lead action level was exceeded ended September 30, 2018, so the deadline for making the recommendation was March 30, 2019.  (Onan Decl. at ¶ 10, ECF No. 96-3, PageID.772).    EGLE encouraged the city to submit the

recommendation sooner than the statutory deadline due to concerns that the number of water samples that tested above the action level had jumped from two to 26.  (*Id.*). EGLE's stated strategy was to "get some form of corrosion control installed as soon as possible while also gathering short-term data collected by the City and pursuing a longer-term corrosion control study through [an] administrative consent order (ACO)."  (E. Oswald Decl. at ¶ 5, ECF No. 96-12, PageID.881).[6]

EGLE allowed Benton Harbor to use grant money previously given the city for use in identifying and replacing lead service lines to implement a treatment protocol to address the lead action level exceedance, including the retention of a private consulting firm.  (Onan Decl. at ¶ 11, ECF No. 96-3, PageID.772).  Benton Harbor retained the services of Elhorn Engineering.  (*Id.* at ¶ 12, PageID.773).  Elhorn provided water samples to Carus, a company that manufactures water treatment chemicals, for analysis.  (*Id.*).  Based on its analysis, Carus recommended the use of its product, a 70% orthophosphate blend.  (*Id.* at ¶ 13).  Benton Harbor submitted this corrosion control proposal to EGLE on November 21, 2018.  (ECF No. 96-19).  The proposal also included the installation of "corrosion racks to monitor and verify performance results are optimal."  (*Id.* at PageID.985).  This proposed use of orthophosphate for corrosion control was not unusual, as it had been used by other

---

[6] EGLE is not required to order a corrosion control study under the statute.  *See* MICH. ADMIN. CODE R. 325.10604f(2)(e)(ii).  Rather, it has the discretion to order such a study within twelve months after the monitoring period in which the exceedance occurred.  If no study is ordered, EGLE must specify "optimal corrosion control treatment" within that twelve month period.  *See id.*

water systems similar to Benton Harbor that drew water from Lake Michigan.  (Onan Decl. at ¶ 13).  The EPA reviewed the proposed corrosion control plan and expressed no concerns.  (Oswald Decl. at ¶ 5, ECF No. 96-12, PageID.881).  Benton Harbor submitted a formal permit application for corrosion control in January 2019.  (Permit, ECF No. 96-18).  EGLE approved the permit the following month.  (*Id.* at PageID.926).

The city then had twelve months from the date of the permit approval to implement the corrosion control treatment.  *See* MICH. ADMIN. CODE R 325.1064f(2)(e)(iv).  The city began that process on March 25, 2019 (*see* O'Malley Email to DEQ, Mar. 27, 2019, ECF No. 101-22), eleven months before the statutory deadline.  EGLE required Benton Harbor to increase the frequency and number of lead testing sites.  (*See* Onan Decl. at ¶ 22, ECF No. 96-3, PageID.776).  EGLE also required the city to submit a corrosion control study proposal by the end of April 2019, a requirement the city met on April 23, 2019.  (*See id.* at ¶¶ 20-21, 23, PageID.776-77).  While the study proposal was less than ideal, EGLE allowed its implementation due to the city's financial limitations and EGLE's interest in getting some data quickly.  (*Id.* at ¶ 23, PageID.777).  The results of this study were inconclusive, and EGLE ordered the city to submit a new study proposal in February 2020.  (*Id.*).

There was some evidence that Benton Harbor's initial corrosion control protocols were working.  (*See id.* at ¶ 26, PageID.778; *see also Benton Harbor*

*Drinking Water Lead Testing*, ECF No. 96-4, PageID.783 (lead testing percentages)).[7]

But, by January 2020, EGLE staff were concerned that the corrosion control treatment was not working quickly enough. (*See* Onan Decl. at ¶ 28, PageID.779). EGLE consulted with EPA and with an engineer who performed a corrosion control study in Flint. The engineer recommended that Benton Harbor increase the orthophosphate to either 100% or a 90% blend at a higher rate of induction. (*Id.* at ¶ 29, PageID.780). On February 13, 2020, EGLE directed Benton Harbor to increase its orthophosphate level to 90% at the rate of 3 mg/L no later than the end of that month, and to submit a third-party study proposal within the following six months. (EGLE Letter to Ellis Mitchell, Feb. 13, 2020, ECF No. 96-21, PageID.991-92). While the lead levels declined over time, they continued to exceed the action level through the monitoring period ending in December 2021. (*See* ECF No. 96-4, PageID.783; ECF No. 96-5, PageID.786 (lead sampling data)). Water samples tested during the three six-month monitoring periods following 2021 showed lead levels below the action level. (*See* EGLE Press Release, July 7, 2022, ECF No. 96-41).

---

[7] Although the 90th percentile rose to 27 ppb in the first part of 2019, and 32 ppb in late 2019, the elevated levels were likely due to the fact that Benton Harbor was required to collect and test the fifth liter sample drawn from each site, and not simply the first. (Onan Decl. at ¶ 26, ECF No. 96-3, PageID.778-79). "The change to collect fifth liter samples often results in finding more lead. That is because the fifth liter collects water that is more likely to have been sitting in the building's service line, and if that line is made of lead, the fifth liter is more likely to have lead in it than the first liter." (*Id.*, PageID.779). In addition, the testing protocol required six to eight hours of stagnation, a greater level of stagnation than is typically encountered in residential use, which protocol "is designed to help identify the worst case scenarios." (*Id.*).

11

In the beginning of the action level exceedance period, Benton Harbor made bottled water available for pickup at city hall, but did not provide water filters. (Onan Decl. at ¶ 14, ECF No. 96-3, PageID.773). Upon learning this information in January 2019, EGLE worked with MDHHS and the Berrien County Health Department to ensure water filters were made available to all residents at no cost. (*Id.* at ¶¶ 14-15, PageID.773-74).

The EPA conducted a study of these filters, which were the same as used in Flint. That study confirmed that the filters "consistently reduc[ed] the lead in tap water, in most cases to undetectable levels, and in all cases to levels that would not result in a significant increase in overall lead exposure." (*See Flint, MI Filter Challenge Assessment*, ECF No. 96-54, PageID.1559; *see also Benton Harbor, Michigan, Drinking Water Study Results*, ECF No. 96-55, PageID.1565 ("[F]ilters, when properly installed and used, remove lead from drinking water as expected.").

## The Amended Complaint

The thirteen counts in the 85-page amended complaint include the following claims, as can best be discerned by the undersigned, giving the benefit of the doubt to Plaintiffs:

Count I:    The federal, state and city defendants engaged in gross negligence and willful neglect of duty by withholding information about lead contaminants in Benton Harbor's tap water (ECF No. 75, PageID.464-67);

Count II:    All defendants violated Plaintiffs' due process rights by exposing them to lead-contaminated water and in failing to warn them of the dangers of the contamination (*id.* at PageID.467-69);

Count III:     The federal, state and city defendants violated Plaintiffs' rights to equal protection and due process by failing to comply with water system reporting requirements and in failing to enforce relevant regulations, thereby causing Plaintiffs to be subject to a "state-created-danger" (*id.* at PageID.469-72);

Count IV:      The federal, state and city defendants violated Plaintiffs' rights to "bodily integrity" by causing them to be "poisoned and traumatized" by toxic lead in the public water system (*id.* at PageID.473-76);

Count V:       The defendants acted with gross negligence in violating federal and state safe drinking water statutes and regulations (*id.* at 477-88);[8]

Count VI:      All defendants committed a "constitutional tort of assault" by exposing Plaintiffs to lead in their tap water (*id.* at PageID.488-91);

Count VII:     All defendants committed a "constitutional tort of battery" by exposing Plaintiffs to lead in their tap water (*id.* at PageID.491-92);

Count VIII:    All defendants committed a "constitutional tort of intentional infliction of emotional distress" by exposing Plaintiffs to lead in their tap water (*id.* at PageID.492-97);

Count IX:      All defendants committed "constitutional torts of public and private nuisance" and "trespass to real property" by failing to "uphold their statutory duties and standards of care" regarding the lead contamination in the Benton Harbor water system (*id.* at PageID.497-99);

Count X:       The State and City Defendants obtained "unjust enrichment" by receiving payments for lead contaminated water (*id.* at PageID.500-01);

Count XI:      The State and City Defendants negligently failed to warn Plaintiffs of the harms in the "commercial product" of water sold to them (*id.* at PageID.501-02);

---

[8] Plaintiffs fail to identify which defendants are subject to the claims in Count V.

Count XII:    All defendants contributed or directly caused the wrongful death of "would be Plaintiff Class members by wantonly and willfully causing neurotoxic contaminated lead-water to be ingested by the deceased persons and embryos" (*id.* at PageID.503-05); and

Count XIII:    All defendants violated Plaintiffs' rights to the free exercise of their religion by forcing them to practice those religions using lead-contaminated water (*id.* at PageID.505-10).

Other than a cryptic reference to "equal protection," Plaintiffs cite to nothing to suggest that the allegations in Count VI support a constitutional claim. Instead, Plaintiffs' assault claim appears to rely exclusively on Michigan state law. Count VII is entirely devoid of any reference to a constitution, federal or state. It is simply a common law claim based solely on state law. Similarly, the gravamen of each of Counts VI, VII, and VIII sound solely in state common law.

This matter is now before the Court on the defendants' various motions to dismiss the federal claims. The undersigned judicial officer advised the parties that the Court may not retain supplemental jurisdiction over the state law claims, and directed the parties to brief that issue. The undersigned's recommendations regarding the motions to dismiss will be included in various sections following an explication of the relevant procedural history of this case. The undersigned is recommending that the four federal claims – Counts II-IV and XIII – be dismissed and that the Court not retain supplemental jurisdiction over the state law claims.

14

## Procedural History

Plaintiffs filed the initial complaint on March 2, 2022.  (ECF No. 1).  The 81-page pleading raised thirteen claims against seventeen defendants, plus a number of "unknown, yet to be discoverable liable persons or entities."  (*Id.* at PageID.2).  It sought to represent a class of Benton Harbor residents who were exposed to lead contaminated drinking water.  (*Id.* at PageID.5-6, 22).  The complaint also contained a seven-page "policy" statement regarding "State Human Rights Obligations and International Law Compliance."  (*Id.* at PageID.69-75).

The Court conducted a status conference on August 30, 2022, to discuss with counsel in each of the three related Benton Harbor water cases how to efficiently coordinate the litigation.  (*See* Order, ECF No. 44, PageID.276).  The Court ordered counsel for all parties to confer for the purposes of developing proposals for consolidating discovery, as well as coordinating with any pending state case.[9]  At that time, Plaintiffs' counsel in this case had failed to serve several named defendants, notwithstanding the requirement that they be served within ninety days of the filing of the complaint.  *See* FED. R. CIV. P. 4(m).  Accordingly, the Court ordered counsel to complete service within thirty days.  (ECF No. 44, PageID.415).

---

[9] There are three known cases pending before Judge Douglas Shapiro in the Michigan Court of Claims:  *Daretha Braziel v. EGLE*, Case No. 22-0046-MM; *Oliver Kavanaugh v. EGLE*, Case No. 22-0050-MM; and *Jennifer Janssen-Rogers v. EGLE*, Case No. 22-0246-MM.

The Court conducted a second status conference on October 20, 2022. (Minutes, ECF No. 56).  During that conference, the Court notified counsel that it may decline to exercise supplemental jurisdiction over the state claims in each of the related Benton Harbor water cases.  (*See* Omnibus Order, ECF No. 59, PageID.384). It issued Plaintiffs an order to show cause within 21 days why the Court should not decline supplemental jurisdiction, requiring Defendants to respond within fourteen days thereafter.  (*Id.* at PageID.385).  The Court stayed Defendants' time for responding to the state claims pending the Court's decision on the issue of supplemental jurisdiction.  (*Id.* at PageID.386).

During the October 20 status conference, the Court asked Plaintiffs' counsel in the instant case whether he had any intention of filing an amended complaint. Counsel responded in the negative.  That, along with the assurances of Plaintiffs' counsel in the two related cases that amendments would not be sought, the Court set a briefing schedule for Defendants' motions to dismiss.  (Omnibus Order, ECF No. 59).  Defendants were required to file any such motion by December 2, 2022 (*see id.* at PageID.386), which was later extended to December 16, 2022 (*see* ECF No. 83).

During the October 20 status conference, the Court sought clarification from Plaintiffs' counsel in the instant case regarding which defendants were subject to which of the thirteen claims in the complaint.  The Court then ordered Plaintiffs' counsel to file a notice with the Court confirming that information.  (Omnibus Order, ECF No. 59, PageID.385).  Plaintiffs' counsel filed that notice on October 29, 2022. (ECF No. 67).

16

In that notice, and notwithstanding his October 20 assurance that no amendment of the complaint was anticipated, Plaintiffs' counsel informed the Court of Plaintiffs' intent to amend the complaint.  (*Id.* at PageID.404).  Counsel advised that the amended complaint would "reflect clarifications in this notice, withdraw a count, and add one new claim for violations of freedom of religion against all defendants."  (*Id.*).  Counsel also noted his intent to correct the name of one of the plaintiffs, and that consideration was being made to add another private contractor as a defendant.  (*Id.*).  The Court ordered Plaintiffs' counsel to file the amended complaint no later than November 14, 2022.  (ECF No. 70).

Plaintiffs filed their amended complaint on November 20, 2022 (ECF No. 75), six days late.  Plaintiffs neither requested nor demonstrated good cause to file the amended complaint out of time.  This 86-page pleading did little to clarify the claims in the original complaint.

All defendants have filed motions to dismiss.  F&V Resource filed its motion on December 14, 2022, seeking dismissal of the claims against it under Federal Rule of Civil Procedure 12(b)(6) (ECF No. 85).  Elhorn similarly moved to dismiss the same day.  (ECF No. 88).  On December 16, 2022, the following motions to dismiss were filed:  EPA administrators Michael Regan and Debra Shore move to dismiss the individual capacity claims against them under Rules 12(b)(2) and 12(b)(6) (ECF No. 91); the EPA and EPA administrators Reagan and Shore in their official

capacities move to dismiss under Rules 12(b)(1) and 12(b)(6) (ECF No. 92);[10] the State Defendants separately move to dismiss the claims against them under Rules 12(b)(1) and 12(b)(6) (ECF No. 95, 97, respectively); and the City of Benton Harbor Defendants move to dismiss the claims against them under Rules 12(b)(1) and 12(b)(6) (ECF No. 98, 102).  On February 10, 2023, Abonmarche filed a motion to dismiss claims against it under Rule 12(b)(6).[11]

Plaintiffs responded to each motion.  (ECF No. 113, 105, 106, 112, 110, 111, 114, 115, 136, respectively).[12]  Defendants have replied.  (ECF No. 123, 124, 125, 132, 133, 135, 134, respectively).  Plaintiffs thereafter filed a number of sur-replies without leave of Court, some of which were styled as "replies" or "responses" (ECF No. 138, 139, 140, 141, 142, 143, 144, 145, 147, 148), all of which have been struck. (*See* ECF No. 146, 152, 153).

On May 8, 2023, the Court conducted oral argument on the pending motions. (Minutes, ECF No. 157).  The undersigned has taken into consideration all that was discussed during that hearing.

---

[10] The Federal Defendants alternatively move for summary judgment.  (*See* ECF No. 92, PageID.678).

[11] Abonmarche was served with the amended complaint on December 2, 2022 (ECF No. 84), and on January 11, 2023, the Court granted its motion to extend time to answer to February 10, 2023 (ECF No. 119).

[12] When Plaintiffs' counsel filed his response (ECF No. 113) to F&V's motion to dismiss (ECF No. 85), he erroneously filed it as a response to docket number 88, which is Elhorn's motion to dismiss.  He compounded this error by naming Elhorn in the heading of his response.  (ECF No. 113, PageID.2563).

## STANDARDS

### I.    Motions to Dismiss for Lack of Subject Matter Jurisdiction

If a challenge is asserted to the Court's subject matter jurisdiction, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Houchens v. Beshear*, 850 Fed. Appx. 340, 342 (6th Cir. 2021). Moreover, the Court "must" consider a jurisdictional challenge first because Defendants' other arguments for relief are moot if the Court lacks jurisdiction. *Ibid.*

Motions challenging subject matter jurisdiction may be based on a "facial" or a "factual" attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack challenges jurisdiction looking only to the allegations in a complaint, taking them as true, while a factual attack challenges "the factual existence of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). In a factual attack, a court has broad discretion as to what evidence to consider, including evidence outside of the pleadings, and it "has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Id.* at 759-60 (citing *Ritchie*, 15 F.3d at 598).

### II.    Motions to Dismiss for Failure to State a Claim

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than

labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a " 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The burden to obtain relief under Rule 12(b)(6) rests with the defendant.  *See, e.g., DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ibid.* A motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Ibid.*

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided such are referenced in the complaint and central to the claims therein. *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008); *see also*, *Continental Identification Products, Inc. v. EnterMarket, Corp.*, 2008 WL 51610, at *1 n.1 (W.D. Mich., Jan. 2, 2008) ("an exhibit to a pleading is considered part of the pleading" and "the Court may properly consider the exhibits. . .in determining whether the complaint fail[s] to state a claim upon which relief may be granted without converting the motion to a Rule 56 motion"); *Stringfield v. Graham*, 212 Fed. Appx. 530, 535 (6th Cir. 2007) (documents "attached to and cited by" the complaint are "considered parts thereof under Federal Rule of Civil Procedure 10(c)").

III.    Motions for Summary Judgment

Summary judgment is available under Rule 56(a) if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, the Court must resolve all ambiguities against the moving party and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Electric Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

The test is whether the party with the burden of proof has presented a jury question as to each of the requisite elements of the cause of action. *See Hartsell v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). To defeat a properly supported summary judgment motion, the plaintiff must present sufficient evidence upon which a trier of fact could reasonably find in the plaintiff's favor. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation is insufficient; there must be a genuine issue of material fact to render summary judgment inappropriate. *Liberty Lobby*, 477 U.S. at 247-49.

## ANALYSIS

The undersigned judicial officer will address the jurisdictional issues first. Thereafter, each of the four federal claims will be analyzed as to whether they state a cognizable claim under Rule 12(b)(6). Finally, the issue of whether the Court should retain supplemental jurisdiction will be addressed.

I.    <u>Federal Defendants' Rule 12(b)(1) Motion to Dismiss</u>

The Federal Defendants (the United States of America and the EPA) move to dismiss the claims against them under Rule 12(b)(1), for lack of subject matter jurisdiction. (ECF No. 92, 93). The only claims in the amended complaint that arguably include the Federal Defendants are Counts I-IX, XII, and XIII.

It should be noted at the outset that the gravamen of Counts I, V-IX, and XII are state-law tort claims. Sovereign immunity plainly bars Plaintiffs from bringing these claims against the United States and the EPA. Accordingly, the undersigned

is recommending that they be dismissed with prejudice as against the Federal Defendants.

With respect to Plaintiffs' constitutional claims – Counts II, III, IV, and XIII – the Federal Defendants argue that Plaintiffs have failed to allege a jurisdictional basis for them. (*Id.* at PageID.696-700). The undersigned agrees and, for the reasons articulated herein, is recommending that the Federal Defendants' Rule 12(b)(1) motion to dismiss (ECF No. 92) be granted in full, and that all the claims against them be dismissed.

A.    The State Law Tort Claims

The Federal Defendants argue, among other things, that, with respect to the state law tort claims – Counts I, V-IX, and XII – Plaintiffs have failed to demonstrate a waiver of sovereign immunity. They are correct.

As a general rule, the United States and its agencies are immune from suit. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). "It is elementary that '[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). A waiver of sovereign immunity must be explicit and unequivocal. *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992); *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95 (1990)). "Moreover, a waiver of the Government's sovereign immunity will be strictly

construed, in terms of its scope, in favor of the sovereign." *Lane* 518 U.S. at 192 (citing *United States v. Williams*, 514 U.S. 527, 531 (1995)).

The exclusive waiver of sovereign immunity for actions in tort against the United States, its agencies, and its employees acting within the scope of their employment, is found in the Federal Tort Claims Act (FTCA). *See* 28 U.S.C. § 2679; *see also Arbour v. Jenkins*, 903 F.2d 416, 419 (6th Cir. 1990). That waiver is limited, however, and any claim must be brought solely against the United States, not an agency or employee. *See* 28 U.S.C. 2679(b)(1). Accordingly, the tort claims against the EPA must be dismissed.

The tort claims against the United States must also be dismissed. None of these claims fall within the FTCA's limited waiver of sovereign immunity.

Plaintiffs' claims of assault and battery – Counts VI and VII – are excluded from the FTCA's waiver of sovereign immunity. The FTCA explicitly excludes conduct "arising out of" a list of torts, such as "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h).

Moreover, Plaintiffs have failed to establish that they have exhausted their administrative remedies as to any of the tort counts, as required by the FTCA. *See* 28 U.S.C. § 2675(a). In fact, the amended complaint makes no mention of the FTCA, and Plaintiffs' response to the instant motion concedes their failure to present any of

their claims to the EPA.  (*See* ECF No. 112).[13]  Before a suit for tortious conduct can be brought against the United States, the putative plaintiff must first present the claim to the appropriate federal agency.  28 U.S.C. §§ 2401(b), 2675(a); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").

As exhaustion is a prerequisite to bringing suit, courts have repeatedly recognized that the failure to exhaust under the FTCA deprives federal courts of subject matter jurisdiction to consider tort claims against the United States.  *See McNeil*, 508 U.S. at 113 (1993) (because petitioner failed to exhaust his administrative remedies, the district court properly dismissed his FTCA claim for lack of jurisdiction); *Joelson v. United States*, 86 F.3d 1413, 1422 (6th Cir. 1996) ("Because [plaintiff] does not allege that he has filed an administrative claim, he has not satisfied the jurisdictional prerequisite to obtaining judicial review under the [FTCA], and the district court properly dismissed this claim."); *Bumgardner v. United States*, 469 Fed Appx. 414, 417 (6th Cir. 2012) ("The [FTCA] exhaustion requirement is jurisdictional."); *Holt v. Morgan*, 79 Fed. Appx. 139, 141 (6th Cir. 2003) ("Failure to exhaust administrative remedies deprives a federal court of jurisdiction over the claim."); *Harris v. City of Cleveland*, 7 Fed. Appx. 452, 459 (6th Cir. 2001) ("Under

---

[13] Plaintiffs' response to the Federal Defendants' motion to dismiss and in the alternative for summary judgment is largely unresponsive to the issues raised in the motion.  Instead, it is a hodge-podge of irrelevancies, hyperbole, and misstatements of the law.  Plaintiffs cite a number of statutes that are plainly inapplicable.  As most of these statutory provisions are not referenced in the amended complaint, the Court need not waste time addressing them.

the plain language of the [FTCA] as interpreted by this Court, the district court procedurally lacked subject matter jurisdiction to hear [plaintiff's] FTCA claim . . . because the claim had not yet become ripe when the complaint was filed."); *see also Wilson v. Big Sandy Healthcare, Inc.*, 553 F. Supp.2d 825, 837 (E.D. Ky April 2, 2008) (following substitution of the United States as the party defendant, court dismissed plaintiff's unexhausted claims for lack of subject matter jurisdiction); *Hodges v. Social Security Administration*, Case No. 1:20-cv-66, 2021 WL 949845, at *4 (E.D. Tenn. Mar. 12, 2021) (dismissing claim for lack of subject matter jurisdiction due to plaintiff's failure to plead exhaustion).

The Supreme Court's decision in *United States v. Wong*, 575 U.S. 402 (2015), does not alter the analysis here. In *Wong*, the Court held that the FTCA's statute of limitations provision is not jurisdictional, but rather, is subject to equitable tolling. *Id.* at 420. That decision is limited to FTCA filing deadlines. The Supreme Court noted that "most time bars are nonjurisdictional," but rather, "quintessential claim-processing rules," intended to promote "the orderly progress of litigation." *Id.* at 410. The Court also noted that it had "repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has 'clearly state[d] as much." *Id.* at 409 (citation omitted).

The requirement that a plaintiff must first have *presented* a claim to an agency – the "presentment rule" – on the other hand, appears to be substantively different. *See* 28 U.S.C. § 2675(a) ("An [FTCA] action *shall not be instituted* . . . unless the claimant shall have first *presented* the claim to the appropriate Federal Agency and

his claim shall have been denied by the agency . . . ." (emphasis added)).    The presentment rule is the unambiguous prerequisite to bringing suit – the prerequisite to the waiver of sovereign immunity.   *See, e.g., McNeil*, 508 U.S. at 113; *see also Greene v. United States*, Case No. 6:19-cv-0024, 2021 WL 1214499, at *6 (E.D. Ky. March 30, 2021) (holding that presentment requirement is jurisdictional even in light of the *Wong* decision).

The Sixth Circuit more recently found another of the FTCA's claims-processing rules lacked jurisdictional import.  In *Copen v. United States*, the court held that the FTCA's "sum certain" requirement – that a claim presented to an agency must contain a specific monetary demand – is not jurisdictional, but rather, a mandatory claims-processing rule.  3 F.4th 875, 884 (6th Cir. 2021).  As with *Wong*, the *Copen* decision does not resolve the question of whether a plaintiff's failure to present any claim deprives the Court of jurisdiction.

In a subsequent unpublished decision, however, a panel of the Sixth Circuit held that the presentment requirement of the FTCA is not jurisdictional, and therefore, a district court may "excuse" the delay in filing a claim with an agency. *Kellom v. Quinn*, Case Nos. 20-1003/1222, 2021 WL 4026789, at *3 (6th Cir. Sept. 3, 2021).  In *Kellom*, the plaintiffs filed an untimely administrative claim after filing suit, and later amended their complaint in the district court after the administrative claim was denied.  *Id.* at *2.  The government in that case did not raise the exhaustion requirement until after the amended complaint had been filed.  *Id.* at *3.  The panel remanded the case to the district court to make determinations of whether to excuse

27

the delay in the untimely filing the administrative complaint and whether the post-exhaustion amended complaint cured any defect. *Id.*

While the question of the jurisdictional import of FTCA's presentment requirement will likely be the subject of continued judicial review, this Court must determine whether it has jurisdiction over Plaintiffs' tort claims. *See Houchens*, 850 Fed. Appx. at 342 ("The Court 'must consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdictional.'" (quoting *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 817 (6th Cir. 2017)). Mindful of this mandate, the undersigned judicial officer finds that this Court lacks subject matter jurisdiction to consider Plaintiffs' tort claims.

First, while there is conflicting case law, the Sixth Circuit has held, in at least one published decision, that the failure to exhaust the administrative remedies under the FTCA is a jurisdictional bar to bringing them in federal court. *See Joelson*, 86 F.3d at 1422. The undersigned can find no published case in the Sixth Circuit that has overturned the *Joelson* decision. Accordingly, the *Joelson* decision is still binding on this Court; the unpublished decision in *Kellom* is not. *See United States v. Flores*, 477 F.3d 431, 433-34 (6th Cir. 2007) (An unpublished decision by a panel of the Sixth Circuit is not binding precedent.). In addition, the Supreme Court has at least implicitly recognized the jurisdictional nature of the presentment requirement of the FTCA, *see McNeil*, 508 U.S. at 113, and the undersigned has found no subsequent Supreme Court decision to the contrary, including *Wong*.

28

Moreover, this Court must be cognizant of the well-settled principle that sovereign immunity is itself a jurisdictional bar. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). The terms of any waiver of that immunity defines this Court's jurisdiction to entertain Plaintiffs' claims. *See, e.g., Mitchell*, 445 U.S. at 538. In *Arbaugh v. Y&H Corp.*, the Supreme Court counsels the Court to look for a clear statement by Congress to determine whether a statutory requirement creates a jurisdictional hurdle. *See* 546 U.S. 500, 515-16 (2006).[14]  And in *Wong*, the Supreme Court instructs that statutory "procedural rules" are to be interpreted as jurisdictional prerequisites only if Congress clearly states its intent to enact such, noting that Congress need not "incant magic words." 575 U.S. at 409-10.

The presentment requirement of the FTCA is substantively different than the employee threshold number in Title VII and the claims processing time limits in the FTCA. The statutory language in the FTCA unambiguously states that: "[a]n action *shall not be instituted* . . . unless the claimant shall have first *presented* the claim to the appropriate Federal Agency." 28 U.S.C. § 2675(a) (emphasis added). This is not a claims processing rule, like *Wong* and *Copen*, but rather, a prerequisite to the waiver of sovereign immunity, the corollary of which is that it is a prerequisite to the

---

[14] In *Arbaugh*, the Supreme Court held that Title VII's employee-numerosity requirement for establishing "employer" status "is an element of a plaintiff's claim for relief, not a jurisdictional issue." 546 U.S. 500, 516 (2006).

Court's subject matter jurisdiction.  Accordingly, Plaintiffs' tort claims – Counts I, V-IX, and XII – must be dismissed pursuant to Rule 12(b)1).

Should the Court not adopt this ruling, the undersigned judicial officer recommends, in the alternative, that the Court grant the Federal Defendants' motion for summary judgment, as there is no dispute of fact regarding Plaintiffs' failure to exhaust their administrative remedy.  First, the amended complaint is devoid of any reference to the FTCA, much less does it so much as suggest that Plaintiffs made any effort to present a claim to the EPA (or any other federal agency).  Second, the Federal Defendants have presented unrefuted evidence that there is no record in EPA's claims database of any such administrative claim.  (*See* Redden Decl. at ¶¶ 3-4, ECF No. 93-1,  PageID.705-06).  Finally, not only have Plaintiffs failed to offer any evidence regarding the submission of any putative claim with the EPA, their' response to the Federal Defendants' motion essentially concedes this point.[15]  (*See* ECF No. 112, PageID.2557).  Plaintiffs instead argue that the EPA administrative remedies "are wholly inadequate for the injuries suffered and an undue burden to accurate and fitting justice for the harms endured."  (*Id.*).  There is no such exception to the administrative exhaustion requirement in the FTCA.

Plaintiffs attempt to avoid the sovereign immunity by claiming that they have pled "constitutional torts."  (ECF No. 112, PageID.2556-57).  But this effort must also fail.  The gravamen of each of these counts is plainly founded state tort law.

---

[15] Plaintiffs' counsel affirmatively conceded this point during oral argument.

Moreover, even if Plaintiffs had properly pled constitutional torts, their efforts to sue the United States would fail. The FTCA provides the only waiver of the United States' sovereign immunity, and it does not waive immunity for constitutional torts. *See Truesdale v. U.S. Department of Justice*, 657 F. Supp.2d 219, 229 (D.D.C. 2009); *Fowlkes v. U.S. National Archive and Records Admin.*, Case No. 3:09-cv-006, 2009 WL 1687940 at *6 (S.D. Ohio June 15, 2009); c*f. FDIC v. Meyer*, 510 U.S. at 477 (holding that a constitutional tort claim is not "cognizable" under the FTCA). "Constitutional duties do not give rise to liability under the FTCA. The FTCA 'applies to torts, as defined by state law – that is to say, circumstances where the United States, *if a private person*, would be liable' under state law – and the '[t]he Constitution governs the conduct of public officials, not private ones.' " *Fosnight v. United States*, Case No. 4:20-cv-0119, 2022 WL 2652112 at *4 (S.D. Ind. July 8, 2022 (quoting *Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019)).

Accordingly, Plaintiffs' tort claims as against the Federal Defendants are facially deficient. Thus, even if this Court has subject matter jurisdiction over Plaintiffs' tort claims, the Court should grant the Federal Defendants' motion for summary judgment on Counts I, V-IX, and XII.

B.    The Constitutional Claims

The Federal Defendants argue that Plaintiffs' constitutional claims – Counts II-IV, and XIII – fail to allege a jurisdictional basis upon which to bring these claims against a federal agency or official. (ECF No. 93, PageID.696-700). The

undersigned agrees, and for the following reasons recommends that these claims be dismissed as to the Federal Defendants.

Constitutional claims cannot be brought against federal agencies or federal employees in their official capacities.  Such claims may be brought only as individual capacity claims to the extent they are actionable under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).[16]  *See FDIC v. Meyer*, 510 U.S. at 477-78 (refusing to expand *Bivens* actions to federal agencies); *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991) ("a *Bivens* claim may not be asserted against a federal officer in his official capacity").  As such, and even to the extent any of the counts in the amended complaint properly plead a constitutional violation, the Federal Defendants are not the proper parties and should be dismissed from this case.[17]

Plaintiffs' response to the Federal Defendants' motion fails to address the specific arguments raised in the motion, and instead includes generalized, and largely irrelevant, statements regarding human rights and references to statutes not cited in the amended complaint.  Plaintiffs' references to the federal civil conspiracy statutes – 42 U.S.C. §§ 1985 and 1986 – are unavailing, as the amended complaint is devoid of specific allegations needed to support such claims.  *See, e.g., Pahssen v. Merrill*

---

[16] In the *Bivens* case, the Supreme Court held that an individual injured by a federal agent's alleged violation of the Fourth Amendment may bring an action for damages against the individual agent.  403 U.S. 388, 397 (1971).

[17] The Federal Defendants have articulated other deficiencies in Plaintiffs' pleading of the tort claims.  (*See* ECF No. 93, PageID.691-96).  These arguments appear to have merit, but, in light of the defendants' sovereign immunity, and the consequential lack of subject matter jurisdiction, the undersigned shall not address those issues.

*Community School District*, 668 F.3d 356, 368 (6th Cir. 2012) (" '[C]onspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim'." (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)).

II.     Defendants Reagan and Shore's Rule 12(b)(2) Motion to Dismiss

Defendants EPA administrators Michael Reagan and Debra Shore seek dismissal of the individual-capacity claims against them under Rule 12(b)(2) for lack of personal jurisdiction, as well as other bases under Rule 12(b)(6).  (ECF No. 91). For the following reasons, their motion should be granted on the basis of lack of personal jurisdiction, and the Court need not address the other issues raised in their motion.

Plaintiffs bear the burden, by preponderant evidence, of establishing personal jurisdiction over Mr. Reagan and Ms. Shore.  *See Beydoun v. Wataniya Restaurants Holding,* Q.S.C.*,* 768 F.3d 499, 504 (6th Cir. 2014); *Conn v. Zakharov*, 667 F.3d 705, 713 (6th Cir. 2012).  In order to defeat a Rule 12(b)(2) motion to dismiss, Plaintiffs must make a *prima facie* showing that personal jurisdiction exists, *Air Products & Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544, 549 (6th Cir. 2008), and that burden is "relatively slight."  *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988).  While "the pleadings and affidavits submitted must be viewed in a light most favorable to [Plaintiffs]," *Air Products*, 503 F.3d at 549 (citation omitted), "to stave off dismissal [Plaintiffs] 'must show the specific facts demonstrating that the court has jurisdiction'."  *Carter v. University of Texas at*

33

*Dallas*, No. 20-1714, 2021 WL 243811, at *2 (6th Cir. 2021) (quoting *Miller v. AXA Winterhur Insurance*, 694 F.3d 675, 678 (6th Cir. 2012)).

Where a claim is brought against a federal official in his or her individual capacity, the standard rules for establishing personal jurisdiction apply. *See Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1988). Under those rules, Plaintiffs must establish, at a minimum, that EPA administrators Reagan and Ms. Shore were "amenable to suit" here under Michigan's long-arm statute. *See Reynolds v. International Amateur Athletic Federation*, 23 F.3d 1110, 1115 (6th Cir. 1994). In addition, Plaintiffs must demonstrate that exercising personal jurisdiction over a given defendant comports with constitutional due process. *See Serras v. First Tennessee Bank National Assoc.,* 875 F.2d 1212, 1216 (6th Cir. 1989).

In Michigan, general personal jurisdiction is established if: (1) the defendant is present in the state at the time process is served; (2) the defendant was domiciled in the state at the time process is served; or (3) the defendant consented to the jurisdiction of the state, subject to certain limitations. MICH. COMP. L. § 600.701. Under Michigan law, " 'Domicile' means a place where a person has his true, fixed and permanent home and principal establishment to which, whenever absent therefrom he intends to return, and domicile continues until another permanent establishment is established." MICH. COMP. L. § 206.18(a). A person is a resident of Michigan if he or she is domiciled in the state. MICH. COMP. L. § 206.18(1).

34

Plaintiffs have not alleged that either Mr. Reagan or Ms. Shore is domiciled in Michigan; nor have Plaintiffs' claimed that either was present in the state when served with the summons and complaint in this case. To the contrary, Plaintiffs' own summonses indicate that EPA Regional Administrator Shore was served at her work address in Chicago, Illinois (*see* ECF No. 46, PageID.283), and that EPA Administrator Reagan was served at his work address in Washington, D.C. (*see* ECF No. 46, PageID.284). Certainly, no one is suggesting that either Ms. Shore or Mr. Reagan consented to suit here. Plainly, this Court does not have generalized personal jurisdiction over either EPA administrator in their individual capacity.

Plaintiffs' argument to the contrary is unavailing. They advance the bald assertion that "there are exceptional circumstances that make [Defendants Reagan and Shore] effectively home for purposes of this litigation." (ECF No. 106, PageID.2508). They fail to explain, however, what the "exceptional circumstances" are, much less how these circumstances fit within the requirements of Michigan's general jurisdiction statute. Nor do Plaintiffs explain how having some unspecified duty to enforce laws or to manage a catastrophe makes them amendable to the jurisdiction of any Michigan court.[18]

Michigan also allows limited personal jurisdiction over individuals. *See* MICH. COMP. L. § 600.705. In order to assert limited personal jurisdiction, Plaintiffs must establish, with respect to each defendant, the existence of one of the following

---

[18] Plaintiffs' counsel conceded the issue of general jurisdiction during oral argument.

relationships with Michigan: (1) "[t]he transaction of any business within the state"; (2) "doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort"; (3) "ownership, use, or possession of real or tangible personal property situated within the state"; (4) "[c]ontracting to insure a person, property, or risk located within this state at the time of contracting" (5) "[e]ntering into a contract for services to rendered or for materials to be furnished in the state by the defendant"; (6) "[a]cting as a director, manager, trustee, or other officer of a corporation incorporated under the laws of, or having its principal place of business within this state"; and (7) [m]aintaining a domicile in this state while subject to a marital or family relationship which is the basis of the claim for divorce, alimony, separate maintenance, property settlement, child support, or child custody." *Id.*

Considering Plaintiffs' allegations in their amended complaint, the only arguable relationship either EPA administrator personally had with the State of Michigan is the second listed in the statute: "doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort." MICH. COMP. L. § 600.705(2). Plaintiffs simply have not alleged "specific facts" to support a claim that either Mr. Reagan or Ms. Shore is *personally* responsible for the lead contamination. As such, any assertion of limited personal jurisdiction over either EPA administrator must fail. *Cf. Carter*, 2021 WL 243811 at *2.

Moreover, even if Plaintiffs could overcome this hurdle, they cannot show that exercising limited personal jurisdiction in this case would satisfy the requirements of due process. In order to satisfy the principals of constitutional due process in the

36

context of limited personal jurisdiction, Plaintiffs must further establish three things: (1) that the respective defendant purposely availed himself of the privilege of acting in the forum state, or caused the consequence that occurred in the state; (2) the cause of action must arise from the respective defendant's activities in the state; and (3) the acts of the respective defendant or the consequences of the respective defendant must have had "a substantial enough connection with the forum state to make exercise of jurisdiction over the defendant reasonable." *Carter*, 2021 WL 243811 at *2 (quoting *Miller*, 694 F.3d at 680, and *citing Southern Machine Co., Inc. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Any assertion of limited personal jurisdiction against either EPA administrator would fail to satisfy the first and third due process requirements. There is nothing in the amended complaint to suggest that either EPA administrator "purposely" availed himself or herself personally of the privilege of acting in Michigan. Nor is there any allegation specifying any alleged act or omission committed by either defendant. Much less is there anything in the amended complaint that shows a sufficiently substantial connection to render the exercise of personal jurisdiction reasonable. The only two places where either administrator is mentioned by name is in the case caption and in paragraph 22, which simply restates the names of all the defendants named in the caption, and which asserts the demonstrably false claim that "*all*" defendants are either "West Michigan residents" or are "corporate entities with active residences or primary places of business within the jurisdiction of this Court." (Amended Complaint at ¶ 22, ECF No. 75,

PageID.449-50).  Moreover, there is no other reference, even a generic one, to any EPA administrator throughout the amended complaint, except in the various statutory provisions cited by Plaintiffs.  (*See id.* at ¶¶ 48, 68, 77, PageID.465-66, 473-74, 477-78).

Plaintiffs offer nothing more than conclusory statements to support their contention that this Court has limited personal jurisdiction over Defendants Reagan and Shore, and that exercising such jurisdiction would comport with the principles of due process.  (*See* ECF No. 106, PageID.2508-12.  This is manifestly insufficient to meet their obligation of presenting "specific facts" to demonstrate that this Court has personal jurisdiction over them.  *Carter*, 2021 WL 243811, at *2.  Having failed to establish a *prima facie* basis for personal jurisdiction, Plaintiffs' request for discovery on that issue (ECF No. 106, PageID.2512) must be denied.

This Court's decision in *Arrizon v. Wolf* is instructive here.  In that case, the plaintiffs sued officials who worked for the United States Department of Homeland Security and the Immigration Service in Washington, D.C., claiming that they were responsible for "a custom, policy, and/or practice" of refusing Deferred Action for Childhood Arrivals (DACA) recipients' requests for emergency advance parole and for in-person appointments to submit such requests.  Case No. 1:20-cv-0788, 2021 WL 4901573, at *1, 5 (W.D. Mich. Oct. 21, 2021).  In granting the defendants' motion to dismiss for lack of personal jurisdiction, this Court noted the following:

> Plaintiffs have not shown that these defendants purposefully availed themselves of the privilege of acting in Michigan.  Defendants no doubt intended that their subordinates in Michigan and elsewhere would follow their guidance.  However, Defendants were not involved in

> Plaintiffs' particular case. Thus, it is not reasonable for the Court to exercise personal jurisdiction over them. To hold otherwise would effectively give any district court in the country personal jurisdiction over Defendants for the actions of subordinates in that district, even where Defendants have no knowledge of those actions.

*Id.* at *5; *see also Hill v. Pugh*, 75 Fed. Appx. 715, 719 (10th Cir. 2003) (allegations that federal prison officials had responsibility for prison operations in forum state and that they received grievances and notices regarding the issues in the suit fell "far short" of the purposeful availment necessary to establish personal jurisdiction); *McCabe v. Basham*, 450 F. Supp.2d 916, 926-27 (N.D. Iowa 2006) (senior-level federal officials' supervisory duties over local government employees were insufficient contacts with forum state to establish personal jurisdiction); *Stone v. Derosa*, Case No. CV 07-0680-PHX, 2009 WL 798930, at *1-2 (D. Ariz. March 25, 2009) (rejecting contention that the Director of the Bureau of Prisons (BOP) had sufficient contacts in forum state, despite fact that BOP policy was a "critical issue" in the case); *c.f. Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1486 (E.D. Wis. 1993) ("If a federal agency head could be sued personally in any district within his or her official authority merely for supervising acts of subordinates . . . the minimum contacts requirement would be rendered meaningless.").

As Plaintiffs have fallen well short of making out a *prima facie* showing of personal jurisdiction over either EPA administrator, the Court need not address the other bases for their motion to dismiss. (*See* ECF No. 91, PageID.658-73). The claims against EPA administrators Michael Reagan and Debra Shore should be dismissed without prejudice. *See Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 520 (6th Cir.

2006); *see also Intera Corp. v. Henderson*, 428 F.3d 605, 620-21 (6th Cir. 2005) ("[D]ismissals for lack of personal jurisdiction should be made 'without prejudice'.").

III.    State Defendants' Rule 12(b)(1) Motion to Dismiss

The State Defendants – the two state agencies (EGLE and MDHHS) and the state officials (Governor Whitmer, EGLE directors Clark and Oswald, and MDHHS directors Gordon and Hertel) in their official capacities – seek dismissal of the federal claims against them under Rule 12(b)(1) for lack of jurisdiction due to Eleventh Amendment sovereign immunity.  (ECF No. 95).  The jurisdictional challenge is both facial and factual.  (ECF No. 96, PageID.745).  The only claims in the amended complaint that are arguably based on federal constitutional rights or the violation of federal law are found in Counts II-IV and XIII.

A.    Eleventh Amendment Sovereign Immunity

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. AMEND. XI.  While it does not explicitly bar suits by a state's own citizens, the Supreme Court has extended the Eleventh Amendment's application to a state's own citizens.  *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (citing other cases).  "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Id.*

Plaintiffs do not challenge whether the State Defendants are "arms of the state" for purposes of Eleventh Amendment immunity and, therefore, entitled to invoke that immunity; but rather, that exceptions to that immunity apply in this case.  (ECF No. 110, PageID.2529-33).  As discussed below, one of these exceptions appears to apply in this case.  Accordingly, the undersigned judicial officer recommends that the State Defendants' Rule 12(b)(1) motion be denied.

B.     The State Defendants are Not Immune from the Federal Claims

The State Defendants argue that, as the instant of action is one essentially seeking monetary relief from the state, they are immune from suit.  Moreover, any other relief would be retroactive in nature, addressing only past violations of law.  (ECF No. 96, PageID.749-59).

Plaintiffs argue, however, that the State Defendants are not immune from the claims in the amended complaint for three reasons:  (1) the state has consented to suit, (2) Congress has abrogated the state's immunity; and (3) the *Ex parte Young* exception applies.  (ECF No. 110, PageID.2529-33).  Plaintiffs' arguments miss the mark as to the first two exceptions, but the third hits home.

1. *Michigan has not consented to suit.*

Plaintiffs' contention regarding the state's purported consent to suit warrants little analysis.  It assumes the State Defendants are employers and it is premised upon state law claims under the Elliott-Larsen Civil Rights Act.  (*Id.* at PageID.2530-31).  At the direction of the Court, the State Defendants' pending motion addresses only federal claims.  The undersigned is recommending that the Court decline

41

supplemental jurisdiction over the state claims.  Plaintiffs would be free to pursue those claims, to the extent the State of Michigan has consented to suit, in state court.

> 2. *Congress has not abrogated Michigan's sovereign immunity as to the pending claims.*

In another effort to avoid Eleventh Amendment immunity, Plaintiffs contend that Congress abrogated Michigan's sovereign immunity for federal civil rights violations.  (ECF No. 110, PageID.2533).  But they simply cite a number of federal statutes, as well as "the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." (*Id.*).  Plaintiffs concede that the amended complaint "does not cite the controlling statute" (*id.*) – whatever that may be.[19]

Putting aside the fact that several of the statutes Plaintiffs cite are patently inapplicable to this case (e.g., the Rehabilitation Act of 1973, Title IX of the Educational Amendments of 1972, and the Age Discrimination Act of 1975), Plaintiffs offer no substantive analysis of this issue.  Issues raised in "a perfunctory manner, unaccompanied by some effort at developed argumentation" are deemed waived. *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007); *see also Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012) (same); *McPherson v. Kelsey*, 125 F.3d 989,

---

[19] Plaintiffs' invocation of the Supremacy Clause in Article VI of the U.S. Constitution (ECF No. 110, PageID.2526), is plainly inapposite.  *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) ("[T]he Supremacy Clause is not the 'source of any federal rights'." (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989); *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 613 (1979)).

995-96 (6th Cir. 1997) (" 'It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving to the court . . . to put flesh on its bones.' " (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Commission*, 59 F.3d 284, 293-94 (1st Cir. 1995)).  Plaintiffs have waived this issue.

### 3.  *The Ex parte Young doctrine does apply.*

Plaintiffs' argument regarding the *Ex parte Young* exception to Eleventh Amendment immunity is somewhat convoluted, but, in essence, it appears to be based on their contention that they are seeking prospective relief.   (ECF No. 110 at PageID.2532-33).  The *Ex parte Young*[20] doctrine avoids the Eleventh Amendment immunity to suit for actions against states and state offers in their official capacity for claims alleging an ongoing violation and which seek relief that is "properly characterized" as prospective.   *See Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002) (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, (1997) (J. O'Connor, J. Scalia, J. Thomas concurring in part and concurring in judgment)).  This is a "straightforward inquiry." *Verizon Maryland*, 535 U.S. at 645.

The State Defendants advance two arguments for the proposition that the *Ex parte Young* doctrine does not apply here:  (1) that they have not, nor are they continuing to violate federal law, so no relief is appropriate (ECF No. 96, PageID.749-57); and (2) that Plaintiffs' amended complaint does not seek prospective relief (*id.* at

---

[20] *Ex parte Young*, 209 U.S. 123 (1908).

PageID.758-59).  The first is inapposite, as the inquiry at this stage "does not include an analysis of the merits of the claim."  *Verizon Maryland*, 535 U.S. at 646 (citing *Coeur d'Alene*, 521 U.S. at 281)).  The second misreads the amended complaint.

The amended complaint is, to say the least, inartfully drafted.  But a review of the complaint indicates that Plaintiffs are seeking prospective relief.  Among the relief requested is what is described as "equitable relief" to remediate the harm caused by the lead contaminated water.  (Amended Complaint at ¶ 149(4), ECF No. 75, PageID.517-20).  Included among the equitable relief requested is injunctive relief against the payment for contaminated water, the "removal of all lead contaminated service lines," delivery of fresh water until the line are replaced, the "establishment of a medical monitoring facility" to treat the effects of lead exposure, and education and training.  (*Id.*).  According to the Sixth Circuit, this is sufficient to invoke the *Ex parte Young* exception to Eleventh Amendment immunity.  *See In Re Flint Water Cases*, 960 F.3d 303, 333-34 (6th Cir. 2020) (complaint seeking repairs to private property, as well as the establishment of medical monitoring and education programs sufficient to invoke *Ex parte Young* exception).

In conclusion, the State Defendants do not enjoy sovereign immunity under the Eleventh Amendment to the extent Plaintiffs seek prospective relief.  Accordingly, the State Defendants' Rule 12(b)(1) motion (ECF No. 95) should be denied.  For the reasons articulated below, however, the State Defendants' Rule 12(b)(6) motion should be granted, as the amended complaint fails to state a cognizable claim for constitutional violation.

44

IV.    <u>Plaintiffs' Count XIII "Free Exercise" Claim Must be Dismissed</u>

Plaintiffs allege that all the defendants violated their right to the free exercise of their religion by creating a "lead water crisis," which "obstructed the Plaintiffs from practicing their religions according to the dictates of their own minds and . . . when they forced [Plaintiffs] to practice those religions using neurotoxic lead-water." (*Id.* at ¶ 133, PageID.505). Plaintiffs note that for "nearly all religions, and especially the Abrahamic faiths that dominate this Plaintiff class community, safe water is essential to proper practice of religion and both substantiates and symbolizes an important role in everyday religious practices and ideologies." (*Id.* at ¶ 135, PageID.506). Plaintiffs then discuss the importance of water to the Islamic faith (*id.*), and that access to water is recognized by the United Nations as a human right (*id.* at ¶ 136, PageID.508). The gravamen of this count is essentially that the defendants failed to warn Plaintiffs for three consecutive years that the tap water they were using in their religious services was contaminated with lead, and had the defendants "complied with their statutory duties and standards of care," Plaintiffs "would not have been exposed to toxic lead water." (*Id.* at ¶¶ 138-39, PageID.509).

The State and Private Contractor defendants argue that Plaintiffs' Free Exercise claim should be dismissed under Rule 12(b)(6) for failure to state a claim.[21] They are correct. But before the Court can address whether the allegations in

---

[21] *See* ECF No. 86, PageID.601-05 (F&V); ECF No. 88-1, PageID.624-26 (Elhorn); ECF No. 101, PageID.1998-2002 (State Defendants); and ECF No. 129.PageID.2673-75 (Abonmarche).

Count XIII state a Free Exercise claim, it must first determine whether Plaintiffs have met the Article III jurisdictional requirements for standing. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (" 'Without jurisdiction the court cannot proceed at all in any cause.' " (quoting *Ex Parte McCardle*, 7 Wall. 506, 514 (1868)). Absent standing, this Court lacks subject matter jurisdiction to consider Plaintiffs' Free Exercise claim.

A.      Plaintiffs Lack Standing

Notably, nowhere in the amended complaint is the religious beliefs or practices of any plaintiff identified. Nor is there any allegation that any of the Plaintiffs actually participated in a religious service in which Benton Harbor tap water was used. Instead, Plaintiffs simply allege that Abrahamic faiths "dominate" in the community. As such, Plaintiffs have failed to meet their burden of establishing standing to bring this claim.

Standing is a threshold jurisdictional inquiry in every federal case that may not be waived by the parties. *See, e.g., Warth v. Seldon*, 422 U.S. 490, 498 (1975). "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). A plaintiff's injury in fact must be "concrete and particularized . . . not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "For an injury to be

46

'particularized,' it 'must affect the plaintiff in a personal and individual way.' " *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).  Plaintiffs bear the burden of establishing standing to sue.  *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

Plaintiffs' failure to allege that any of them are actually members of the religious groups referenced in the amended complaint, and specifically, their failure to allege that any of them were present at religious services in which lead-tainted water was allegedly used, deprives them of standing.  There is nothing in Count XIII to indicate that any of the named plaintiffs were affected "in a personal and individual way."  Accordingly, as this Court lacks jurisdiction to consider this claim, it should be dismissed *sua sponte*.  *See Akno 1010 Market Street St. Louis Missouri LLC v. Pourtaghi*, 43 F.4th 624, 627 (6th Cir. 2022) (The Court has an independent obligation to ensure that subject matter jurisdiction exists.).

B.    Plaintiffs Fail to State a Claim for a Free Exercise Violation

In the alternative, Count XIII should be dismissed for failure to state a claim as against all defendants.  The Free Exercise Clause of the First Amendment is triggered when government action or regulation "treat[s] *any* secular activity more favorably than religious exercise."  *Tandon v. Newsom*, __ U.S. __, 141 S. Ct. 1294, 1296 (2021) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. __, 141 S. Ct. 63, 67-68 (2020)) (emphasis in original).  In *Roman Catholic Diocese of Brooklyn*, the governor imposed restrictions on the number of attendees at church and synagogue services, but not on businesses categorized as "essential."  141 S. Ct. at 66.

47

The Supreme Court noted that, [b]ecause the challenged restrictions are not 'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (2008)).  Plaintiffs' amended complaint fails to assert that those practicing the faiths identified in Count XIII are being treated any differently than the general public.  The lead-contamination in Benton Harbor's water system affected everyone using it – the faithful, the agnostic, and the atheist – alike.

The Supreme Court has held that, even when government mandated environmental disturbances or government imposed administrative requirements for welfare programs disparately impact a certain religious group, it does not necessarily trigger scrutiny under the Free Exercise Clause.  In *Bowen v. Roy*, applicants for a welfare program claimed that the government's requirement to use a social security number violated their religious beliefs.  476 U.S. 693, 696 (1986).  The Court rejected this claim, noting the following:

> The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.  Just as the Government may not insist that [the plaintiffs] engage in any set form of religious observance, so [they] may not demand that the Government join their chosen religious practices by refraining from using a number to identify their daughter.

*Id.* at 699-700.  The Court further noted: " '[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the

individual can extract from the government.' " *Id.* at 700 (quoting *Sherbert v. Verneer*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring).

Similarly, in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, the Supreme Court held that the Free Exercise Clause did not prohibit the Forest Service from permitting timber harvesting and road construction on lands held sacred by three American Indian tribes.  485 U.S. 439, 442-42, 448-49 (1988).  The Court noted that, even though the government action "would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs," the tribal members were not being "coerced by the Government's action into violating their religious beliefs."  *Id.* at 449.  The Court reiterated that " 'the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.' " *Id.* at 451 (quoting *Sherbert*, 374 U.S. at 412).

Plaintiffs here have not alleged that any government official prevented them from exercising their religious beliefs, including conducting services using water. What they are contending is that they were exposed to lead contamination when they used the Benton Harbor tap water.  They seem to suggest that the defendants had some First Amendment duty to protect them from lead contamination during their religious services.[22]  Such a novel theory would run contrary to the holdings in *Bowen*, 476 U.S. at 696; and *Lyng*, 458 U.S. at 448-49.

_____

[22] Plaintiffs did not respond in any meaningful way to the State Defendants' arguments concerning the free exercise claims.  (*See* ECF No. 111. PageID.2543-52).

V.    Plaintiffs' Count III "State-Created-Danger" Claim Must be Dismissed

In Count III of the amended complaint, Plaintiffs essentially claim that the defendants failed to prevent the lead-contamination in the Benton Harbor water system and failed to warn Plaintiffs of the threat from that contamination.  Plaintiffs contend that the defendants thereby caused Plaintiffs to be exposed to a "state created danger."  (Amended Complaint at ¶ 64, ECF No. 75, PageID.472).

Plaintiffs have failed to state a cause of action as to any of the defendants. Count III is facially deficient in three respects: (1) it fails to allege that any of the defendants engaged in an affirmative act that increased harm to Plaintiffs by a private third party; (2) it fails to plausibly allege that any of the defendants placed Plaintiffs at a risk greater than that of the public at large; and (3) that it fails to plausibly allege that any of the defendants knew or should have known that their actions specifically endangered Plaintiffs.  Accordingly, Count III must be dismissed as to all defendants.

The state-created-danger doctrine is an exception to the general proposition that the Due Process Clause of the Fourteenth Amendment does not impose upon a state an affirmative duty to protect its citizens from private acts of violence.  *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (citing *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195 (1989)).  In *DeShaney*, the Supreme Court noted that the Due Process Clause imposes a duty to protect an individual against the private acts of violence where there is a "special relationship"

between the state and the individual, such as an individual who has been taken into custody against his will.  489 U.S. at 198-200.

With this guidance, the Sixth Circuit, as well as other circuits, have recognized "a constitutional violation under a state-created-danger theory of liability." *Kallstrom*, 136 F.3d at 1066 (citing cases).  "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to *private acts* of violence."  *Id.* (citing *Sargi v. Kent City Board of Education*, 70 F.3d 907, 913 (6th Cir. 1993)) (emphasis added). Inasmuch as any state is involved in a multitude of activities that have the potential to increase the risk of harm to certain individuals, the Sixth Circuit requires one asserting a state-created-danger claim to show "special danger," unless there is a "special relationship" between the state and the individual.  *Kallstrom*, 136 F.3d at 1066).  "The victim faces 'special danger' where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large."  *Id.* (citing *Jones v. City of Carlisle*, 3 F.3d 945, 949 (6th Cir. 1993); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986)).

To state a claim for state-created-danger, Plaintiffs' allegations must plausibly establish three elements:

    (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a *third party*;

    (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and

(3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. Marine City*, 336 F.3d 487, 493 (6th Cir. 2003), and citing *Kallstrom*, 136 F.3d at 1066) (emphasis added).[23]   Assessing the allegations in the amended complaint against these elements, Plaintiffs fall well short of stating a claim for state created danger.

As to the first element, there is nothing in the amended complaint that so much as suggests that Plaintiffs suffered any harm from a third party, or that they were at risk of harm from a third party.[24]   To the extent the amended complaint accuses anyone of harming them it is the defendants themselves, not a third party.

Plaintiffs similarly fail to plausibly allege the second element, that any action by the defendants created a risk "special" to them, as opposed to the public at large. The lead contamination in the Benton Harbor water system affected all users of the system.   Plaintiffs have failed to allege that they were at a risk greater or different from the rest of the population using that water system.   *See In Re Flint Water Cases*,

---

[23] In *Schneider v. Franklin County, Ohio*, 288 Fed. Appx. 247, 252 (6th Cir. 2008), the court included an incomplete version of this circuit's test for a state-created danger claim that did not include the requirement that the exposure to harm must be from a third party, despite citing the *Kallstrom* for that test.   Nothing in that decision suggests an intention to overturn *Kallstrom*.   Moreover, as an unpublished decision, *Schneider* is not binding on this Court.   *See, e.g., United States v. Flores*, 477 F.3d 431, 433-34 (6th Cir. 2007).

[24] During oral argument, Plaintiffs' counsel advanced the novel theory that the lead contamination put the Plaintiffs at a greater risk of violence from one another.   This warrants no response.

384 F. Supp.3d 802, 865 (E.D. Mich. 2019) ("An entire city, plus all those who visit, work, or pass through that city is, by definition, 'the general public'.").

Finally, Plaintiffs have failed to plausibly allege that any of the defendants took any *action* to cause the lead contamination in Benton Harbor. Accordingly, Plaintiffs cannot establish that the defendants knew or should have known that they could be responsible for specifically endangering Plaintiffs.

Plaintiffs' recognize the three elements required to bring a state-created-danger claim (*see* ECF No. 111, PageID.2547-48), but they avoid any analysis of the elements, opting instead to make generalized and conclusory statements about purported violations of constitutional rights and the standards for assessing Rule 12(b)(6). None of this serves Plaintiffs' interests here. As Plaintiffs have failed to allege facts that could plausibly establish any of the three requisite elements of a state-created-danger claim, the Court should dismiss Count III under Rule 12(b)(6). *See In Re Flint Water Cases*, 384 F. Supp.3d at 862-65 (after comprehensive review of the law concerning the doctrine, the district court dismissed the Flint plaintiffs' state-created-danger claim for failure to allege harm from a third party and failure to establish that they were at risk in a way different from the general public.).

## VI.  The Private Contractor Defendants' Rule 12(b)(6) Motions to Dismiss

The Private Contractor Defendants are three private engineering firms, which, at various times, provided consultation services under contracts with the City of Benton Harbor. They are F&V Operations and Resource Management, Inc. ("F&V"), Elhorn Engineering Company ("Elhorn"), and Abonmarche Consultants, Inc.

53

("Abonmarche").  Each has moved under Rule 12(b)(6) to dismiss the federal claims against them.  (ECF No. 85 (F&V); ECF No. 88 (Elhorn); ECF No. 128 (Abonmarche)).  Each argues that Plaintiffs have failed to establish that it is a "state actor," a predicate to asserting a Section 1983 claim against it, and that Plaintiffs have otherwise failed to satisfy the pleading requirements for the claims asserted.  (ECF No. 85, PageID.582-83; ECF No. 88, PageID.609-10; ECF No. 128, PageID.2665).  For the following reasons, the undersigned judicial officer agrees and recommends that each of their motions to dismiss be granted as to all federal claims.

A.    <u>Section 1983 – State Actors</u>

Under federal law, state actors are prohibited from violating the constitutional and statutory rights of individuals.  That statute provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.  Accordingly, to state a Section 1983 claim, Plaintiffs must plausibly allege both "(1) the deprivation of a right secured by the Constitution or laws of the United States and (2) the deprivation was caused by a person acting under color of state law." *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995) (internal quotes and citation omitted).  "A plaintiff may not proceed under § 1983 against a private party 'no matter how discriminatory or wrongful' the parties' conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (citing *American Manufacturers Mutual*

*Insurance Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).  In other words, only "state actors" are subject to liability under Section 1983.

The Sixth Circuit employs three tests for determining whether a private party's conduct amounts to state action.  The first is the "public function test," which requires proof "that the private entity exercise[d] powers which are traditionally and exclusively reserved to the state."  *Ellison*, 48 F.3d at 195 (internal quotes omitted). The second, the "state compulsion test," requires a showing that the state "significantly encouraged or somehow coerced the private party, either overtly or covertly, to take particular action so that the choice is really that of the state."  *Id.* The third is the "nexus test," which requires proof of "a sufficiently close relationship (i.e., through state regulation or contract) between the state and the private actor . . . that the action taken may be attributed to the state."  *Id.*

B.    <u>Plaintiffs Have Failed to Plausibly Allege That Any of the Private Contractors Was a State Actor</u>

Looking to Plaintiffs' amended complaint, the undersigned finds few allegations against the Private Contractors generally, and certainly nothing that satisfies any of the tests for state actor.  The analysis will begin with Abonmarche, as it faces the most allegations of the three.

1. *Plaintiffs fail to plausibly allege that Abonmarche is a state actor.*

Reading the amended complaint, as liberally as reason will allow, reveals the following allegations against Abonmarche: that it consulted Benton Harbor regarding the water plant (Amended Complaint at ¶ 23, ECF No. 75, PageID.451); that the water plant operator consulted Abonmarche while engaged in "a habitual practice of

55

misconduct and safe drinking water regulation violations, failing to maintain records, pass inspections, and or comply with federal laws" (*id.* at ¶ 24, PageID.451); and that Abonmarche "failed to adequately advise the City Defendants and instead helped to steer the municipality into this ongoing crisis by providing disparate services beneath the relevant standards of care in Benton Harbor" (*id.* at ¶ 26, PageID.454).

These allegations are manifestly insufficient to satisfy any of the three "state actor" tests. None of the allegations suggest that Abonmarche exercised authority "traditionally and exclusively reserved to the state. To the contrary, they suggest at most that Abonmarche provided bad advice, either negligently or intentionally, but the allegations do not accuse Abonmarche of making any decisions. Nor is there any suggestion that any state actor "encouraged or somehow coerced" Abonmarche to do anything. Finally, Plaintiffs describe a "consulting" relationship between Abonmarche and city officials, but there is nothing in the allegations asserting that Abonmarche made any decision or took any action of any kind. Accordingly, no matter how close the relationship between Abonmarche and city officials may have been, Plaintiffs have not plausibly alleged that Abonmarche is a "state actor" under the "nexus test." *See Ellison*, 48 F.3d at 195 (nexus requires proof of "a sufficiently close relationship . . . between the state and the private actor . . . that the *action taken* may be attributed to the state").

The undersigned acknowledges that it may be sufficient for purposes of asserting actions under "color of state law" to allege that the private entity corruptly "conspired" with a state actor to violate someone's rights. *See Dennis v. Sparks*, 449

U.S. 24, 29 (1980) (holding that private parties who corruptly conspired with a judge to obtain an injunction against another party was sufficient to allege that the private parties were state actors for purposes of a Section 1983 claim).  But here, Plaintiffs have failed to include a single act Abonmarche allegedly committed or a single decision it purportedly made to cause any of the city officials to do anything regarding the water system.  Instead, every allegation simply identifies Abonmarche as a consultor and an advisor.  (*See* Amended Complaint at ¶¶ 23, 24, 26, PageID.451, 454).  State and local officials regularly consult with private firms about all sorts of matters.  Providing advice or counsel alone does not make the private firm a "state actor."

In response to Abonmarche's motion, Plaintiffs' counsel significantly misstates the allegations in the amended complaint regarding that consultant.  For example, Counsel quotes the amended complaint as stating: "Abonmarche, engaged in a habitual practice of misconduct and safe drinking water regulation violations . . . ." (ECF No. 136, PageID.2746).  The amended complaint actually accuses city officials of doing that, and it simply notes that the city officials consulted Abonmarche in connection with their alleged misconduct.  (*See* Amended Complaint at ¶ 24, PageID.451).  Plaintiffs' counsel also grossly misstates the allegations in the amended complaint by suggesting that Abonmarche "acted deliberately indifferent to causing injury" and that it "caused battery via exposure to toxic levels of other chemicals." (ECF No. 136, PageID.2746).  Notably, these assertions are unsupported by any

citation to the amended complaint.  The undersigned can find no such allegations anywhere in the amended complaint.

Plaintiff counsel's bald assertions to the effect that Abonmarche was under contract to manage state properties and that it "assumed the position of the State" (*Id.* at PageID.2747) suffer from at least two disabilities.  First, nothing of the sort is alleged in the amended complaint.   Second, counsel essentially concedes the speculative nature of these assertions by stating that he needs "a substantial amount of discovery . . . to resolve whether or not [Abonmarche] is a state actor liable for unconstitutional disparate treatment, and other claims asserted against [it]."  (*Id.*). Plaintiffs cannot avoid dismissal by claiming they need discovery to find out if they can state a claim against Abonmarche.  *See, e.g., Whitaker v. Tesla Motors*, 985 F.3d 1173, 1177 (9th Cir. 2021) ("[T]he Supreme Court has been clear that discovery cannot cure a facially insufficient pleading."); *see also Iqbal*, 556 U.S. at 678-79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *cf. Twombly*, 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process.").

2. *Plaintiffs fail to plausibly allege that either F&V or Elhorn is a state actor.*

The amended complaint barely mentions either F&V or Elhorn.  Other than the case caption and the paragraph listing the defendants, the complaint references each of these firms in only one paragraph:

> In 2018, in addition to [to] Abonmarche Consultants, the City Defendants contracted Defendants Elhorn Engineering and F&V Resource Management Inc. to assist in the maintenance and management of the water plant, as well as consulting and guidance directed towards achieving compliance with state and federal water regulations; namely, a mandatory follow-up study to be conducted an concluded in response to the 2018 lead exceedance. The City Defendants and the contracted Defendants of Elhorn Engineering Co. and F&V Resource Management Inc. failed to meet the study deadline, as well as maintain an effective corrosive control mixture within a reasonable.

(Amended Complaint at ¶ 30, PageID.456-57).

At most, these allegations suggest that F&V and Elhorn were negligent in their consultation responsibilities to the city. Assisting in maintenance or even management of the water plant does not make either firm a state actor. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of [] private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."). There is nothing in these allegations to suggest that either F&V or Elhorn made any decisions regarding the water treatment. Much less is there anything to support a conclusion that they were exercising powers traditionally and exclusively reserved to the state; that they were significantly encouraged or somehow coerced by the state in any way; or that that they took any action that caused or contributed to the lead contamination, whether or not attributable to the state. *Cf. Ellison*, 48 F.3d at 195.

Plaintiffs' responses to each of the motions by F&V and Elhorn are nearly identical to each other, as well as to their response to the Abonmarche motion. (Compare ECF No. 113; ECF No. 105; ECF No. 136). They similarly misstate or obfuscate the allegations in the amended complaint. Even so, Plaintiffs' responses

fail to articulate a valid basis for finding either F&V or Elhorn to be state actors for purposes of avoiding dismissal of the claims against them.

C.    Plaintiffs' Amended Complaint Otherwise Fails to State a Claim Against Any of the Private Consultants.

The three private consultants each alternatively argue that, even if deemed to be a "state actor" for purposes of Plaintiffs' Section 1983 claims, the amended complaint fails to state a claim against it.  The undersigned agrees.

A Section 1983 claim "cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right." *Terrance v. Northville Regional Hospital*, 286 F.3d 834, 842 (6th Cir. 2002) (emphasis in original).  In other words, Plaintiffs must identify *which* defendants committed *which* acts that purportedly violated their rights.  *See id.* (citing *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986)).

The allegations in the amended complaint paint Abonmarche as a "consultor" and an "advisor" to Benton Harbor city officials.  The complaint says nothing, however, to establish that Abonmarche did anything to cause the lead contamination, much less that they did anything that would "shock the conscience."  *See Guertin*, 912 F.3d at 929-32 (dismissing from the case those who allegedly knew about the lead contamination in Flint and who failed to "protect and notify the public" of it; those who attempted to discredit a study showing the effects of the lead contamination; and those who, knowing of the lead contamination, withheld data requested by researchers, and sought to attribute the elevated contamination levels to other

causes).   The same is true for the joint allegations against F&V and Elhorn. Accordingly, and for the reasons stated in section VII, below, Plaintiffs have failed to state a due process claim against any of the three private consultants.

As explained in section V, above, Plaintiffs fail to state a "state-created-danger" claim as to any defendant, and for the reasons stated in section IV, above, Plaintiffs have failed to state a claim against any defendant under the Free Exercise Clause.

Accordingly, the undersigned judicial officer recommends that the Court dismiss all the federal claims as against each of defendants Abonmarche, F&V, and Elhorn.

VII.   The State Defendants' Rule 12(b)(6) Motion to Dismiss

The State Defendants – Governor Whitmer, EGLE directors Clark and Oswald, and MDHHS directors Gordon and Hertel – have moved to dismiss the federal claims against them for failure to state a claim under Rule 12(b)(6).  (ECF No. 101).  They argue, among other things, that the due process claims in Counts II and IV should be dismissed for failure to state a claim, and that these claims should be dismissed against them in the individual capacity on the basis of qualified immunity.  (*Id.* at PageID.1989-98).

Plaintiffs' oppose the State Defendants' Rule 12(b)(6) motion, in relevant part, by asserting the following:

> The plain and inferred language of the Grant complaint sufficiently states claims seeking plausible relief in fact and law. . . [it] alleges that the movants knowingly allowed the Plaintiffs [to] ingest toxic lead for three consecutive years in contravention of their non-discretionary duties to warn and provide freshwater, an offense akin to cruel and unusual punishment and constitutionally repugnant to any American.

61

(ECF No. 111, PageID.2545).  Plaintiffs' response in opposition to the pending motion is long on conclusory language and very short on specifics.  More to the point, the amended complaint suffers the same disabilities.

As explained below, the undersigned judicial officer finds that Counts II and IV of the amended complaint each fails to state a claim against the State Defendants, both in their official and their individual capacities, and, accordingly, the Court need not address the issue of qualified immunity.[25]

The State Defendants correctly note that the Court may consider certain evidence outside the complaint in assessing a Rule 12(b)(6) motion.  (*See* ECF No. 101, PageID.1987-88).   But, given the paucity of factual averments in the amended complaint, the undersigned need not – and did not – consider the evidence proffered by the State Defendants in making his recommendation regarding the motion to dismiss.  This does not preclude the Honorable Hala Y. Jarbou from considering this evidence should she deem it necessary and appropriate.

A.    Counts II and IV:  Due Process – Bodily Integrity

Cognizant that a Rule 12(b)(6) motion tests the sufficiency of the factual allegations in a complaint, *see, e.g., Twombly*, 550 U.S. at 545, the undersigned will

---

[25] Neither state agencies nor their officers acting in an official capacity are "persons" for the purposes of a claim under 42 U.S.C. § 1983.  *See Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989).  This is an independent basis for dismissing the Section 1983 claims in Counts II and IV of the amended complaint as against MDHHS, EGLE, and the official capacity claims against the other State Defendants.

review the factual allegations in Counts II and IV, giving Plaintiffs the benefit of every reasonable inference.

### 1. *Count II: Fourteenth Amendment Due Process (Bodily Integrity)*

Plaintiffs allege that all the defendants violated Plaintiffs' right to due process under the Fourteenth Amendment when they "exposed [Plaintiffs] to toxic contaminated lead water, failed to warn them, and caused them to suffer various ailments, property damage, mental and physical illnesses, and emotional distress associated with toxic lead-water exposure and ingestion." (Amended Complaint at ¶ 52, ECF No. 75, PageID.467).  Plaintiffs further allege that the defendants "deprived the Plaintiffs of fundamental, universally recognized liberties such as bodily integrity and access to safe drinking water," and "purposely" withheld this information from the public, which conduct would "shock the conscience of an informed person." (*Id.* at ¶ 55, PageID.468-69).

### 2. *Count IV: Violations of Bodily Integrity*

Plaintiffs allege that the State Defendants violated their rights to bodily integrity, equal protection, and due process "when they caused [Plaintiffs] to be poisoned and traumatized by their unknown exposure to and digestion of highly toxic lead water in their public water system . . . [and by] refusing to comply with statutorily mandated duties to warn." (*Id.* at ¶ 67, PageID.473).

B.   Due Process Standards – Bodily Integrity Claims

The Due Process Clause of the Fourteenth Amendment significantly restricts government action.  "[It] was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression.' "  *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (quoting *DeShaney*, 489 U.S. at 196).  "The touchstone of due process is protection of the individual against arbitrary action of government."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)).  This applies "whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations omitted)).  "[Supreme Court] cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'."  *Id.* at 846 (quoting *Collins*, 503 U.S. at 129).

There are both procedural and substantive due process components in the Fourteenth Amendment.  *See Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014).  "Procedural due process generally requires that the state provide a person with notice and opportunity to be heard before depriving that person of a property or liberty interest."  *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005).  A plaintiff must first demonstrate a deprivation of protected property or liberty interest before the court will consider whether the process afforded the plaintiff was sufficient.  *See Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002).

64

Substantive due process, on the other hand, "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). It protects "fundamental rights and liberties," including the right to bodily integrity. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). It also protects against arbitrary and capricious government action " 'that shocks the conscience' and violates the 'decencies of civilized conduct.' " *Lewis*, 523 U.S. at 846-47 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)). "[T]he central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body." *Guertin*, 912 F.3d at 919 (citing *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 269-70 (1990)).

This Court is guided by the analysis in *Guertin*, in which the Sixth Circuit analyzed bodily integrity claims relating to the lead-contaminated water in Flint, Michigan. "Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Guertin*, 912 F.3d at 922. The Sixth Circuit has adopted "the 'shocks-the-conscience' rubric to evaluate intrusions into a person's right to bodily integrity." *Id.* (citing *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 725 (6th Cir. 1996)). Accordingly, to state a substantive due process claim, Plaintiffs must plausibly allege both the "deprivation of a liberty or property interest" and "conscience shocking conduct." *Guertin* 912 F.3d

at 922.  "Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees."  *Id.* at 923.

Governmental infliction of lead-contamination on an individual is unquestionably a "harm striking at the core of [that person's] bodily integrity."  *Id.* at 925.  The remaining issue, then, is whether Plaintiffs have alleged plausible facts, which if true, establish that any of the defendants engaged in conduct relating to the lead-contamination of the Benton Harbor water supply that "shocks the conscience."  *See id.* at 925-32.  The Sixth Circuit "has consistently held that damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right."  *Terrance*, 286 F.3d at 842 (emphasis in original).

C.    <u>Plaintiffs Fail to Allege Plausible Facts Showing That Any of the State Defendants Engaged in Conduct That Shocks the Conscience.</u>

1.    *Governor Gretchen Whitmer*

The amended complaint alleges that Governor Whitmer's office "colluded" with the Federal Bureau of Investigation, the Michigan State Police, and the Berrien County Sheriff's Department to "recklessly import excessive, external law enforcement officers into the city [of Benton Harbor], unleashing them upon city residents while being fully aware that the Plaintiff Class was suffering from toxic lead exposure and were in need of fresh drinking water."  (Amended Complaint at

¶ 28, ECF No. 75, PageID.455).  Plaintiffs further allege that the governor's office and treasury department "attempted to close Benton Harbor High School, and dismantle the Benton Harbor Area Schools, citing low performance and 'economic distress.' " (*Id.*; *see also id.* at ¶ 107 (discussing the governor's public comments about the potential school closings)).  Plaintiffs complain that, during the period of time the governor was taking these actions, she failed to inform Plaintiffs of the lead-contamination in their water.  (*Id.*).

The only allegation that comes close to accusing Governor Whitmer of wrongdoing is the assertion that the governor "imported" law enforcement and considered closing schools despite the fact she was "fully aware" of the lead contamination.  But merely being aware of a problem – even a very serious one – does not constitute a violation of Plaintiffs' due process rights.  *See Guertin*, 912 F.3d at 929-30 (holding that plaintiffs' claim that MDHHS official "failed to 'protect and notify the public' of the problems with Flint's water" was insufficient to state a due process claim, noting that "the Due Process Clause is limitation only on government action," not failure to act).  Plaintiffs' conclusory statements to the effect that "[t]he Defendants acted outrageous[ly] and reckless[ly] when they intentionally caused or allowed neurotoxic, lead contaminated tap water to be sold or presented to unaware persons in the City of Benton Harbor" falls well short of the specific factual pleading required to state a constitutional claim.  *See Terrance*, 286 F.3d at 842.

2. *EGLE Director Liesl Clark*

The amended complaint references EGLE Director Liesl Clark by name only in the case caption and in the paragraph identifying the defendants. (Amended Complaint, ECF No. 75, PageID.438, 449 (¶ 22)). Moreover, there is no mention of her official position ("EGLE Director"), except to allege that "Defendant EGLE Director admitted that corrosive control measures 'take a long time . . . it takes a while' to configure an appropriate chemical mix to effectively coat toxic lead service lines," (i*d.* at ¶ 33, PageID.459),[26] and an allegation that "[i]ssues with Benton Harbor's water compliance should have been known to the State and its EGLE and [MDHHS] Departments, and their appointed directors" (*id.* at ¶ 24, PageID.452).

First, there is nothing about the EGLE Director's alleged statement or the timing of the Corrosive Control study that supports the conclusion that the "EGLE Director," whoever he or she was, "willfully exposed" Plaintiffs to contaminated tap water. (*See id.*). Second, the allegation that state officials "should have known" of issues with the Benton Harbor water supply could, at most, suggest negligence – a far cry from a due process violation. *See Lewis*, 523 U.S. at 834 ("Liability for negligently inflicted harm is categorically beneath the constitutional due process threshold . . . .").

---

[26] It is unclear whether the title "EGLE Director," as used in paragraph 33 of the amended complaint, is intended to refer to Liesl Clark or Eric Oswald, the EGLE Drinking Water Director. The next sentence identifies the gender of the "EGLE Director" as male. (*See* Amended Complaint at ¶ 33, ECF No. 75, PageID.459).

Moreover, there is nothing in the amended complaint to suggest that Director Clark personally did anything wrong; much less does it provide a basis for concluding that she engaged in conduct that "shocks the conscience." *Cf. Guertin*, 912 F.3d at 930 (holding that allegation that MDHHS official's attempt to discredit a report showing pediatric increases in blood lead levels was insufficient to state a due process claim, noting such conduct "falls well-short of conscience-shocking conduct").

### 3. *Other Individual State Defendants*

As with EGLE Director Clark, the amended complaint is devoid of any allegation of conduct personally committed by Drinking Water Director Eric Oswald. There is no reference in the amended complaint to his position, unless the generic reference to "EGLE Director" noted above in the discussion of Director Clark was intended for the EGLE Drinking Water Director. Even so, it is manifestly insufficient to state a claim for a due process violation. *See Lewis*, 523 U.S. at 834.

MDHHS Directors Robert Gordon and Elizabeth Hertel are named only in the case caption and in the paragraph identifying the defendants. (*See* Amended Complaint, ECF No. 75, PageID.438, 449 (¶ 22)). There is nothing whatsoever in the amended complaint to suggest that these officials had any involvement in the Benton Harbor water system; much less is there a single allegation of conscious-shocking conduct on either of their parts.

### 4. *Comparison to the "Flint Water Crisis Case"*

The Sixth Circuit opinion in *Guertin* is instructive to the analysis of Plaintiffs' claims against the State Defendants. In the Flint case, officials made a decision to

69

switch the source of water supply for the city from the Detroit Water and Sewage Department to "an outdated and previously mothballed water treatment plant," which drew water from the Flint River.  912 F.3d at 915.  The officials compounded the problem by dispensing the water without taking measures to address the river water's known corrosivity.  *Id.*  Not surprisingly, this resulted in significant increases in lead contamination, the results of which were both swift and seriously harmful to the residents.  *Id.*

The Sixth Circuit held that the *Guertin* plaintiffs had adequately stated a claim for a due process bodily integrity claim against certain of the named defendants.  These included those who were among the "chief architects" of the decision to switch water sources and to use a plant they knew could not safely process the water, especially in light of "the Flint River's known environmental issues and the problems associated with lead exposure."  *Id.* at 926.  Those defendants facing potential liability also included some officials from Michigan's Department of Environmental Quality, who "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications."  *Id.* at 927.

On the other hand, the Sixth Circuit reversed the denial of motions to dismiss by those defendants who were not involved in the decision-making or the implementation of the decision to switch water sources.  *See Guertin*, 912 F.3d at 929-32.  Those who were dismissed from the case included individuals who allegedly knew about the lead contamination and who failed to "protect and notify the public" of it,

id. at 929-30; those who attempted to discredit a study showing the effects of the lead contamination, *id.* at 930-31; and those who, knowing of the lead contamination, withheld data requested by researchers, and sought to attribute the elevated contamination levels to other causes. *Id.* at 932.

Key to the failure to state a claim against the latter group of defendants was the absence of any allegation that these defendants did anything to cause the consumption of lead-contaminated water. As the Court noted: "plaintiffs do not factually link [the defendants'] *inaction* to causing Flint residents to consume (or at least continue to consume) lead-tainted water. Nor do plaintiffs identify a source of law for the proposition that an individual violates the right to bodily integrity just because he failed to 'blow the whistle.'" *Id.*

The allegations in Plaintiffs' amended complaint offer nothing close to what was alleged against the officials in *Guertin*, who were directly involved in *causing* Flint residents to consume lead-contaminated water. At most, the allegations here suggest the same level of culpability as those in *Guertin* whose alleged involvement was insufficient to state a due process claim.

VIII.    The City Defendants' Motions to Dismiss.

The City Defendants have filed two motions to dismiss the federal claims against them.[27] In the first motion, they seek dismissal under Rule 12(b)(1) on the

---

[27] During the October 20, 2022, status conference, Plaintiffs' counsel advised that his clients intended to proceed against the water department only through claims against the city. Accordingly, the water department is subsumed within the City of Benton Harbor for purposes of this Report and Recommendation.

basis of sovereign immunity, and also under Rule 12(b)(6) on the basis of qualified immunity.  (ECF No. 98, 99).  In their second motion, under Rule 12(b)(6), they seek dismissal for failure to state a claim.  (ECF No. 102, 103).

A.    The City Defendants Have Failed to Establish Their Entitlement to Sovereign Immunity.

The City Defendants claim in their Rule 12(b)(1) motion that they are entitled to sovereign immunity.  (ECF No. 98, PageID.1889).  But the only potential discussion of this issue in their brief is the unsupported assertion regarding a putative equal protection claim that, "[a]bsent some showing of disparate treatment, the City Officials are entitled to governmental immunity."  (ECF No. 99, PageID.1919).  This is manifestly insufficient to warrant dismissal of any claim under Rule 12(b)(1). Moreover, the courts have already ruled otherwise.  "Sovereign immunity 'does not extend to counties and similar municipal corporations,' such as the defendants associated with the City of Flint in these cases."  *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) (quoting *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977)).  Having failed to demonstrate an entitlement to sovereign immunity, the undersigned recommends that the Rule 12(b)(1) part of the motion (ECF No. 98) be denied.

B.    Plaintiffs Amended Complaint Fails to State a Claim Regarding Any Constitutional Violation.

As explained in section V above, Plaintiffs amended complaint fails to state a cognizable claim as against any of the named defendants regarding Count III (state-created-danger claim).  Also, as explained in section IV above, the amended complaint

fails to establish Plaintiffs' standing to bring Count XIII (free exercise claim), and it fails to state a cognizable claim.

In order to bring a due process claim, Plaintiffs must show that the City Defendants not only did something wrong, but that each engaged in misconduct that was so egregious that it "shocks the conscience." (*See* Section VII-B, above). Moreover, while "[a]n official-capacity claim against a person is essentially a claim against the municipality . . . an individual-capacity Section 1983 claim must establish that the official is "personally liable for the wrong alleged." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Essex v. City of Livingston*, 518 Fed. Appx. 351, 354 (6th Cir. 2013)).

The allegations in the amended complaint fall well short of plausibly alleging such conduct, individually or officially. Accordingly, the undersigned judicial officer recommends that the City Defendants' Rule 12(b)(6) motion be granted and the constitutional claims – Counts II-IV and XIII – be dismissed. The Court need not address the City Defendants' assertion of qualified immunity.

### 1. *Individual capacity claims under Section 1983*

The amended complaint barely mentions the individual City Defendants by name, even though they are being sued in their individual as well as official capacities. Plaintiffs' cryptic references to city officials are manifestly insufficient to establish liability. *See, e.g., Moore v. Whitmer*, No. 21-1755, 2022 WL 18862075, at *2 (6th Cir., Aug. 12, 2022). Moreover, to the extent the allegations name any of the

individual defendants, they fail to establish conscience-shocking conduct required to make out a substantive due process claim.

The amended complaint mentions Michael Muhammad, the mayor of Benton Harbor by name only in the case caption and in paragraph 22, which simply lists the named defendants.  (Amended Complaint, ECF No. 75, PageID.440, 449-50).  The amended complaint otherwise only mentions the office of mayor one other time, in the following allegation:  "At no time while importing law enforcement officers into the city or pursuing school closures did the Defendants, the Governor of the State of Michigan, the Mayor of the city of Benton Harbor, nor any of their Defendant colleagues inform the Class of the neurotoxic lead-water they were consuming."  (*Id.* at ¶ 28, PageId.456).

The amended complaint mentions the names Darwin Watson and Ellis Mitchell, as well as the office they hold or held (City Manager), only in the case caption.  Notably, those names and that title are not even included in paragraph 22's list of defendants.  (*See id.* at PageID.440; *compare id.* at PageID.449).

The failure to allege by name any wrongdoing on the part of Messieurs Muhammad, Watson or Ellis alone warrants dismissal of the individual-capacity Section 1983 claims against these defendants.  *See Gilmore v. Corrections Corporation of America*, 92 Fed. Appx. 188, 190 (6th Cir. 2004) ("Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983." (citing *Flagg Brothers v. Brooks*, 436 U.S. 149, 155-57 (1978)).

Water Plant Operator Michael O'Malley is listed by name in the amended complaint only twice, other than the case caption and paragraph 22 (in which his name is misspelled) (*id.* at PageID.440, 449), and his position of Water Plant Operator is otherwise not mentioned at all.  The two allegations in which Mr. O'Malley are named include the following:

> Understaffed and poorly funded, from 2015 to 2018, [t]he Benton Harbor City Water Plant operator Michael O'Malley and his staff, with consultancy form [sic] Abonmarche, engaged in a habitual practice of misconduct and safe drinking water regulation violations, failing to maintain records, pass inspections, and or comply with state and federal laws.

(Amended Complaint at ¶ 24, PageID.451).

> Between 2018 and 2021, Defendants Michael O'Malley, private contracted Defendants, and State of Michigan EGLE specialists debated and argued back and forth about the City's inability to fund compliance with state and federal regulations and the best method to resolve the lead problem, all while Class Plaintiffs ingested contaminated water, endured the consequences, and continued to suffer from the unconstitutional nonfeasance of the Defendants' failure to warn the public.

(*Id.* at ¶ 29, PageID.456).

These allegations are patently insufficient to support either a due process or an equal protection claim.  The first articulates purely conclusory claims of misconduct, leaving the Court to speculate about what Mr. O'Malley did or did not do that warrants a finding of liability against him.  Moreover, both fall well short of plausibly alleging conduct that shocks the conscience.  There is no allegation that he did anything to cause the lead-contamination, nor that he took any affirmative action to cause anyone to ingest it.  "Due Process Clauses generally confer no affirmative

right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196); *see also Guertin*, 912 F.3d at 930 ("the Due Process Clause is a limitation only on government action"). Merely violating a statutory or regulatory obligation is insufficient to constitute a violation of constitutional magnitude. *See Collins*, 503 U.S. at 129 (holding that violation of statutory duty to warn sanitation workers of dangers of noxious gases in sewers was insufficient to constitute a due process violation).

Instead, the most that can be inferred from these allegations is that Mr. O'Malley and others working with him may have been negligent in the performance of their duties. But negligence falls at the far other end from intent to injure on the substantive due process continuum. *See Guertin*, 912 F.3d at 923; *see also Lewis*, 523 U.S. at 834 ("Liability for negligently inflicted harm is categorically beneath the constitutional due process threshold . . . .").

### 2. *Official capacity claims under Section 1983*

A Section 1983 claim asserted against a municipal officer in his official capacity is, in actuality, a claim against the municipality the officer serves. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 n.55 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). In *Monell*, the Supreme Court held that "municipalities and other local government units [are] included among those persons to whom § 1983 applies." 436

U.S. at 690.  In what is now commonly referred to as "*Monell* claims," a plaintiff must demonstrate that the purported constitutional violation was caused by some official policy, practice, or custom.  *See id.* at 690, 694.  Accordingly, in order to succeed on a claim for municipal liability, Plaintiffs must demonstrate both:  (1) the violation of a constitutional right, and (2) that the City of Benton Harbor is responsible for the violation by virtue of a policy, practice or custom.  *See Ellis v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Doe v. Claiborne County*, 103 F.3d 495, 505-06 (6th Cir. 1996)).

Plaintiffs' amended complaint fails to plausibly allege a constitutional violation by any city employee.[28]  Even reading the amended complaint indulgently, the undersigned finds that the allegations support nothing more than negligence, if that.[29]  Plaintiffs allege, for example, that "City Defendants wanted to pursue lead service line replacement, while State Defendants (EGLE)[] chose to demand corrosive control measures as the most adequate response to water plant compliance failures

---

[28] The City Defendants argue that, because Messieurs O'Malley and Watson no longer hold office, they must be dismissed.  (ECF No. 99, PageID.1921).  The problem with their argument within the context of a Rule 12(b)(6) motion is that there is nothing in the *Grant* complaint conceding this point.  The Court cannot look to pleadings in another, albeit related, case.

[29] For the purposes of this analysis, the undersigned is putting aside the fact that Plaintiffs continuously grouped all of the City Defendants together in their allegations, rather than identify by individual who purportedly did what.  It is not plausible that all the individually named City Defendants acted in complete concert in all things.  Accordingly, the undersigned is treating these allegations as relating solely to potential *Monell* liability.

and the toxic lead exceedances." (Amended Complaint at ¶ 29, ECF No. 75, PageID.456). Plaintiffs also allege that the City Defendants and its consulting firms failed to meet [a] study deadline, as well as to attain an effective corrosive control admixture within a reasonable time." (*Id.* at ¶ 30, PageID.457). But Plaintiffs also acknowledge that the City of Benton Harbor, in conjunction with the State of Michigan, "applied for a nearly $15 million grant from the [EPA] to help replace lead pipes and conduct a required corrosion control study for a city of ten thousand residents that couldn't afford such measures on its own." (*Id.* at ¶ 31, PageID.457).[30]

Without a plausible claim of a constitutional violation against any of the City Defendants, Plaintiffs cannot sustain a *Monell* claim against the City of Benton Harbor. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation."). But, even if Plaintiffs had plausibly alleged a constitutional violation, the outcome would be no different, as they have failed to plead any policy, practice or custom that purportedly caused the alleged constitutional violation. In fact, the federal claims in the amended complaint say nothing at all about Benton Harbor policies, practices or customs, with the lone exception that the Water Plant Operator "engaged in a habitual practice of

---

[30] Apparently, the city learned that it would receive a grant of "a mere $5.6 million, far less than what was needed." (Amended Complaint at ¶ 32, ECF No. 75, PageID.457). Plaintiffs fail, however, to offer anything to suggest that the grant reduction was the fault of anyone working for the city. To the contrary, Plaintiffs acknowledge that the Covid-19 pandemic was at least partially the reason for the state's inability to provide greater funding to abate the lead contamination. (*See id.* at ¶ 31, PageID.457).

misconduct and safe drinking water regulation violations, failing to maintain records, pass inspections, and or comply with state and federal laws." (Amended Complaint at ¶ 24, PageID.451).[31]  As noted above, this allegation is far too conclusory to support liability for anything, individually or officially.

### 3. *Equal Protection Claim*

To the extent Plaintiffs' are asserting an equal protection claim against the City Defendants, the allegations in the amended complaint fail to plausibly state a viable cause of action.  The only purported equal protection claim asserted against the City Defendants is that in Count IV for violations of bodily integrity, which is ostensibly predicated on the Equal Protection Clause as well as the Due Process Clause. (*See* Amended Complaint at ¶¶ 65, 67, ECF No. 75, PageID.473).[32]  Plaintiffs allege that "[t]he Defendants violated the Plaintiff Class' constitutional rights to bodily integrity, equal protection under the law, substantive, and procedural due process when they caused the Plaintiff Class to be poisoned and traumatized by their unknown exposure to and digestions of highly toxic lead water in their public water system." (*Id.* at ¶ 67, PageID.473).  None of the rest of the allegations in Count IV

---

[31] The only reference to "customs and policies" in the amended complaint is made in reference to purported customs and policies of the State of Michigan. (*See* Amended Complaint at ¶ 24, PageID.452).

[32] Count III's "state-created-danger" claim is purportedly predicated on an equal protection violation only as against the federal defendants. (*See* Amended Complaint at ¶ 56, ECF No. 75, PageID.469) ("VIOLATIONS OF EQUAL PROTECTION (Federal Defendants)").  Nevertheless, Count III fails to state an equal protection claim against any defendant as Plaintiffs fail to include factual allegations to establish that they were treated differently from other "similarly situated" persons.

provide so much as a clue as to how the City Defendants' actions or inactions constituted an equal protection violation.

The Equal Protection Clause is violated when government officials treat similarly situated persons differently without sufficient justification. *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 602 (2008); *City of Cleburne*, 473 U.S. at 439. The lead contamination in the Benton Harbor water system affected everyone who drank the tap water in that city – residents, workers, and visitors alike – irrespective of their race, ethnicity, gender, etc. In this case, everyone similarly situated with respect to the lead-contaminated water were, unfortunately, treated the same. Plaintiffs amended complaint fails to state an equal protection claim against any of the City Defendants.

4.    *Plaintiffs' responses to City Defendants' motions miss the mark.*

The undersigned has considered Plaintiffs' responses to the two City Defendants motions. (ECF No. 114, ECF No. 115). Once again, Plaintiffs' responses largely fail to meet the issues presented in the pending motions. For example, Plaintiffs attempt to attribute to the City Defendants as "affirmative acts" work done by the private consulting firms, and they address issues relating to Eleventh Amendment immunity. (ECF No. 114, PageID.2573-74). The former is unsupported by either the law or the amended complaint, and the latter is, of course, irrelevant to any of the City Defendants' arguments. Plaintiffs also suggest that the Court should "infer" from the amended complaint "assert[ions of] a habitual custom of nonfeasance and deliberate indifference" for establishing a constitutional tort claim. (*Id.* at 2574).

It appears that Plaintiffs are conflating the requirements for proving a constitutional violation with the requirements for establishing municipal liability in a *Monell* claim. Plaintiffs otherwise repeat conclusory claims, advance inapposite legal theories, and repeat general claims of racism.  (ECF No. 114, PageID.2475-80; ECF No. 115, PageID.2583-86).

IX.    Plaintiffs Fail to State a Safe Water Drinking Act Claim, 42 U.S.C. § 300g-6.

In their amended complaint Plaintiffs reference the Safe Drinking Water Act (SWDA) in several locations.  (Amended Complaint at ¶¶ 45, 48 (Count I), ¶¶ 65, 68 (Count V), and ¶¶ 73, 77 (Count V)).  Because Plaintiffs have included in each count of their amended complaint references to numerous state and federal provisions, it is unclear whether they are asserting distinct stand-alone claims under the SWDA or are merely referencing the SWDA to bolster other claims.  Nevertheless, to the extent Plaintiffs seek to assert a separate claim under the SWDA, it must be dismissed for the reasons articulated below.

A.    Plaintiffs are not Seeking Relief Permitted under the SDWA

Federal law permits "any person" to bring an action "against any person . . . who is alleged to be in violation of any requirement prescribed by or under" the SDWA.  42 U.S.C. § 300j-8(a)(1).  The remedies available under any such claim, however, are limited to "prospective injunctive relief for ongoing violations."  *Waid v. Busch*, 740 Fed. Appx. 94, 95 (6th Cir. 2018); *Guertin v. Michigan*, Case No. 16-cv-12412, 2017 WL 2418007, at *12 (E.D. Mich., June 5, 2017) ("[t]he SDWA has been interpreted to provide only for prospective injunctive relief for ongoing violations")

(collecting cases) (overruled on other grounds by *Guertin v. State*, 912 F.3d 907 (6th Cir. 2019)).

As previously noted, Plaintiffs do not allege any ongoing violations of the SDWA, but instead appear to concede that the lead contamination was abated by the end of 2021.  (*See* Amended Complaint at ¶¶ 8, 27, 29, 32, PageID.444, 454, 456, 458). Likewise, Plaintiffs have not specifically pled injunctive relief under the SDWA. Accordingly, the undersigned recommends that, to the extent Plaintiffs' amended complaint is interpreted as asserting a separate claim for violation of the SDWA, it be dismissed because Plaintiffs neither allege an ongoing violation of the SDWA nor seek injunctive relief under that statute.

B.    Plaintiffs have not Complied with the SWDA 60-Day Notice Requirement

The statute authorizing limited private causes of action under the SDWA also sets mandatory preconditions any plaintiff must satisfy.  Specifically, the statute provides that "[n]o civil action may be commenced [under § 300j-8(a)(1)] prior to sixty days after the plaintiff has given notice of such violation (i) to the Administrator, (ii) to any alleged violator of such requirement and (iii) to the State in which the violation occurs."  42 U.S.C. § 300j-8(b)(1).

While this notification requirement is not jurisdictional, *see, e.g., Michigan Department of Environmental Quality v. City of Flint*, 296 F.Supp.3d 842, 849 (E.D. Mich. 2017), "compliance with the 60-day notice provision is mandatory. . .[and] when a plaintiff fails to comply with [the] notice provision, the district court must dismiss the action as barred by the terms of the statute."  *McMillian v. Snyder*, Case No. 16-

10796, 2017 WL 492077, at *2 (E.D. Mich., Feb. 7, 2017) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 33 (1989)).

At oral argument, Plaintiffs' counsel conceded that Plaintiffs failed to comply with the statute's sixty-day notice requirement.   Accordingly, the undersigned recommends that any putative claim Plaintiffs are asserting under the SDWA be dismissed on this alternative ground.

X.    The Court Should Decline to Exercise Supplemental Jurisdiction
      Over the State Claims.

The parties have submitted their respective views on whether the Court should entertain supplemental jurisdiction over the state claims.  (*See* ECF No. 74, 78, 79, 80, 82).  Having taken these views into consideration, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over the state claims – Counts I and V-XII – and dismiss them without prejudice.

The doctrine of supplemental jurisdiction was originally established by the Supreme Court as a matter of federal common law under the term "pendent jurisdiction."  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  It is now largely codified at 28 U.S.C. § 1367.

Under that statute, "the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  The Court may decline to exercise supplemental jurisdiction over such a claim if:

(1)    the claim raises a novel or complex issue of State law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    the district court has dismissed all claims over which it has original jurisdiction, or

(4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1-4).

District courts retain broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims, discretion which "is bounded by constitutional and prudential limits on the use of federal judicial power. *See Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). "As a rule of thumb . . . [w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Id.* (citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7(1988)).

In determining whether to exercise supplemental jurisdiction after the dismissal of the federal claims, the Court must take into consideration the basis for the dismissal of the federal claims. "Not all 'pretrial dismissals' affect supplemental claims in the same manner." *Musson*, 89 F.3d at 1255. Dismissals following summary judgment do not affect the Court's ability to resolve supplemental claims. *Id.* But that is not in play here.[33]

---

[33] The only pending summary judgment motion is from the Federal Defendants, and supplemental jurisdiction does not apply to them due to the application of sovereign immunity.

84

Appellate courts closely scrutinize, however, the retention of supplemental jurisdiction following the dismissal of claims under Rule 12(b)(1) and Rule 12(b)(6). *See id.* When federal claims are dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction, "supplemental jurisdiction can *never* exist," and the "[e]xercise of jurisdiction on a theory of supplemental jurisdiction would therefore violate Article III of the Constitution." *Id.* (citing *Gibbs*, 383 U.S. at 725; *Bigelow v. Michigan Department of Natural Resources*, 970 F.2d 154, 159 (6th Cir. 1992)).

Dismissals under Rule 12(b)(6) triggers a "strong presumption in favor of dismissing supplemental claims." *Musson*, 89 F.3d at1255 (citing *Taylor v. First America Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (dictum); *Vild v. Visconsi*, 956 F.2d 560, 570 (6th Cir. 1992) (dictum); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (dictum); *Gaff v. Federal Deposit Insurance Corp.*, 814 F.2d 311, 319 (6th Cir. 1987) (reversing district court's decision to exercise supplemental jurisdiction after Rule 12(b)(6) dismissal)). One of the reasons for the Rule 12(b)(6) dismissal presumption is that it comes early in the case, before the court has expended time or resources on the state claims. *See Musson*, 89 F.3d at 1255. That presumption may be overcome by "unusual circumstances," *Gaff*, 814 F.2d at 318; for example, "some prejudice arising from relegating the case for trial in the state court." *Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d Cir. 1975).

Accordingly, the Court should decline to exercise supplemental jurisdiction for all the state law claims against the defendants whose federal claims are dismissed for failure to state a claim. Unless the Court rejects at least one of the

recommendations for Rule 12(b)(6) dismissal, that would leave no state claims in this case.

## Conclusion

For all the reasons outlined above, the undersigned judicial officer recommends the following:

1. that the Federal Defendants' Rule 12(b)(1) motion (ECF No. 92) be granted, and that all the claims against the United States and the EPA be dismissed with prejudice for lack of subject matter jurisdiction; or in the alternative as to Counts I, V-IX, and XII that summary judgment be awarded to them pursuant to Rule 56(a);

2. that EPA Administrators Michael Reagan and Debra Shore's Rule 12(b)(2) motion (ECF No. 91) be granted, and that all the individual-capacity claims against EPA Administrators Michael Reagan and Debra Shore be dismissed without prejudice for lack of personal jurisdiction;

3. that the State Defendants' Rule 12(b)(1) motion (ECF No. 95) be denied;

4. that the State Defendants' Rule 12(b)(6) motion (ECF No. 97) be granted, and that all the official and individual-capacity federal claims against the State Defendants – Governor Whitmer, EGLE, EGLE directors Liesl Clark and Eric Oswald, MDHHS, and MDHHS directors Robert Gordon and Elizabeth Hertel – be dismissed with prejudice for failure to state a claim;

5. that the F&V, Elhorn, and Abonmarche Rule 12(b)(6) motions to dismiss (ECF No. 85, 88, 128) be granted, and that all the federal claims against them be dismissed with prejudice for failure to state a claim;

6. that the City Defendants' Rule 12(b)(1) motion (ECF No. 98) be denied; and

7. that the City Defendants' Rule 12(b)(6) motion (ECF No. 102) be granted, and that all the federal claims against the City Defendants – the City of Benton Harbor, Mayor Marcus Muhammad, Water Plant Manager Michael O'Malley, and City Managers Ellis Mitchell and Darwin Watson – be dismissed with prejudice for failure to state a claim.

In addition, and for the reasons articulated above, the undersigned judicial officer recommends that the Court decline to exercise supplemental jurisdiction and to dismiss all the state-law claims – Counts I and V-XII – without prejudice, and to close this case.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: June 1, 2023

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge